Mark C. Comtois (*pro hac vice*)
mccomtois@duanemorris.com
**DUANE MORRIS LLP**
901 New York Avenue NW
Suite 700 East
Washington, DC 20001
Telephone: (202) 776-5240

Nicole K. McLaughlin (*pro hac vice*)
nkmclaughlin@duanemorris.com
Tyler R. Marandola (*pro hac vice*)
trmarandola@duanemorris.com
Brianna M. Vinci (*pro hac vice*)
bvinci@duanemorris.com
**DUANE MORRIS LLP**
30 S 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1198

Jennifer M. Lantz (SBN 202252)
jmlantz@duanemorris.com
**DUANE MORRIS LLP**
260 Homer Avenue, Suite 202
Palo Alto, CA 94301-2777
Telephone: (650) 847-4150

*Attorneys for Plaintiff*
*The Foundry Visionmongers Ltd.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **THE FOUNDRY VISIONMONGERS LTD.,**<br><br>Plaintiff,<br><br>v.<br><br>**ADOBE INC.,**<br><br>Defendant. | **Case No. 5:26-cv-2121-NW**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Reserved Hearing Date: July 22, 2026**<br>**Judge: The Honorable Noël Wise** |

# TABLE OF CONTENTS


Page

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. INTRODUCTION 1

II. STATEMENT OF FACTS 2

A. Plaintiff and Its Well-Known FOUNDRY® Marks ..... 2

B. Defendant Launches Competing “Firefly Foundry” Product ..... 5

C. The Parties Compete and Offer Complementary Products to Overlapping Customers Through Overlapping Channels ..... 6

D. Adobe Accelerates Its Marketing At The 2026 NAB Show – April 19-22, 2026 – With Foundry In Attendance ..... 7

E. Defendant Has Escalated Its Use of “Foundry” Despite Repeated Objections ..... 9

F. Defendant’s Infringement Threatens Imminent and Irreparable Harm to Plaintiff’s Brand and Goodwill ..... 10

III. LEGAL STANDARD 10

IV. ARGUMENT 11

A. Plaintiff is Likely to Succeed on the Merits of Its Claims ..... 11

1. Plaintiff’s Trademark is Valid and Enforceable ..... 11

2. There Is a Strong Likelihood of Confusion ..... 11

a) Defendant’s Infringing Mark is Legally Identical ..... 11

b) The Parties’ Products Are Highly Related ..... 13

c) Overlapping Marketing Channels Make Confusion Likely ..... 14

d) Strength of Plaintiff’s FOUNDRY® Marks Makes Confusion Likely ..... 15

e) A Lack of Clear Evidence of Actual Confusion is Neutral Given The Short Time On The Market ..... 17

f) Degree of Consumer Care Makes Confusion Likely ..... 18

g) The Intent Factor Weighs in Favor of Plaintiff ..... 19

h) Likelihood of Expansion Makes Confusion Likely ..... 20

i) The *Sleekcraft* Factors Weigh Uniformly In Favor of Confusion ..... 20

j) Plaintiff has Likewise Shown a Likelihood of Success on Its Unfair Competition Claims ..... 20

B. Plaintiff Will Suffer Irreparable Harm Absent An Injunction ..... 21

C. The Public Interest Would Be Served By An Injunction ..... 23

D. The Balance Of Equities Supports An Injunction ..... 23

E. No Bond Or A Minimal Bond Is Appropriate ..... 24

V. CONCLUSION 24

# TABLE OF AUTHORITIES

**Cases**

*AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682 (9th Cir. 2022) ....................................21

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ....................................10

*Am. Rena Int'l Corp. v. SisJoyce Int'l Co.*, 534 F. App'x 633 (9th Cir. 2013) ............................23

*Am., Inc. v. Skechers USA, Inc.*, 149 F. Supp. 3d 1222 (D. Or. 2016), *aff'd in relevant part*, 890 F.3d 747 (9th Cir. 2018) ....................................................................................................21

*Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747 (9th Cir. 2018)....................................................16

*Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284 (9th Cir. 1992)............................13

*AMF Inc. v. Sleekcraft*, 599 F.2d 341 (9th Cir. 1979) ...............................................11, 13, 17, 20

*Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521 (9th Cir. 1984) ..................................21

*Baron App, Inc. v. OpenAI, Inc.*, 2026 WL 447428 (N.D. Cal. Feb. 14, 2026) ...............17, 21, 24

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036 (9th Cir. 1999) ............................................................................................................ 13, 15, 19-20

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173 (E.D. Cal. 2016) ....23

*Cleary v. News Corp.*, 30 F.3d 1255 (9th Cir. 1994)......................................................................20

*Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245 (4th Cir. 1970).................................13

*CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051 (E.D. Cal. 2009), *aff'd*, 348 F. App'x 288 (9th Cir. 2009)....................................................................................................22

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998)..............................11

*Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125 (C.D. Cal. 2001) ............................18

*FAZE Apparel, LLC v. Faze Clan, Inc.*, 2018 WL 3830027 (C.D. Cal. May 22, 2018) ...............23

*Feldenkrais Guild of N. Am. v. Wildman*, 2018 WL 2331905 (N.D. Cal. May 23, 2018) ............12

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015)......................19

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025 (9th Cir. 2010) ..........................................................................................................................16, 18

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138 (C.D. Cal. 2012) ....................................................................................................................................24

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) ...........................................11

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707 (S.D.N.Y. 1973), aff'd, 523 F.2d 1331 (2d Cir. 1975)...........................................................18

*InSinkErator, LLC v. Joneca Co., LLC*, 163 F.4th 608 (9th Cir. 2025) .......................................... 23

*Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150 (9th Cir. 2021) .................................. *Passim*

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866 (9th Cir. 2002) ........................... 16

*JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098 (9th Cir. 2016) .............. 15-16, 19

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596 (9th Cir. 2005) .......... 11

*Lindy Pen Co. v. Bic Pen Corp.*, 796 F.2d 254 (9th Cir. 1986) .................................................... 12

*Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024 (N.D. Cal. 2009) ................... 23

*Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161 (C.D. Cal. 2017) ............................ 22

*Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385 (9th Cir. 1993) ..................................................... 14

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985) ................................................................ 24

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020 (9th Cir. 2004) .................... 18

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014) .................................... 10, 14, 17

*Porsche Cars North America, Inc. v. Manny's Porshop, Inc.*, 972 F. Supp. 1128 (N.D. Ill. 1997) 19

*Prolacta Bioscience, Inc. v. Prolact Ltd.*, 2025 WL 2078270 (C.D. Cal. June 18, 2025) ............ 11

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ......................... 22

*Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825 (C.D. Cal. 2018) ................................... 12

*Tari Labs, LLC v. Lightning Labs, Inc.*, 2023 WL 2480739 (N.D. Cal. 2023) ................. 16-17, 24

*Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894 (9th Cir. 2002) .......................................... 17

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069 (9th Cir. 2014) ..................... 18

*Westside Shepherd Rescue of Los Angeles, Inc. v. Pollock*, 2010 WL 11520159 (C.D. Cal. Sept. 20, 2010) ................................................................................................................................ 17

**Statutes**

15 U.S.C. § 1065 ....................................................................................................................... 3, 17

15 U.S.C. § 1115(b) ........................................................................................................................ 11

15 U.S.C. § 1116(a) ................................................................................................................. 10, 21

Lanham Act ............................................................................................................................ 10, 20

**Other Authorities**

Fed. R. Civ. P. 65 .......... 10, 24

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff The Foundry Visionmongers Ltd. (“Plaintiff”) respectfully submits this memorandum of points and authorities in support of its Motion for Preliminary Injunction (“Motion”).

## I. INTRODUCTION

For thirty years, the media, entertainment, and gaming industries have relied on Plaintiff’s FOUNDRY® branded products as best-in-class tools for visual effects (“VFX”). FOUNDRY® VFX products have both enabled award winners—every VFX Academy Award winner has used FOUNDRY® branded tools going back almost two decades—and won awards in their own right.

Consequently, when Defendant Adobe—which both competes against and partners with Plaintiff in the VFX space—announced that it was launching a video production tool referred to as “Firefly Foundry,” “AI Foundry,” and singularly “Foundry,” Plaintiff took action to protect its established brand. Just two days after Defendant’s October 20, 2025 announcement, Plaintiff sent a cease and desist letter based on its registered and incontestable FOUNDRY® trademarks. Nevertheless, despite a number of substantive discussions between the parties from October 2025 to February 2026, during which Plaintiff raised its concerns in an effort to find an amicable resolution, Plaintiff was left with no choice but to file a Complaint on March 11, 2026. Without any regard to Plaintiff’s stated concerns based on its rights in the FOUNDRY mark, Adobe has continued to forge ahead with its infringing conduct. Recently, on April 19, 2026, at the annual National Association of Broadcasters (“NAB”) show, attended by both Foundry and Adobe, Adobe made clear that it intends to devote enormous marketing resources to pushing “Foundry,” going so far as to advertise the new product on the Sphere in Las Vegas, whose “eye watering” estimated ***daily*** advertising costs approach Plaintiffs entire ***yearly*** marketing budget. At the same conference, an Adobe executive appeared on a panel with a Foundry employee—both to discuss their respective generative AI offerings—and was forced to clarify that Adobe’s “Firefly Foundry” is “not to be confused with Foundry, Foundry.” Such awkward statements highlight the likelihood of confusion, rather than resolving it.

///

///

The NAB show, including Defendant's marketing leading up to it, show why Plaintiff is being and will be irreparably harmed by waiting until dispositive motions or trial to vindicate its rights. Plaintiff and Defendant are directly overlapping in their marketing, their products, and their target customers and prospective employees. And Defendant has now made clear that it is targeting the very core of Plaintiff's market with its "Foundry" branding: VFX and content creation in the media and entertainment space. Given the massive size of Defendant's marketing budget, and its stated intent to embed Adobe Firefly Foundry in every aspect of the Adobe ecosystem, Defendant is threatening to wrest control of Plaintiff's 30-year old brand away from it as the case awaits trial in the ordinary course. Plaintiff therefore asks the Court to protect its rights—and its ability to obtain meaningful relief in this case—by granting the requested preliminary injunction.

The equities in this case, and the public interest, likewise strongly support preliminary relief. Notably, Defendant will suffer no harm from having to stop the use of "Foundry" until the merits of this case can be decided. Its "Foundry" offering has barely launched, as Defendant's website still urges customers who are interested to "get in contact with Adobe so we can understand your specific needs and goals." And Defendant already employs a serviceable (and non-infringing) name for an identical service that it could easily deploy in the interim: Firefly Custom Models. *See* Declaration of Tyler Marandola ("Marandola Decl."), Ex. 23. In short, Foundry is highly likely to prevail on the merits, will be subject to irreparable harm in the event it does not obtain preliminary relief, and the relief Plaintiff seeks will not harm Defendant pending the outcome of this case because it has yet to roll the infringing product out in any meaningful sense.

## II. STATEMENT OF FACTS

### A. Plaintiff and Its Well-Known FOUNDRY® Marks

The VFX industry encompasses artists, technologists, and software developers who create or edit things that are not captured by a camera on set, such as digital environments, computer-generated characters, simulated weather, fire, water, and explosions, textures, and the integration of live-action footage with computer-generated content. VFX is now a core component of nearly every modern film, television series, streaming program, commercial, and a multitude of other visual media. VFX work is

generally performed during the "post-production" stage of a project—the period after principal photography has concluded—when raw footage is assembled, refined, and combined with computer-generated elements to produce the finished product. Declaration of Alex Foulds ("Foulds Decl.") ¶ 3.

Founded in 1996, Plaintiff has spent nearly thirty years building creative software for the media, entertainment, and gaming industries. Foulds Decl. ¶¶ 1, 4, 7. Plaintiff's flagship product, Foundry Nuke, is a VFX application used to combine, layer, and manipulate footage into a finished shot, and is widely regarded as the industry standard for high-end film and television. Foulds Decl. ¶ 4. Plaintiff also offers Mari (high-resolution 3D digital painting and texturing), Katana (look-development and lighting), Flix (story-development and storyboarding, with direct integration to third-party creative applications such as Adobe Photoshop), and Nuke Stage (built for virtual production). Foulds Decl. ¶¶ 5, 32.

Plaintiff's Foundry products are relied upon by VFX professionals and technical teams at the world's leading studios—including ILM, DNEG, Walt Disney Animation Studios, Wētā FX, Pixar, Marvel, Netflix, Framestore, and Skydance Animation—as well as independent studios, content creators, and amateur users. Foulds Decl. ¶¶ 6–7. Plaintiff's software has been used in the making of every VFX Academy Award-winning film since at least 2007, and was integral to recent productions including Dune: Part Two and the series Heated Rivalry. Foulds Decl. ¶¶ 7–8. The core of Foundry is its FOUNDRY® brand. Plaintiff owns the <FOUNDRY.COM> domain name and a family of FOUNDRY trademark registrations, including the incontestable Registration Nos. 5,619,985, 5,619,986, and 5,619,987, which cover, among other things, computer software for visual effects, digital image creation, 3D modeling, animation, and related content-creation services (collectively, the "FOUNDRY® Marks"). Foulds Decl. ¶¶ 17–20; Marandola Decl. Exs. 24–26[1]. Each of those registrations is incontestable under 15 U.S.C. § 1065. Plaintiff uses the FOUNDRY® Marks prominently in its marketing, including on www.foundry.com and at industry trades shows. Foulds Decl. 21. Consumers who use Plaintiff's products are presented with the FOUNDRY® Marks:

///

[1] For ease of reference, the exhibits attached to the declarations are continuously numbered. Exhibits 1-15 are attached to the Declaration of Alex Foulds; Exhibits 16-22 are attached to the Declaration of Steven Shapiro; and Exhibits 23-39 are attached to the Declaration of Tyler Marandola.




Foulds Decl. ¶ 22.

The FOUNDRY® brand has been recognized with industry-leading honors, including the 2020 Engineering Emmy® Award for Nuke; the 2006 and 2018 Academy of Motion Picture Arts & Sciences Scientific and Engineering Awards for Foundry products; the 2021 Hollywood Professional Association Engineering Excellence Award for Nuke; Best of Show at the 2025 NAB Show for Nuke Stage; an Emerging Technology nomination at the 23rd Annual VES Awards for Foundry's CopyCat product; and a 2026 NAB Show Product of the Year Award for Nuke 17.0 in the Graphics, VFX, and Switchers category. Foulds Decl. ¶ 9; Declaration of Steven Shapiro ("Shapiro Decl.") ¶ 5.

Plaintiff has also been at the forefront of AI-enabled content creation. Foulds Decl. ¶¶ 10–11. The Foundry CopyCat machine-learning tool—trained on artists' own source material rather than undisclosed third-party data—has been deployed in major motion pictures, including Dune: Part Two, where it allowed VFX artists to produce 30,000 distinctive blue eyes from 280 shots and saved thousands of hours of manual work. Foulds Decl. ¶¶ 7, 11–13. To deepen its AI capabilities, Plaintiff recently acquired Griptape, a pioneer in enterprise-grade AI orchestration that allows users to create and run AI agents that generate video imagery for use across FOUNDRY® products. Foulds Decl. ¶¶ 14–16.

Plaintiff has invested significant resources to develop the goodwill associated with the FOUNDRY® Marks. Foulds Decl. ¶¶ 17-19, 23-25, 55-56. The Foundry website attracts roughly 1.5 million unique users per year; its social-media channels collectively reach hundreds of thousands of subscribers and followers; and tens of thousands of additional users are trained on FOUNDRY® products through student licenses. Foulds Decl. ¶¶ 28-30. Approximately 60% of Plaintiff's revenue

comes from enterprise customers spending more than $100,000 per year, while the other 40% comes from thousands of small and medium sized businesses and individuals. Foulds Decl. ¶ 31.

### B. <u>Defendant Launches Competing "Firefly Foundry" Product</u>

On October 20, 2025, Defendant announced a generative-AI model capable of producing text, images, video, audio, vector, and 3D content, and fine-tuned using a customer's own data. Foulds Decl. ¶ 34. Defendant initially branded the offering "AI Foundry," with Adobe's Vice President of GenAI New Business Ventures, Hannah Elsakr, declaring that "AI Foundry builds on years of Adobe innovation and expertise…to help businesses solve today's most complex content and media production challenges." Marandola Decl. Ex. 27. After receiving Plaintiff's October 22, 2025 cease-and-desist letter, Defendant modified the brand name to "Firefly Foundry," but Defendant and the trade press have consistently shortened that name to "Adobe Foundry" or only "Foundry." Foulds Decl. ¶¶ 35–37, 40, 53; Marandola Decl. Ex. 28 (compilation of third-party uses). And Plaintiff promptly informed Defendant that the new phrasing—which still incorporated FOUNDRY in its entirety and is often not presented with "Firefly"—was still likely to cause consumer confusion. Marandola Decl. Ex. 29. Defendant markets the product as "responsibly trained on your brand or franchise—to solve complex media and content challenges," a description that closely tracks Foundry's description of its own CopyCat solution: "CopyCat in Nuke gives you the tools to train your models with your own data." Foulds Decl. ¶¶ 42–43.

Users of Defendant's product also see a user interface that not only presents "Foundry" as a standalone tool, but as an ***alternative*** to "Firefly" models:



*See* Marandola Decl., Ex. 30.

Defendant's Chairman and CEO recently made clear that Defendant is targeting its infringing Foundry offering at a broad set of potential customers: "So the vision clearly is that for ***every single brand***, if you're a ***consumer company or for every single TV show or a movie***, we can create a Foundry specifically for that particular franchise . . . because the ability to help with the automation of that content and production is massive." Marandola Decl., Ex. 31 (Trans. of Dec. 10, 2025 Earnings Call), at 16.

### C. The Parties Compete and Offer Complementary Products to Overlapping Customers Through Overlapping Channels

Plaintiff and Defendant have a long history of providing competing and complementary products in the content-creation and VFX space. Foulds Decl. ¶ 43. Adobe After Effects VFX software competes directly with Foundry Nuke, and Adobe Substance texturing software competes with Mari by Foundry. Foulds Decl. ¶ 43. Notably, Defendant has licensed Plaintiff's Keylight greenscreen-removal technology for incorporation in After Effects since 2003, and prominently identifies "Foundry Keylight" as a third-party plug-in within After Effects, so every After Effects user who pulls up the Keylight feature sees the FOUNDRY® trademark inside Defendant's software. Foulds Decl. ¶¶ 33.

Defendant markets Firefly Foundry as covering the same end-to-end media-production workflow that Foundry serves—"from concepting through post-production"—and as "seamlessly available across the Adobe ecosystem," including within Adobe Premiere and After Effects. Foulds Decl. ¶¶ 53, 59; Marandola Decl. Ex. 30 (Firefly Foundry Overview Video). Both Foundry CopyCat and Griptape and Adobe Firefly Foundry can be trained on a particular customer's intellectual property to generate on-brand multi-modal content (image, video, text, audio, vector, and 3D). Foulds Decl. ¶¶ 13, 15, 39–42.

The parties also reach customers through the same trade organizations and trade shows. Foulds Decl. ¶¶ 48-49. Both Defendant and Plaintiff are members of ASWF, AOUSD, and the Rookies, and in just the past year both have appeared—often as sponsors at the same tier—at the HPA Tech Retreat, the NAB Show, FMX, and SIGGRAPH. Foulds Decl. ¶¶ 48-49. Composition artists routinely combine the two parties' products in tutorials and production workflows. Foulds Decl. ¶¶ 32, 43-44.

Defendant's marketing of Firefly Foundry is targeting Plaintiff's core market. In late January 2026, Defendant announced that it was "collaborating with industry leaders" in media and entertainment to roll out the Foundry product. Foulds Decl. ¶ 58. Defendant has already pitched its Foundry product to Walt Disney Imagineering, with whom Plaintiff has a longstanding relationship, as well as others of Plaintiff's historical customers. Foulds Decl. ¶ 46.

### D. Adobe Accelerates Its Marketing At The 2026 NAB Show – April 19-22, 2026 – With Foundry In Attendance

The 2026 NAB Show, held in Las Vegas from April 18–22, 2026, is the largest trade show for the media, entertainment, and technology industries; more than 58,000 people registered. Shapiro Decl. ¶ 3. Plaintiff attended with approximately fifteen representatives, including its Chief Executive Officer Jody Madden and Chief Technology Officer Steven Shapiro, and Plaintiff received a Product of the Year Award for Nuke 17.0. Shapiro Decl. ¶¶ 2, 4–6. Adobe also had multiple representatives in attendance, with its Vice President Hannah Elsakr featured as a speaker who, according to her NAB profile, "launched…Firefly Foundry to scale [generative AI]." Shapiro Decl. ¶ 6.

///

///

///

///

///

///

///

///

///

///

///

///

///

During the NAB Show, Defendant rented advertising space on the Las Vegas MSG Sphere—visible to NAB attendees and to the broader public throughout the city—displaying the message "Powered by Adobe Firefly Foundry."




Foulds Decl. ¶¶ 54; Shapiro Decl. ¶ 15. The Sphere is one of the most expensive pieces of marketing real estate in the world, with estimates from 2023 putting a single ***day*** of advertising at $450,000. *See* Marandola Decl. Ex. 32., (accessed at https://news3lv.com/news/local/the-worlds-most-unique-billboard-the-hefty-price-tag-to-advertise-on-the-vegas-sphere).

At an April 19, 2026 panel titled "Building AI Agent Solutions on NVIDIA," held on the show floor before approximately fifty attendees, Ms. Elsakr herself acknowledged the risk of confusion

between Defendant's Foundry product and the FOUNDRY® Marks. Shapiro Decl. ¶¶ 11–12. While describing how Defendant's Foundry product can be used in generative-AI workflows, Ms. Elsakr told the audience that Adobe Foundry was "not to be confused with Foundry, Foundry." Shapiro Decl. ¶ 12. Notably, Plaintiff's own Jason Schleifer, of Foundry Griptape, was a co-panelist. Shapiro Decl. ¶ 12.

Earlier that same morning, at an invitation-only "Breakfast Briefing" attended by approximately 100–120 Adobe customers, Defendant's field CTO presented its new product as "Firefly Foundry" but thereafter referred to it almost exclusively as "Foundry" standing alone. Shapiro Decl. ¶¶ 8–9. NVIDIA's CEO Jensen Huang likewise addressed the Adobe Summit during the NAB Show and discussed NVIDIA's partnership with Adobe to "creat[e] customer-specific, brand-specific, AI models on the Firefly Foundry." Shapiro Decl. ¶ 7; Marandola Decl. Ex. 33.

### E. <u>Defendant Has Escalated Its Use of "Foundry" Despite Repeated Objections</u>

Plaintiff promptly objected to Defendant's use of Foundry as a trademark for its new product. On October 22, 2025—two days after Defendant's launch announcement—Plaintiff's counsel sent Defendant a cease-and-desist letter explaining that Defendant's use was likely to cause confusion with Plaintiff's incontestable FOUNDRY® Marks. Marandola Decl. Ex. 29. The parties subsequently exchanged correspondence and met by videoconference, but Defendant declined to cease using the term "Foundry," prompting Plaintiff to file this action on March 11, 2026. Compl. ¶¶ 1–11.

Rather than ceasing the infringing conduct, Defendant has accelerated and intensified its use. Foulds Decl. ¶¶ 53–55, 57-59. Defendant's senior executives have continued to use "Foundry" as a shorthand for the product, including in LinkedIn posts just last month. Foulds Decl. ¶ 53. Industry publications such as Newscast Studio, Jon Peddie Research, Forbes, TechCrunch, Venture Beat, Tech Radar, and Pulse 2.0 have followed Defendant's lead, referring to the product as "Firefly Foundry," "Adobe Foundry," or only "Foundry." Foulds Decl. ¶¶ 37, 52; Marandola Decl. Ex. 28. And on May 1, 2026, just last week, Defendant filed a trademark application seeking to register FIREFLY FOUNDRY as its own trademark. Marandola Decl. Ex. 39.

### F. Defendant's Infringement Threatens Imminent and Irreparable Harm to Plaintiff's Brand and Goodwill

Defendant's continued and escalating use of the FOUNDRY mark threatens irreversible damage to Plaintiff's brand, reputation, and goodwill. Foulds Decl. ¶¶ 55-57. Plaintiff spends roughly $1 million per year marketing the FOUNDRY® brand; by contrast, Defendant reportedly spent more than $1 billion in marketing in 2025. Foulds Decl. ¶ 56. Defendant's stated intent is for "Foundry" to be "seamlessly available across the Adobe ecosystem," including within After Effects and other Adobe applications used by overlapping customers. Foulds Decl. ¶¶ 41, 59.

Because the parties' goods serve overlapping needs in the same workflows, consumer confusion will cause Plaintiff to lose control of its reputation and threaten its market position—losses that are impossible to quantify in monetary terms and may be impossible to remedy with a damages verdict or even a permanent injunction at the conclusion of this case. Foulds Decl. ¶¶ 60-61. The threat that consumers will think Defendant's use of Foundry is associated with Plaintiff—thereby tying Plaintiff's reputation to Defendant's product—is not hypothetical: Defendant already licenses the Foundry Keylight technology and touts it as an Academy Award-winning feature of After Effects, making it especially likely that consumers will mistakenly believe that Defendant's "Foundry" reflects an additional license, partnership, or acquisition. Foulds Decl. ¶¶ 33–34, 41-43, 61.

## III. LEGAL STANDARD

The Lanham Act and Fed. R. Civ. P. 65(b) provide the Court with "power to grant injunctions, according to the principles of equity and upon such terms as the Court may deem reasonable." 15 U.S.C. § 1116(a). A moving party is entitled to a preliminary injunction if it establishes that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable injury if the relief is denied, (3) the balance of equities tips in its favor, and (4) the relief is in the public interest. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014). Under 15 U.S.C. § 1116(a), a showing that Plaintiff is likely to succeed on the merits gives rise to a "rebuttable presumption of irreparable harm." Moreover, under the Ninth Circuit's "sliding scale approach," a preliminary injunction may issue where "serious questions going to the merits were raised and the balance of hardships tips sharply in [the movant's] favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

Injunctive relief is appropriate here to avoid irreparable harm from Defendant's ongoing use of Plaintiff's incontestable FOUNDRY® Marks.

## IV. ARGUMENT

### A. Plaintiff is Likely to Succeed on the Merits of Its Claims

To prevail on a claim for trademark infringement, a plaintiff must demonstrate: (i) "a valid mark"; and (ii) that defendant's use of its infringing mark "is likely to cause confusion, or to cause mistake, or to deceive." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). Plaintiff satisfies those elements here.

#### 1. Plaintiff's Trademark is Valid and Enforceable

Plaintiff owns the FOUNDRY® Marks, including incontestable Trademark Registration Nos. 5,619,985, 5,619,986, and 5,619,987. Marandola Decl., Exs. 24-26; Foulds Decl. ¶ 20. These trademark registrations constitute conclusive evidence of the validity of the marks, Plaintiff's ownership of them, and Plaintiff's exclusive right to use them in commerce. 15 U.S.C. § 1115(b); *Prolacta Bioscience, Inc. v. Prolact Ltd.*, 2025 WL 2078270, at *15 (C.D. Cal. June 18, 2025) ("Registered marks that have been declared incontestable are afforded a conclusive presumption of validity.").

#### 2. There Is a Strong Likelihood of Confusion

In evaluating likelihood of confusion, courts in the Ninth Circuit are guided by the eight *Sleekcraft* factors: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998); *AMF Inc. v. Sleekcraft*, 599 F.2d 341, 348-49 (9th Cir. 1979).

##### a) Defendant's Infringing Mark is Legally Identical

The "greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). Marks are confusingly similar when they have similar sound, sight, and meaning, and "similarities weigh more heavily than differences." *Sleekcraft*, 599 F.2d at 351.

Defendant's "Firefly Foundry" ("Infringing Mark") incorporates Plaintiff's FOUNDRY® mark in its entirety. Further, "Firefly Foundry" has been, and continues to be, shortened to "Foundry" by Defendant and third parties. Marandola Decl., Ex. 28. Thus, Defendant's Infringing Mark is identical in sound, sight, and meaning to Plaintiff's FOUNDRY® Marks, which strongly favors finding a likelihood of confusion. *Feldenkrais Guild of N. Am. v. Wildman*, 2018 WL 2331905, at *5 (N.D. Cal. May 23, 2018) (granting preliminary injunction where marks were "identical"); *Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 838 (C.D. Cal. 2018) (Because the marks at issue were "virtually indistinguishable in both sound and appearance, the similarity of the marks weighs heavily in favor of finding a likelihood of consumer confusion."); *Lindy Pen Co. v. Bic Pen Corp.*, 796 F.2d 254, 257 (9th Cir. 1986) (holding that likelihood of confusion was "overwhelming" where both parties sold pens with virtually identical marks). Defendant likewise presents its "Foundry" brand in a manner similar to Plaintiff, such as on the Las Vegas Sphere where Defendant's use even mimicked Plaintiff's common stylization of including a period after the word Foundry, in similar *sans serif* font[2]:

| | |
|---|---|
| FOUNDRY. | Powered by Adobe Firefly Foundry. |

Defendant's occasional use of "Adobe" or "Firefly" alongside Foundry compounds the confusion. Because Defendants intends to incorporate its Foundry product "across the Adobe ecosystem," consumers who see "Foundry" alongside Adobe are likely to mistakenly believe that Defendant's Foundry product is approved or licensed by Plaintiff. *See* McCarthy on Trademarks and Unfair Competition (5th ed.) ("McCarthy") § 23:43 (Use of a defendant's house mark with the infringing mark "may merely suggest to customers that plaintiff has licensed defendant or that the parties are

[2] Defendant has claimed in the parties' pre-suit correspondence that its use of "Foundry" has a "descriptive quality" as a "place where digital products are 'forged.'" Marandola Decl., Ex. 29, at 2. That, of course, is not a traditional use of "foundry," which is a place where metal castings are produced. *See, e.g.*, Marandola Decl., Ex. 38 (accessed at https://www.dictionary.com/browse/foundry). Regardless, ***Defendant's*** use is plainly as a trademark; Adobe routinely capitalizes "Foundry" and uses it as a brand alongside words that actually describe its product, like "models" and "multimodal generative AI." *See* Marandola Decl., Ex. 23 ("Firefly Foundry models are commercially safe and seamlessly available across the Adobe ecosystem….").

affiliated in some other way.”). That consumer perception would be consistent with the fact that Defendant already ***does*** license FOUNDRY® technology. Foulds Decl. ¶ 33. Thus, Defendant’s use of other marks in conjunction with Foundry is “an aggravation” of the confusion because the other marks “reinforce[] the association between” the mark and the junior user (here, Defendant). *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1164-65 (9th Cir. 2021); *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir. 1992). This factor strongly favors Plaintiff.

**b) The Parties’ Products Are Highly Related**

“Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods.” *Brookfield Commc’ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1055-56 (9th Cir. 1999). However, direct competition of goods and services is not a requirement for likelihood of confusion. *Commc’ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1253 (4th Cir. 1970) (“Complementary products, or services, are particularly vulnerable to confusion.”); *see also Sleekcraft*, 599 F.2d at 350 (“For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists.”). Even where similar marks are seen on noncompetitive, but related goods, confusion as to affiliation or connection can occur. It follows that Plaintiff “need not establish that the parties are direct competitors to satisfy the proximity or relatedness factor.” *Ironhawk Techs.*, 2 F.4th at 1163. Instead, “related goods (or services) are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark.” *Id.* (internal quotations omitted). Goods and services are related when “similar in use and function” or “sold to the same class of purchasers.” *Id.*

In this case, the parties offer products that are both complementary to each other and products that are in direct competition. Foulds Decl. ¶¶ 41, 43, 60. For instance, Defendant offers its After Effects compositing software, which competes directly with Plaintiff’s Nuke compositing software. *Id.* After Effects will incorporate Defendants “Foundry” tool. Foulds Decl., ¶ 33. And Defendant’s SUBSTANCE texturing software competes with Plaintiff’s MARI texturing software, and there are numerous examples of consumer comparisons. Foulds Decl., ¶¶ 30, 43. At the NAB show, Plaintiff and Defendant won product of the year awards in the same category (Graphics, VFX, Switchers). *Id.* at ¶¶ 9, 50 . Defendant’s

introductory video for Adobe Firefly Foundry explains that its Foundry tool is meant to cover ***every*** aspect of video production, "[f]rom static images to full storyboards, from animatics to final frame," and to "work seamlessly in Adobe apps and workflows." Marandola Decl., Ex. 30, Transcript: Firefly Foundry Overview Video. As the video shows, customers will be able to select "Foundry" in existing Adobe products like Premiere Pro or After Effects for use for video editing. *See supra*, pages 5-6 (showing Foundry as one of the dropdown options within an Adobe application). Defendant presents "Foundry" as a trademark, capitalized alongside "Firefly" models. A consumer who sees "Foundry" as an option in Adobe applications is thus likely to think that Adobe has partnered with Plaintiff Foundry to offer its tools through Adobe, just like it has partnered with other companies, and with Plaintiff itself in the past. The "similarity in use and function" between the parties' products and services strongly supports a finding of relatedness in the marketplace. *Ironhawk*, 2 F.4th at 1163.

This overlap is only growing. On about April 29, 2026, Defendant just hired a "Staff AI VFX Engineer" to its "Firefly Foundry" team, highlighting its push into Plaintiff's core market. *See* Marandola Decl., Ex. 34 On May 1, 2026, Defendant posted a job advertisement for another "Staff AI VFX Engineer" for its Foundry product, presenting the brand not only as a standalone product, but as its own company or division, thus compounding the confusion with Plaintiff: "At Foundry, we approach this work with a deep respect for the artistry and craft of VFX." Marandola Decl. Ex. 35. Defendant's job posting explicitly seeks candidates who have experience with FOUNDRY® (that is, Plaintiff's) Nuke, and announces—for the first time—Defendant's intention to integrate Defendant's Foundry product ***into*** Nuke, under "What You'll Do": Define how Foundry models plug into Nuke . . . ." *Id.* In short, in the near future, Defendant's plan is to have its Foundry-branded product integrate directly into Plaintiff's FOUNDRY®-branded product. Confusion is practically inevitable.

**c) Overlapping Marketing Channels Make Confusion Likely**

"Convergent marketing channels increase the likelihood of confusion." *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (quotations omitted). "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful*, 775 F.3d at 1130. "Marketing channels can converge even

when different submarkets are involved so long as 'the general class of ... purchasers exposed to the products overlap.'" *Id*. (quoting *Sleekcraft*, 599 F.2d at 353).

In this case, there is clear overlap in customer bases. The parties both sell FOUNDRY branded goods and services through overlapping channels of trade, are members of the same trade organizations (ASWF, AOUSD, and the Rookies), and present products to consumers at the same trade shows. Indeed, in just the last eight months, Plaintiff and Defendant appeared at four of the same trade shows (HPA, NAB, FMX, and SIGGRAPH), often as sponsors. Foulds Decl. ¶¶ 48-49, 54. Indeed, employees of Plaintiff and Defendant appeared on the same panel at NAB, emphasizing the relatedness of their products and customer bases. Further, customers in the VFX industry can use Adobe's Firefly generative AI tool and the FOUNDRY®-branded Nuke compositing software as complementary tools. Foulds Decl. ¶¶ 48-49; Shapiro Decl. ¶¶ 11-12. The parties' products are likewise marketed to overlapping classes of purchasers – businesses, advertising agencies, in-house advertising departments, recreational filmmakers/content creators, and AI and digital technology enthusiasts. Foulds Decl. ¶¶ 41-42, 48-49; Shapiro Decl. ¶ 13; *Ironhawk*, 2 F.4th at 1163.

Defendant's recent marketing of its products, including its Foundry product, targets the same consumers Plaintiff's core media and entertainment industry, and apes Plaintiff's marketing claims. For example, Plaintiff has long marketed its product on the strength of its reputation in the film industry, a natural angle given that Plaintiff's products have been used as part of "[e]very VFX Oscar winner in the past decade," and Plaintiff's tools are "[t]rusted by the world's top studios and brands." *See* Marandola Decl. Ex. 36 (accessed at www.foundry.com, last visited April 27, 2026). Defendant markets its products the same way, claiming that "[f]or decades, Adobe has stood at the heart of filmmaking," that its "technology has earned multiple Academy Awards for scientific and technical achievement," and that "[t]his year, 85 percent of films premiering at the Sundance Film Festival were created using Adobe tools. *See* Marandola Decl., Ex. 37. This factor thus strongly favors Plaintiff.

**d) Strength of Plaintiff's FOUNDRY® Marks Makes Confusion Likely**

The scope of protection for a mark increases with its strength. *Brookfield*, 174 F.3d at 1058. In evaluating mark strength, courts consider both the mark's commercial strength and conceptual strength.

*JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016). By virtue of the success of Plaintiff's industry-standard FOUNDRY® branded tools, the FOUNDRY® Marks are commercially strong as well. Commercial strength "is based on actual marketplace recognition," *id*. at 1107, and Plaintiff is a household name in the VFX industry, as evidenced by its award-winning products, tens of millions in sales, and recognition in earned media. Foulds Decl. ¶¶ 25-31; *see Tari Labs, LLC v. Lightning Labs, Inc.*, 2023 WL 2480739, at *4 (N.D. Cal. 2023) (finding mark commercially strong based on "significant press attention" and "strong social media presence"); *adidas Am., Inc. v. Skechers USA, Inc*., 890 F.3d 747, 754-56 (9th Cir. 2018) (finding "tremendous commercial success and market recognition" based on "considerable amount of unsolicited media coverage").

In addition, Plaintiff's FOUNDRY® Marks are also conceptually strong, suggestive marks. A mark's conceptual strength is analyzed by classifying it "along a spectrum of five categories ranging from strongest to weakest: arbitrary, fanciful, suggestive, descriptive, and generic." *JL Beverage*, 828 F.3d at 1107. Descriptive marks "define a particular characteristic of the product in a way that does not require any imagination"—*e.g.*, the mark "Japan Telecom" for a telecom business catering to the Japanese community. *Id.*; *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 873 (9th Cir. 2002). Suggestive marks are stronger than descriptive marks and, like fanciful and arbitrary marks, are deemed inherently distinctive. *See Ironhawk*, 2 F.4th at 1162. Suggestive marks "suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product." *JL Beverage*, 828 F.3d at 1107. Here, Plaintiff's FOUNDRY® Marks are suggestive (if not arbitrary) because it requires significant imagination to associate it with Plaintiff's products and services (rich media AI-enabled digital content creation and VFX solutions). *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1033 (9th Cir. 2010) (suggestive marks require a consumer to "use imagination or any type of multistage reasoning to understand the mark's significance") (citations omitted); 1 McCarthy on Trademarks and Unfair Competition § 11:12 (5th ed.) ("[F]or legal purposes, there is little, if any, reason to make the distinction [between arbitrary and suggestive marks] . . . '[a]rbitrary' and 'suggestive' marks fall within the same legal pigeon hole of classification in that neither category requires proof of secondary meaning for legal protection . . . .").

And even if FOUNDRY *were* descriptive (it is not),[3] the strength of mark factor would still favor Plaintiff due to the identity of the parties' marks and the FOUNDRY mark's notable commercial strength.[4] *See Baron App, Inc. v. OpenAI, Inc.*, 2026 WL 447428, at *5 (N.D. Cal. Feb. 14, 2026) (commercial strength of plaintiff's mark caused strength factor to weight in plaintiff's favor even though mark was "conceptually weak"); *Westside Shepherd Rescue of Los Angeles, Inc. v. Pollock*, 2010 WL 11520159, at *1, 4-7 (C.D. Cal. Sept. 20, 2010) (strength factor favored plaintiff even though mark was descriptive where mark had secondary meaning and infringing mark was identical).

Despite the strength of the FOUNDRY® Marks, Defendant's massive marketing budget—some 1,500 times larger than Plaintiff—poses a substantial risk that Defendant's use of the FOUNDRY mark will become significantly more commercially dominant, thus "swamp[ing] the reputation" of Plaintiff's mark and adversely impacting its business and reputation in the market. *Tari Labs*, 2023 WL 2480739, at *4. Defendant's stated goal is to dominate the industry with its AI tools, including "Firefly Foundry": "[a]nd it doesn't just stop at entertainment. Adobe is transforming every industry, helping teams move from AI experimentation to value realization. In fact, 99 percent of Fortune 100 companies have used AI in an Adobe app." Marandola Decl., Ex. 37, at 5. This factor thus strongly favors Plaintiff.

**e) A Lack of Clear Evidence of Actual Confusion is Neutral Given The Short Time On The Market**

Evidence of actual confusion "constitutes persuasive proof that future confusion is likely." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) ("If enough people have been *actually* confused, then a *likelihood* that people are confused is established."). However, given the "difficulty in garnering such evidence," trademark infringement does not require proof of actual confusion, and its absence at this preliminary relief stage is of minimal importance. *Sleekcraft*, 599 F.2d at 353; *Pom Wonderful*, 775 F.3d at 1131 (district court erred in weighing absence of actual confusion evidence

---

[3] An incontestable trademark—as Plaintiff's FOUNDRY® Marks are—cannot be challenged on the basis that they are merely descriptive. 15 U.S.C. § 1065.

[4] In a letter to Plaintiff dated November 7, 2026, Defendant suggested that the term "foundry" is commonly used by software and digital media companies which renders the FOUNDRY mark less distinctive. Even if that were true, generic software and digital media companies are not closely related to the content creation and VFX tools offered by the parties and therefore not relevant to the analysis of the commercial strength of Plaintiff's mark.

against plaintiff seeking preliminary injunction); *see also Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072-73 (9th Cir. 2014).

Here, Adobe announced its Foundry product only six months ago, and for the time being it appears to remain in very limited release, without any public pricing or download availability. Defendant's own FAQ for the product directs customers interested in its Foundry product to "get in contact with Adobe so we can understand your specific needs and goals." Foulds Decl. ¶ 47. It is thus not surprising that actual confusion evidence—at least actual confusion evidence to which Plaintiff is privy—has not yet come to light. But it is clear that Defendant recognizes the likelihood of confusion here, given its executive's own need to clarify just last week that Adobe Firefly Foundry is "not to be confused with the Foundry, Foundry." Shapiro Decl. ¶ 12. The implication is clear: consumers who hear "Foundry" are likely to think of the ***real*** Foundry—Plaintiff—unless told otherwise.

The actual confusion factor is therefore, at worst, neutral.

**f) Degree of Consumer Care Makes Confusion Likely**

Courts consider whether a typical consumer exercising ordinary care is likely to be confused. *Fortune Dynamic*, 618 F.3d at 1038. "Low consumer care… increases the likelihood of confusion." *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004). Here, the parties have the same name, so "virtually no amount of consumer care can prevent confusion." *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1134 (C.D. Cal. 2001) ("It is irrational to expect that even the most sophisticated consumer will exercise the kind of scrupulous examination that would enable him or her to discern the difference between 'Livewire' and "LiveWire.'").

In addition, the type of confusion here—sponsorship, approval, or license—means that even sophisticated purchasers who are familiar with both companies would be confused. Courts have routinely found that even where prospective purchasers are experts in the field, they may still be initially confused that parties are somehow affiliated or connected where they use similar marks on the same or related goods. *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 716-717 (S.D.N.Y. 1973), aff'd, 523 F.2d 1331 (2d Cir. 1975) (finding that the harm is that that even an expert consumer could consider the other brand even though later investigation revealed that

there was no connection between the parties); *see also Porsche Cars North America, Inc. v. Manny's Porshop, Inc.*, 972 F. Supp. 1128, 1131 (N.D. Ill. 1997) ("[E]ven if sophisticated customers eventually discover that [defendant] is not related to plaintiffs, a trademark violation can exist simply from the initial confusion."). As explained above, sophisticated purchasers are likely to understand—perhaps better than unsophisticated ones—that companies in the video production space commonly work together, license one another's tools, or otherwise build products that allow integration with third-party applications. Defendant already licenses FOUNDRY® branded tools, while Plaintiff makes plug-ins that allow applications like Defendant's Photoshop product to integrate with Plaintiff's FOUNDRY® branded products. Foulds Decl. ¶¶ 11, 32-33. Thus, a sophisticated consumer would be even more likely than an unsophisticated one to assume—mistakenly—that Defendant's use of "Foundry" reflects a partnership or license agreement with Plaintiff. This factor thus favors Plaintiff.

**g) The Intent Factor Weighs in Favor of Plaintiff**

Defendant's knowing and intentional infringement of the FOUNDRY® Marks makes confusion more likely. This factor favors the plaintiff "where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *JL Beverage*, 828 F.3d at 1111 (internal citation omitted). For reverse confusion, courts "ask whether there is some evidence that the junior user, when it knew of the senior user, was at fault for not adequately respecting the rights of the senior user." *Ironhawk*, 2 F.4th at 1167-68 (quoting and citing McCarthy § 23:10).

Defendant plainly knew of Plaintiff and its FOUNDRY® Marks before it launched its own Foundry product. The parties appear at the same trade shows, offer related products, and use one another's technology. And Defendant's "[u]se of [its] infringing mark, in the face of warnings about potential infringement, is strong evidence of willful infringement." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074 (9th Cir. 2015) (quoting *E & J Gallo Winery v. Consorsio del Gallo Nero*, 782 F. Supp. 472, 475 (N.D. Cal. 1992). But in any event, "absence of malice is no defense to trademark infringement," which is why "an intent to confuse consumers if not required for a finding of trademark infringement."[5] *Brookfield*, 174 F.3d at 1059. Thus, this factor weighs in Plaintiff's favor.

---

[5] It is also telling in this case that Adobe markets an indistinguishable service under a non-infringing name: Firefly Custom Models. That name was already in use before Defendant launched its "Foundry"

**h) Likelihood of Expansion Makes Confusion Likely**

The likelihood of expansion of business by either party to compete with the other weighs in favor of finding trademark infringement. *Sleekcraft*, 599 F.2d at 354. "[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Id*. Here, competition is already occurring, and is only likely to increase as Plaintiff expands its products under the FOUNDRY® Marks, such as by acquiring new companies.. By way of example, Plaintiff recently acquired Griptape, an AI content generation company, and is integrating Griptape into other FOUNDRY® branded products. Foulds Decl. ¶¶ 14-15. And, as noted above, Defendant is actively recruiting VFX employees to "plug" its own Foundry product into Plaintiff's FOUNDRY® branded products and compete more effectively generally in the VFX space. Defendant is thus taking advantage of the goodwill that Plaintiff has built in the FOUNDRY® brand to support its more aggressive move directly into Plaintiff's space. This factor thus strongly favors Plaintiff.

**i) The *Sleekcraft* Factors Weigh Uniformly In Favor of Confusion**

The *Sleekcraft* factors weigh uniformly in favor of a likelihood of confusion, and the Court should find that Plaintiff has shown a likelihood of success on the merits of its infringement claims.

**j) Plaintiff has Likewise Shown a Likelihood of Success on Its Unfair Competition Claims**

Where a plaintiff has demonstrated trademark infringement under Section 32(1) of the Lanham Act, the Ninth Circuit agrees that the plaintiff is entitled to prevail on its claim of unfair competition under Section 43(a). *See Brookfield*, 174 F.3d at 1046 n.8.

In addition, claims for unfair competition under the Lanham Act and under California state law are "substantially congruent" to claims for trademark infringement under the Lanham Act. *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994). Thus, Plaintiff's likelihood of success on its claims for infringement of the FOUNDRY® Marks likewise means that Plaintiff is likely to succeed on its federal and state claims for unfair competition.

---

branding, and therefore there is no reason for Defendant to adopt an entirely new name ***other than*** to take advantage of the goodwill in the FOUNDRY® Marks.

**B. <u>Plaintiff Will Suffer Irreparable Harm Absent An Injunction</u>**

Plaintiff will be irreparably harmed without preliminary relief in precisely the manner that the Ninth Circuit and courts in this District have repeatedly held cannot be undone by a money judgment: the loss of control over Plaintiff's reputation and goodwill, the dilution of brand identity through reverse confusion by a larger competitor, and the erosion of market position.

As an initial matter, because Plaintiff has shown a likelihood of success on the merits, it is entitled to a statutory presumption of irreparable harm. 15 U.S.C. § 1116(a); *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 694 (9th Cir. 2022); *Baron App, Inc. v. OpenAI, Inc.*, 2026 WL 447428, at *15 (N.D. Cal. Feb. 14, 2026) (granting preliminary injunction in AI-tool trademark case). Defendant cannot rebut that presumption: it has refused Plaintiff's repeated requests to stop and instead has escalated its use of FOUNDRY in the months since this suit was filed, such as advertising it on the Las Vegas Sphere during NAB, and targeting the media and entertainment companies that comprise Plaintiff's core customer base. Foulds Decl. ¶¶ 51–60; Shapiro Decl. ¶¶ 6–15. But even putting the presumption aside, the imminent threat of irreparable harm supports preliminary injunctive relief.

First, courts routinely recognize that "evidence of loss of control over business reputation and damage to goodwill" constitutes irreparable harm in a trademark case. *adidas Am., Inc. v. Skechers USA, Inc.*, 149 F. Supp. 3d 1222, 1248–49 (D. Or. 2016) (granting preliminary injunction where junior user "piggy-back[ed]" on senior brand's marketing efforts), *aff'd in relevant part*, 890 F.3d 747 (9th Cir. 2018); *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 526 (9th Cir. 1984) (affirming preliminary injunction where "continuing infringement would result in loss of control over Apple's reputation and loss of good will"). Plaintiff has built the FOUNDRY brand for nearly thirty years, dedicating sustained investment to ensuring that consumers in the media, entertainment, and gaming industries connect FOUNDRY with high-quality creative software. Foulds Decl. ¶¶ 7, 23–27, 55. That investment has produced an Engineering Emmy, two Academy Scientific and Engineering Awards, multiple NAB Show "Best of Show" and Product of the Year awards, and recognition by *Wired* as the "UK firm that built the effects software that always wins an Oscar." Foulds Decl. ¶¶ 9, 26–27. Adobe's use of an identical mark for an overlapping AI content-creation product borrows that reputation and

places its quality "no longer . . . within [Foundry's] own control." *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) (granting preliminary injunction), *aff'd*, 348 F. App'x 288 (9th Cir. 2009). The risk is acute because Defendant already licenses Plaintiff's Academy Award-winning technology and touts it inside its After Effects VFX software. Foulds Decl. ¶¶ 33–34, 61.

Second, the unique circumstances here threaten the irreparable harm of reverse confusion, in which Defendant's use of Foundry and its much larger marketing budget drown out the distinctiveness of Plaintiff's longstanding FOUNDRY® Marks before a trial can take place. Plaintiff spends approximately $1 million per year marketing the FOUNDRY® brand; Defendant reportedly spent more than $1 billion on marketing in 2025 and intends to make "Foundry" "seamlessly available across the Adobe ecosystem," including within After Effects, Premiere, and other Adobe applications used by overlapping customers. Foulds Decl. ¶¶ 41, 56, 60–61. When a junior user with overwhelming marketing resources pushes a confusingly similar mark into the senior user's space, the senior user faces the loss of "the value of [its] trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Ironhawk Techs*, 2 F.4th at 1160. That too is irreparable harm that cannot be remedied by money damages or a permanent injunction two years from now. *Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1175–78 (C.D. Cal. 2017) (granting preliminary injunction where junior user threatened senior user's premium-brand reputation).

Third, as explained above, Plaintiff and Defendant offer both competing and complementary products, and thus Defendant's infringement necessarily threatens the loss of prospective customers and goodwill in an overlapping market. That threat "supports a finding of the possibility of irreparable harm" and justifies preliminary relief. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (affirming preliminary injunction). Plaintiff and Defendant are head-to-head competitors and suppliers of complementary products in the same workflows: Adobe After Effects compositing software competes directly with Foundry Nuke, and Adobe Substance texturing software competes directly with Mari. Foulds Decl. ¶¶ 30, 41-43; Compl. ¶¶ 50–51. The parties target the same customers (studios such as Disney, Pixar, Marvel, and Netflix), market through the same channels (NAB, SIGGRAPH, HPA, FMX), and belong to the same trade organizations (ASWF, AOUSD, the Rookies).

Foulds Decl. ¶¶ 7, 46, 48-50. Adobe has now publicly announced collaborations with talent agencies, film studios, VFX houses, and directors of blockbuster films to push its "Foundry" product into the precise market segment—enterprise media and entertainment—that generates roughly 60% of Foundry's revenue. Foulds Decl. ¶¶ 31, 59–61. The risk that, once Defendant begins distributing its Foundry offering at scale, confused customers will purchase Defendant's products in the mistaken belief that they are affiliated with, licensed by, or endorsed by Plaintiff—or that Defendant has acquired Plaintiff—is precisely the loss of control over reputation and potential diversion of trade that courts in the Ninth Circuit law treats as irreparable. *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1184–85 (E.D. Cal. 2016); *Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1035–36 (N.D. Cal. 2009).

None of these three types of injury can be remedied by a final judgment, likely to be rendered at least a couple of years from now, which is an eternity in the fast-paced world of technology tools. A preliminary injunction is therefore necessary to preserve Plaintiff's ability to obtain meaningful relief.

### C. <u>The Public Interest Would Be Served By An Injunction</u>

In trademark cases, "the public interest is the right of the public not to be deceived or confused as to the source of the parties' goods." *FAZE Apparel, LLC v. Faze Clan, Inc.*, 2018 WL 3830027, at *8 (C.D. Cal. May 22, 2018).; *see also InSinkErator, LLC v. Joneca Co., LLC*, 163 F.4th 608, 623 (9th Cir. 2025) (affirming finding that "the public has a strong interest in avoiding confusion"). Defendant's continued use of the Infringing Mark will mislead consumers into mistakenly believing that "Firefly Foundry" is related to or associated with Plaintiff (or vice-versa). An injunction that prevents such consumer confusion thus "serves the public interest." *Am. Rena Int'l Corp. v. SisJoyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013).

### D. <u>The Balance Of Equities Supports An Injunction</u>

This factor weighs heavily in Plaintiff's favor. Plaintiff is at risk of irreparable harm, including loss of goodwill and control over its brand and reputation, without injunctive relief. In stark contrast, the only potential harm to Defendant is the cost associated with removing the infringing "Foundry" name from its product, and replacing it with a non-infringing name.

Moreover, this harm is entirely attributable to Defendant's own purposeful decision to infringe Plaintiff's FOUNDRY® Marks. The law is clear that Defendant has "no equitable interest in continuing an infringing activity." *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012). Rather, since Defendant's "purported harms stem solely from its allegedly infringing use of" Plaintiff's mark, and it can "continue all activities and communications if it changed the name" of its service, the equities favor Plaintiff. *Tari Labs*, 2023 WL 2480739, at *12; *see also Baron App*, 2026 WL 447428, at *16 (balance of equities favored movant where the injunction would require only that the defendant "simply rename its feature"). An injunction would prevent immediate irreparable harm to Plaintiff and pose little (if any) hardship to Defendant.

**E. No Bond Or A Minimal Bond Is Appropriate**

Plaintiff should not be required to post security under Fed. R. Civ. P. 65(c) in view of Defendant's intentional and ongoing infringement and its escalation in "Foundry" marketing well after it received Plaintiff's cease and desist letter. And the strong showing of likelihood of success on the merits here favors minimal or no bond. *Tari Labs*, 2023 WL 2480739, at *12 (granting TRO and waiving a bond requirement where plaintiff established likelihood of success on the merits); *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985) ("[T]he likelihood of success on the merits ... tips in favor of a minimal bond or no bond at all.") (citation omitted). Moreover, there will be no evidence that Defendant will incur any meaningful cost in complying with a preliminary injunction, which would simply require it to pause and remove its marketing and to change the name of its new product in the interim. Notably, Defendant already uses a non-infringing name for an identical product: Firefly Custom Models.

## V. CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court grant its Motion and issue a preliminary injunction against Defendant. A proposed form of preliminary injunction is being filed along with this motion.

///

///

Dated: May 6, 2026

*/s/ Tyler R. Marandola*
Mark C. Comtois (*pro hac vice*)
mccomtois@duanemorris.com
**DUANE MORRIS LLP**
901 New York Avenue NW
Suite 700 East
Washington, DC 20001
Telephone: (202) 776-5240

Nicole K. McLaughlin (*pro hac vice*)
nkmclaughlin@duanemorris.com
Tyler R. Marandola (*pro hac vice*)
trmarandola@duanemorris.com
Brianna M. Vinci (*pro hac vice*)
bvinci@duanemorris.com
**DUANE MORRIS LLP**
30 S 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1198

Jennifer M. Lantz (SBN 202252)
jmlantz@duanemorris.com
**DUANE MORRIS LLP**
260 Homer Avenue, Suite 202
Palo Alto, CA 94301-2777
Telephone: (650) 847-4150

*Attorneys for Plaintiff*
*The Foundry Visionmongers Ltd*

**CERTIFICATE OF SERVICE**

I certify that I caused the foregoing document to be electronically filed on May 6, 2026 with the Clerk using the CM/ECF System. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

*/s/ Tyler R. Marandola*
Tyler R. Marandola (*pro hac vice*)