ARNOLD & PORTER KAYE SCHOLER LLP
DORI ANN HANSWIRTH (pro hac vice)
Email: dori.hanswirth@arnoldporter.com
250 West 55th Street
New York, NY 10019
Telephone:(212) 836-8000
Facsimile:(212) 836-8689

ARNOLD & PORTER KAYE SCHOLER LLP
JOSEPH FARRIS (SBN 263405)
Email: joseph.farris@arnoldporter.com
HAFEEZ KHAN (SBN 339702)
Email: hafeez.khan@arnoldporter.com
Four Embarcadero Center, 14th Floor
San Francisco, CA 94111
Telephone: (415) 471-3100
Facsimile: (415) 471-3400

ARNOLD & PORTER KAYE SCHOLER LLP
OSCAR RAMALLO (SBN 241487)
Email: oscar.ramallo@arnoldporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199

*Attorneys for Defendant Adobe Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE FOUNDRY VISIONMONGERS LTD.<br><br>Plaintiff,<br><br>vs.<br><br>ADOBE INC.,<br><br>Defendant. | Case No. 5:26-cv-02121-NW<br><br>Action Filed: March 11, 2026<br><br>**DEFENDANT ADOBE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT**<br><br>Date: July 22, 2026<br>Time: 9:00 a.m.<br>Place: Courtroom 3, 5th Floor<br><br>Judge: Honorable Noël Wise<br>Trial Date: None Set |

## TABLE OF CONTENTS


Page

NOTICE OF MOTION AND MOTION TO DISMISS ..... 1

STATEMENT OF RELIEF SOUGHT / ISSUES TO BE DECIDED ..... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. INTRODUCTION ..... 1

II. ALLEGATIONS OF THE COMPLAINT ..... 3

A. Foundry Visionmongers' History Of Offering Visual Effects Software. ..... 3

B. Foundry Visionmongers' Trademark Registrations For Visual Effects Software. ..... 4

C. Adobe's Firefly And Firefly Foundry Generative Artificial Intelligence Services. ..... 4

D. Foundry Visionmongers' Hurried Trademark Applications For Artificial Intelligence Services After Learning Of Firefly Foundry. ..... 6

E. Foundry Visionmongers Allegations Of "Forward" And "Reverse" Confusion. ..... 6

III. LEGAL STANDARD ..... 7

IV. ARGUMENT ..... 7

A. Foundry Visionmongers' Federal Claims Fail As A Matter of Law Because It Has Not Alleged A Plausible Likelihood of Confusion. ..... 7

1. Foundry Visionmongers cannot plead a likelihood of forward confusion with Firefly Foundry. ..... 8

a. The Foundry Marks are weak because they are descriptive or suggestive. ..... 9

b. The parties' marks are not presented similarly in the marketplace. ..... 12

c. The parties offer distinct goods and services. ..... 16

d. Foundry Visionmongers has not alleged even a single instance of actual confusion. ..... 19

e. The parties' marketing channels are distinct. ..... 19

f. The parties' specialized services are expensive and sold to sophisticated consumers. .... 20

g. Foundry Visionmongers fails to plausibly allege Adobe intended to capitalize on its goodwill. .... 21

h. Foundry Visionmongers does not allege either party is likely to offer the same products or services under a Foundry mark. .... 22

2. Foundry Visionmongers has not sufficiently pleaded a likelihood of reverse confusion. .... 23

3. Foundry Visionmongers has not pleaded and cannot plead Adobe used the Foundry Design Marks or Foundry.com domain name.. .... 23

B. Foundry Visionmongers' State Law Claims Fail As A Matter of Law. .... 25

V. CONCLUSION .... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aliign Activation Wear, LLC v. Lululemon Athletica Canada, Inc.*, 2022 WL 3210698 (9th Cir. Aug. 9, 2022) .......... 24

*Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440 (9th Cir. 1980) .......... 15

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) .......... *passim*

*Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074 (9th Cir. 2020) .......... 12, 13, 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 7, 22

*Athleta, Inc. v. Pitbull Clothing Co.*, 2013 WL 142877 (C.D. Cal. Jan. 7, 2013) .......... 19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 7

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036 (9th Cir. 1999) .......... 9, 18

*Citigroup Inc. v. Cap. City Bank Grp., Inc.*, 637 F.3d 1344 (Fed. Cir. 2011) .......... 15

*Cleary v. News Corp.*, 30 F.3d 1255 (9th Cir. 1994) .......... 25

*Cohn v. Petsmart, Inc.*, 281 F.3d 837 (9th Cir. 2002) .......... 23, 24

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) .......... 7

*Dfinity Found. V. Meta Platforms, Inc.*, 2022 WL 16857036 (N.D. Cal. Nov. 10, 2022) .......... 21, 22

*Dinan v. SanDisk LLC*, 2020 WL 364277 (N.D. Cal. Jan. 22, 2020), *aff'd*, 844 F. App'x 978 (9th Cir. 2021) .......... 9

*Echo Drain v. Newsted*, 307 F. Supp. 2d 1116 (C.D. Cal. 2003) .......... 17

*Entrepreneur Media, Inc. v. Smith*,
279 F.3d 1135 (9th Cir. 2002)........................................................................................ 12

*Fitbug Ltd. v. Fitbit, Inc.*,
78 F. Supp. 3d 1180 (N.D. Cal. 2015) ............................................................................. 22

*Fizz Soc. Corp. v. Maplebear, Inc.*,
791 F. Supp. 3d 990 (N.D. Cal. 2025) ............................................................................. 14

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
618 F.3d 1025 (9th Cir. 2010)........................................................................................ 21

*Groupion, LLC v. Groupon, Inc.*,
859 F. Supp. 2d 1067 (N.D. Cal. 2012) ........................................................................... 18

*Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*,
668 F. Supp. 3d 1025 (C.D. Cal. 2023), *aff'd*, 2024 WL 4750497 (9th Cir. Nov. 12, 2024) ........................................................................................................... 22

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
2 F.4th 1150 (9th Cir. 2021)........................................................................................... 24

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
599 U.S. 140 (2023) ........................................................................................................ 7

*Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*,
797 F.3d 1363 (Fed. Cir. 2015)........................................................................................ 10

*Knowles v. Spin Master, Inc.*,
2018 WL 6131207 (C.D. Cal. Nov. 2, 2018).................................................................. 15

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
762 F.3d 867 (9th Cir. 2014).......................................................................................... 20

*Lodestar Anstalt v. Bacardi & Co.*,
31 F.4th 1228 (9th Cir. 2022)........................................................................................... 8

*M2 Software, Inc. v. Madacy Ent.*,
421 F.3d 1073 (9th Cir. 2005)........................................................................................ 18

*Mkt. Corner Realty Assocs., LLC v. CGM-GH LLC*,
2004 WL 1077918 (S.D.N.Y. May 13, 2004)........................................................... 18, 19

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
290 F. Supp. 2d 1083 (C.D. Cal. 2003)................................................................ 16, 17, 18

*Mintz v. Subaru of Am., Inc.*,
716 F. App'x 618 (9th Cir. 2017) ..................................................................................... 7

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
856 F.2d 1445 (9th Cir. 1988) ..... 9

*Multi Time Mach., Inc. v. Amazon.com, Inc.*,
804 F.3d 930 (9th Cir. 2015) ..... 21

*Murray v. Cable Nat'l Broad. Co.*,
86 F.3d 858 (9th Cir. 1996) ..... 7

*Naimi v. Starbucks Corp.*,
2018 WL 11255596 (C.D. Cal. Feb. 28, 2018) ..... 10

*Nautilus Grp., Inc. v. Savvier, Inc.*,
427 F. Supp. 2d 990 (W.D. Wash. 2006) ..... 17

*Nerdio, Inc. v. NerdIO Ltd.*,
2024 WL 2978518, at *17 (T.T.A.B. May 14, 2024) ..... 19

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) ..... 8, 9, 21

*Oculu, LLC v. Oculus VR, Inc.*,
2015 WL 3619204 (C.D. Cal. June 8, 2015) ..... 21

*Performance Designed Prods. LLC v. Plantronics, Inc.*,
2019 WL 3082160 (S.D. Cal. July 15, 2019) ..... 7

*Perplexity Solved Sols., Inc. v. Perplexity AI, Inc.*,
2025 WL 1555749 (N.D. Cal. June 2, 2025) ..... 22

*Pocket Socks, Inc. v. Louis Vuitton N. Am., Inc.*,
2025 WL 1239348 (S.D. Cal. Apr. 29, 2025) ..... 12, 13, 14

*Robinson v. Hunger Free Am., Inc.*,
2018 WL 1305722 (E.D. Cal. Mar. 13, 2018) ..... 21

*Spin Master, Ltd. v. Zobmondo Ent., LLC*,
944 F. Supp. 2d 830 (C.D. Cal. 2013) ..... 19

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ..... 16

*Surfvivor Media, Inc. v. Survivor Prods.*,
406 F.3d 625 (9th Cir. 2005) ..... 8, 23

*Toho Co. v. Sears, Roebuck & Co.*,
645 F.2d 788 (9th Cir. 1981) ..... 7

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
610 F.3d 1171 (9th Cir. 2010) ..... 8, 16, 21

*United States Pat. & Trademark Off. v. Booking.com B. V.*,
591 U.S. 549 (2020) ........ 9, 11

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ........ 4

*Universal Prot. Serv., LP v. Coastal Fire & Integration Sys., Inc.*,
2023 WL 4042582 (S.D. Cal. June 15, 2023) ........ 25

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ........ 10

*Walter v. Mattel, Inc.*,
210 F.3d 1108 (9th Cir. 2000) ........ 24

*World Champ Tech, LLC v. Peloton Interactive, Inc.*,
2025 WL 2673906 (9th Cir. Sept. 18, 2025) ........ 23, 24

**<u>Statutes & Rules</u>**

Federal Rule of Civil Procedure 12(b)(6) ........ 1

15 U.S.C.
§ 1051(b) ........ 19
§ 1051(b)(1) ........ 6
§ 1114 ........ 7
§ 1114(1) ........ 3
§ 1125(a) ........ 3, 7

Cal. Bus. & Prof. Code § 17200.. ........ 3, 25

**<u>Other Authorities</u>**

Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/foundry
(last visited May 11, 2026) ........ 9, 10

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 22, 2026 at 9:00 a.m., or as soon thereafter as this motion may be heard in Courtroom 3, 5th Floor, of the above-entitled court, located at 280 South First Street, San Jose, California, defendant Adobe Inc. ("Adobe" or "Defendant") will and hereby does move, under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rules"), to dismiss the Complaint filed by plaintiff The Foundry Visionmongers Ltd. ("Foundry Visionmongers" or "Plaintiff") on March 11, 2026 (Dkt. 1). This motion is based on this Notice of Motion; the accompanying Memorandum of Points and Authorities, Request for Consideration, and Declaration of Hafeez Khan ("Khan Decl."); the pleadings and papers on file in this matter; and such other matters as may be presented to the Court at the hearing.

## STATEMENT OF RELIEF SOUGHT / ISSUES TO BE DECIDED

Adobe seeks dismissal of the entire Complaint with prejudice under Rule 12(b)(6) on the grounds that Foundry Visionmongers has not pleaded and, as a matter of law, cannot plead infringement of its alleged trademarks.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Foundry Visionmongers—a maker of professional visual effects software—alleges that it owns trademark registrations for the term "foundry" on visual effects and related software. In this case, it asks the Court to stretch its rights far beyond their legitimate scope to block Adobe's use of the term "Firefly Foundry" to market its enterprise-grade generative AI consultancy service—a service where a dedicated team of Adobe engineers and scientists spend months building bespoke AI models for Fortune 2000 companies. These offerings are distinct in nature, price, audience, and purpose, such that customer confusion about the source of those services is implausible.

Defendant Adobe is a global technology company that offers a wide range of tools for creative design, document management, digital marketing, and many other applications. Since 2023, Adobe has offered a family of leading generative artificial intelligence models under the brand name

Adobe Firefly.[1] ¶ 37. The Firefly models are "generative" because they allow users to create entirely new text, images, video, and other media from natural language prompts. *Id.* Building on that platform, last year, Adobe began offering Fortune 2000 companies a premium service called "Firefly Foundry" for creating bespoke versions of its Firefly models. ¶ 38. Every enterprise customer who engages Adobe for this service works for months with a team of Adobe AI engineers and other professionals to develop a custom AI model that is deep-tuned on the customer's own branding guidelines and intellectual property. ¶ 41. These bespoke models are adept at generating audio-visual materials that align with the customer's branding and capture the unique qualities of the customer's intellectual property. *Id.*

Plaintiff Foundry Visionmongers sits in a different market. It alleges that it is "a global leader in developing creative software and services for the media, entertainment, and gaming industries" and offers "visual effects" products for film post-production and other uses. ¶ 14. However, Foundry Visionmongers does not allege that it offers any product or service called "Foundry"—that term is solely its house mark. Nor does it allege that it offers anything similar to Adobe's bespoke Firefly Foundry service. Rather, it allegedly offers an "AI-enabled" software "plug-in" called "CopyCat," which automates repetitive tasks and is bundled with certain professional versions of its visual effects software called "Nuke." ¶¶ 28-30. With the CopyCat plug-in, a visual effects artist manually edits a small number of frames of video, and CopyCat uses machine learning to automatically apply similar edits to other frames. *Id.* Foundry Visionmongers does not allege that Nuke or CopyCat competes with Firefly Foundry—because it cannot.

This case should end at the pleading stage. Foundry Visionmongers has not alleged a plausible case of likelihood of confusion, and the reason is straightforward: the parties' products and services are different; they operate in different markets; sell through different channels; and brand their offerings in ways that no reasonable customer could mistake them for one another. The names of Foundry Visionmongers' products—*Nuke* and *CopyCat*—bear no resemblance to *Firefly Foundry*. Adobe also markets its offerings under its well-known and distinct house mark—*Adobe*—

[1] Unless otherwise stated, citations to "¶ __" are to the paragraphs of the Complaint; citations to numbered exhibits ("Ex. __") are to the exhibits to the Khan Declaration filed herewith.

which further forecloses any inference that the parties' products share a common source. ¶ 35, 41; Compl. Ex. D.

The remaining likelihood-of-confusion factors are equally decisive. The parties serve highly sophisticated customers: "Fortune 2000 enterprise companies" for Adobe, and specialized visual effects professionals for Foundry Visionmongers. ¶¶ 4, 14-15, 38, 41. The parties' offerings are expensive and acquired through deliberate processes: a license for Foundry Visionmongers' Nuke with the CopyCat plug-in, and substantially more for Adobe's months-long consultancy engagement with a team of professionals training a custom AI model. ¶ 28. The descriptive term "foundry" itself is widely used across the technology industry by companies that provide custom services for others—including Microsoft Foundry, Salesforce AI Foundry, Palantir's Foundry, and many more. Punctuating all of this, Foundry Visionmongers does not point to ***any*** instance of actual confusion—not a single example of a customer having mistakenly believed that Foundry Visionmongers was the source of Firefly Foundry (or that Adobe is the source of Nuke or CopyCat).

Because the legal analysis points decisively against a likelihood of confusion, the Complaint should be dismissed with prejudice.

## II. ALLEGATIONS OF THE COMPLAINT

Foundry Visionmongers sued Adobe on March 11, 2026. The Complaint asserts that Adobe's use of Firefly Foundry constitutes: (1) trademark infringement under 15 U.S.C. § 1114(1); (2) false designation of origin under 15 U.S.C. § 1125(a); (3) California common law trademark infringement; and (4) violation of Cal. Bus. & Prof. Code § 17200 et seq.

### A. Foundry Visionmongers' History Of Offering Visual Effects Software.

Foundry Visionmongers is a London-based company that offers visual effects software, including "compositing" software for professional video editing called "Nuke". ¶¶ 8, 14-16, 28-29. Nuke is allegedly a commercially successful product, that has won an Engineering Emmy® Award, among other accolades. ¶¶ 4-5, 29.

To bolster its complaint and make it seem like Adobe's Firefly Foundry artificial intelligence services overlap with its own, Foundry Visionmongers alleges that it is now "developing" "content creation software with AI capabilities." ¶ 27. Specifically, it points to one feature of its Nuke-

branded software: a Nuke "*plug-in*" called CopyCat. ¶ 28. Using the CopyCat plug-in, a visual effects artist can manually edit "a small number of frames" of video, and CopyCat uses "machine learning" to automate the repetitive task of editing thousands of additional frames in a similar manner as the manually-edited frames. ¶ 30. For example, an artist can manually paint blue eyes on a character on a small number of frames, and the plug-in will automatically give the character blue eyes in other frames. *See* ¶ 31. According to Foundry.com, the CopyCat plug-in is only included with the two most expensive versions of Nuke—NukeX and Nuke Studio—for which annual licenses cost $5,219 and $6,379. Ex. 4.4.[2]

Foundry Visionmongers' only other allegation concerning its "AI" offerings is based on its recent acquisition of the company, Griptape, which it describes as an "enterprise-grade AI orchestration" tool that coordinates other tools to create efficient workflows. ¶ 33. But the Complaint contains no allegation about how Griptape's capabilities compare to any Adobe product, let alone to Firefly Foundry.

### B. Foundry Visionmongers' Trademark Registrations For Visual Effects Software.

Foundry Visionmongers alleges that it owns three trademark registrations: one word mark—FOUNDRY—and two design marks—**FOUNDRY.** and **FOUNDRY.**—all registered on December 4, 2018 (the "Foundry Marks"). ¶ 21. The registrations cover computer software for visual effects, 3D animation, digital image editing, and related services. None of the three registrations covers goods or services involving "artificial intelligence." *Id.*

### C. Adobe's Firefly And Firefly Foundry Generative Artificial Intelligence Services.

Since 2023, Adobe has offered a family of generative AI models under the brand name "Firefly." ¶ 37, Ex. 5. Firefly allows users to generate images, video, text, audio, vectors and 3D

---

[2] The Complaint alleges that Foundry Visionmongers is the owner of the Foundry.com domain name and extensively references and links to Foundry.com to explain the nature of its products and how they are marketed. ¶¶ 21, 27, 31, 48. Under the incorporation by reference doctrine, the Court may treat material to which the Complaint "refers extensively" or which "form[s] the basis" of the plaintiff's claims as part of the Complaint, even if not physically attached to the Complaint. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

using text prompts. ¶ 38. Firefly is offered to a broad range of customers from individual creators to businesses. *Id.*

Building on its Firefly platform, in 2025, Adobe introduced select "Fortune 2000" enterprise customers to a "premium bespoke" managed service called *Firefly Foundry*. *Id.*[3] ¶¶ 35; 38. As explained in an article that the Complaint incorporates to describe the nature of Adobe's service:

> [Adobe's clients] actually get a team of allocated experts from Adobe … [that includes] applied scientists, engineers, [and] creative workflow experts. These teams work directly with a client to build a unique generative AI model from the ground up, trained exclusively on that company's private data and assets.
>
> The process is intensive and can take a couple of months just to get the first results. It begins with use-case discovery, in which Adobe's team identifies the core business problem, whether it's creating seasonal ad campaigns for a retailer like Amazon Fresh or generating limitless variations of a hero image for a beauty brand like MAC.
>
> Then comes the heavy lifting. Adobe's engineers surgically reopen their foundational Firefly models to retrain them on the client's proprietary IP, a process involving billions of parameters. After months of training and untold GPU cycles and consumed watts, the final model inherits all the world knowledge of the base Firefly engine but is then overfitted to speak the client's brand language fluently and exclusively.

¶ 41; Ex. 8 (internal quotations omitted). Firefly Foundry is thus "a deep, consultative partnership that feels more like hiring a boutique division of AI experts from Accenture or IBM than licensing a tool." ¶ 41.

Apart from Firefly Foundry, the Complaint references just two other Adobe software products: a visual effects software product branded as *Adobe After Effects*, and Adobe's suite of software for texture effects, branded as *Adobe Substance 3D*. ¶ 47. Foundry Visionmongers alleges that these products "compete" with Nuke and another Foundry Visionmongers' product called *Mari*. *Id.* But it does not allege that either one of the allegedly-competitive Adobe products has ever been marketed under the "Firefly Foundry" brand.

---

[3] While not necessary to resolution of this Motion to Dismiss and not alleged in the Complaint, for background purposes, Adobe notes that it began rendering Firefly Foundry services no later than June 2025 and has applied for a trademark for FIREFLY FOUNDRY based on a "first use" in commerce of July 2025. Dkt. 28-43 at 2.

### D. Foundry Visionmongers' Hurried Trademark Applications For Artificial Intelligence Services After Learning Of Firefly Foundry.

On October 20, 2025, Adobe announced its Firefly Foundry service in a press release. *See* ¶¶ 35, 41. On October 22, 2025— just ***two days*** later—Foundry Visionmongers rushed to file five new intent-to-use trademark applications, three of which are raised in the Complaint: a FOUNDRY word mark, and two design marks: **FOUNDRY.** and **FOUNDRY.**. ¶ 22.[4] These applications represent the first time that Foundry Visionmongers has sought U.S. trademark rights in connection with "artificial intelligence" products and services under the Foundry brand name. *Id.*

According to judicially noticeable USPTO records, Foundry Visionmongers filed these trademark applications on an intent-to-use basis, representing that it was ***not presently offering*** the applied-for services as of the date of its applications. Exs. 1-3. *See* 15 U.S.C. § 1051(b)(1). All five applications remain pending and are currently subject to non-final refusals by the Trademark Office, to which Foundry Visionmongers has not responded. *See* Exs. 1-3.

### E. Foundry Visionmongers Allegations Of "Forward" And "Reverse" Confusion.

The Complaint inconsistently alleges both "forward" and "reverse" confusion theories. Most of the Complaint is dedicated to alleging forward confusion, *i.e.*, that Foundry Visionmongers' Foundry Marks are strong and that Adobe's customers are likely to be confused into believing that Foundry Visionmongers is the source of Adobe's Firefly Foundry. *See, e.g.*, ¶ 45 ("Because the term 'Foundry' is inherently distinctive in relation to content creation software, and because of Foundry's longstanding use of its FOUNDRY Marks and its outstanding reputation in the marketplace, consumers will inevitably assume that Adobe's use of FOUNDRY is somehow associated with Foundry and/or its goods and services."). Yet, two conclusory paragraphs of the Complaint also allege "reverse confusion," *i.e.*, that there is a risk of Firefly Foundry "overtaking and swamping" Foundry Visionmongers' marks. ¶¶ 53-54.

The Complaint alleges that Adobe infringes the "FOUNDRY Marks" collectively, defining the term to include all three trademark registrations described in Section II.B, *supra*, all three

[4] The other two applications are for "F." in a gray circle, and "F." in a yellow circle.

trademark applications described in Section II.E, *supra*, and the Foundry.com domain name. ¶¶ 22, 59, 63, 69. However, the Complaint contains no allegation that Adobe is using any design similar to Foundry Visionmongers' design marks, nor does it allege that Adobe is using a domain name similar to Foundry.com.

## III. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court need not "accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

In the trademark infringement context, the Supreme Court has instructed that "if, in a given case, a plaintiff fails to plausibly allege a likelihood of confusion, the district court should dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6)." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 157 n.2 (2023). Thus, "courts have not hesitated to dismiss [trademark] claims at the pleading stage." *Performance Designed Prods. LLC v. Plantronics, Inc.*, 2019 WL 3082160, at *4 (S.D. Cal. July 15, 2019) (citing cases); *see also Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 859–61 (9th Cir. 1996) (affirming Rule 12(b)(6) dismissal with prejudice of infringement claims where no likelihood of confusion existed as a matter of law between marks "America's Talking" and "America Speaks"); *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 793–94 (9th Cir. 1981) (affirming dismissal with prejudice of claim that use of BAGZILLA for garbage bags infringed GODZILLA mark); *Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618, 620, 622 (9th Cir. 2017) (affirming dismissal with prejudice).

## IV. ARGUMENT

### A. Foundry Visionmongers' Federal Claims Fail As A Matter of Law Because It Has Not Alleged A Plausible Likelihood of Confusion.

Foundry Visionmongers' first two claims for trademark infringement under 15 U.S.C. § 1114 and false designation of origin under § 1125(a) both fail to plausibly allege likelihood of

confusion, a requisite element of either claim. "[T]he legal analysis under the two sections is essentially identical:" a plaintiff must allege facts to plausibly show "(1) a protectable ownership interest in the mark; and (2) a likelihood of consumer confusion in the defendant's use of its allegedly infringing mark." *Lodestar Anstalt v. Bacardi & Co.*, 31 F.4th 1228, 1245 (9th Cir. 2022) (internal quotation marks omitted). Whether under its theory of forward or reverse confusion, the Complaint is unable to allege that consumers would likely be confused by Adobe's use of Firefly Foundry.

**1. Foundry Visionmongers cannot plead a likelihood of forward confusion with Firefly Foundry.**

In the Ninth Circuit, courts assess likelihood of confusion using the eight-factor test set forth in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). An evaluation of each of the *Sleekcraft* factors weighs decisively against any likelihood of forward confusion in this case:

> [1] strength of the mark; [2] proximity of the goods; [3] similarity of the marks; [4] evidence of actual confusion; [5] marketing channels used; [6] type of goods and the degree of care likely to be exercised by the purchaser; [7] defendant's intent in selecting the mark; and [8] likelihood of expansion of the product lines.

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011) (quoting *Sleekcraft*, 599 F.2d at 348–49).

When analyzing Foundry Visionmongers' "forward" confusion claim, the court should assess whether Adobe's Firefly Foundry customers are likely to mistakenly believe that they are dealing with Foundry Visionmongers. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630–31 (9th Cir. 2005). The court assesses these factors from the perspective of the "'reasonably prudent consumer' in the marketplace," *i.e.*, in this case, from the perspective of Adobe's Fortune 2000 level customers who are contemplating entering into a months-long collaboration with Adobe for the development of a bespoke generative artificial intelligence platform. *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010). How an "[u]nreasonable, imprudent, and inexperienced" person might react to the parties' marks is "not relevant." *Id.*

**a. The Foundry Marks are weak because they are descriptive or suggestive.**

"Foundry" is a common term associated with content creators, digital artists, and the software industry; therefore Foundry Visionmongers' rights in the term Foundry, if any, are weak. In analyzing the strength of a mark, courts assess both the mark's "commercial" and "conceptual" strength. *Network Automation*, 638 F.3d at 1149. Here, the Complaint alleges that the Foundry Marks are commercially strong, based upon Foundry Visionmongers' status as a "global leader.[5] ¶ 26.

However, the Foundry Marks are conceptually weak because they are descriptive or at best suggestive.[6] Descriptive and suggestive marks are "presumptively weak." *Id*. This presumption of weakness applies even to "incontestable registrations." *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988). The reason that conceptual strength impacts the likelihood of confusion analysis is that "[w]hen a mark incorporates generic or highly descriptive components, consumers are less likely to think that other uses of the common element emanate from the mark's owner." *United States Pat. & Trademark Off. v. Booking.com B. V.*, 591 U.S. 549, 562 (2020) (internal quotation omitted).

Here, the original meaning of *foundry* is an "establishment for producing castings in molten metal." Ex. 16; *see also Dinan v. SanDisk LLC*, 2020 WL 364277, at *5 (N.D. Cal. Jan. 22, 2020), *aff'd*, 844 F. App'x 978 (9th Cir. 2021) (taking judicial notice of definition at dictionary.com). Over the past decades, the term became ubiquitous because of its use to describe facilities that manufacture semiconductors for outside clients, and its meaning has expanded to encompass the more general idea of a business that makes products for outside clients. Ex. 17. Thus, the Merriam-Webster entry for *foundry* gives the following example of usage for the word "*foundry*": "*Gelsinger*

---

[5] Commercial strength is based on "actual marketplace recognition." *Id.* at 1149.

[6] A mark is conceptually strong if it falls on the fanciful end of the spectrum of distinctiveness. *Id.* Its conceptual strength weakens as it moves down each step on the spectrum below fanciful, *i.e.*, arbitrary, suggestive, and descriptive. *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999). A descriptive mark is a mark that describes the trademark owner's service. *Id.* at 1058 n. 19. A suggestive mark "conveys an impression" of the service "but requires … imagination and perception to reach a conclusion as to the [service's] nature." *Id.* An arbitrary mark has no connection to the service. *Id.* A fanciful mark is entirely made up. *Id.*

*had embarked on an ambitious plan to turn Intel into a chip* ***foundry****, a business that makes products for outside clients.*" *Id.* (emphasis added).

In the software context, the factory analogy is extended to a digital environment or service that allows its users to build or accomplish something in a digital space, which the Court may find by taking judicial notices of such uses. Exs. 16-18; *Naimi v. Starbucks Corp.*, 2018 WL 11255596, at *2 (C.D. Cal. Feb. 28, 2018). In *Naimi*, for example, the court took judicial notice of five different websites in a trademark case to determine that the word "doubleshot" may refer to non-espresso products. *Id.* The court explained that, while it was inappropriate to notice websites for their truth, a court may properly notice websites "to indicate what [is] in the public realm." *Id.* (quoting *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010)) (taking judicial notice that the contents of certain newspapers, magazines, and books were in the public realm). Trademark registrations and applications are likewise in the public realm and indicative of the meanings of words. *See Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1374 (Fed. Cir. 2015) (holding trademark registrations "show the sense in which a mark is used in ordinary parlance") (internal citation omitted).

As examples, "Microsoft Foundry" advertises itself as a platform that streamlines its customers' ability to build AI apps. Ex. 19. "Salesforce AI Foundry" advertises a service in which Salesforce works with its customers to find AI solutions to their problems. Ex. 20. Palantir's "Foundry" takes an organization's data from multiple sources and organizes it in a way to enhance effective decision making. Ex. 21. "Fu.Sion AI Foundry®" offers AI-generated analysis for business planning. Ex. 25. "AI Foundry®" provides software for managing databases. *Id.* "Foundry Sparks®" offers AI data analysis. *Id.* "Mind Foundry®" offers software for using machine learning models. *Id.* "Multiverse Foundry®" offers software for operating AI. *Id.* "Cloud Foundry" is a platform that simplifies the process for publishing apps on the internet. Ex. 22. "EdgeX Foundry®" is a software platform that facilitates operation of the Internet of Things. Ex. 25. "Foundry" by Paradigm is a toolkit for developing Ethereum blockchain apps. Ex. 23. "TheFoundryAI.com" offers a browser simulator to train AI agents. Ex. 24. "Foundry®" by Paige Hulse offers software for contract drafting. Ex. 25. "Foundry®" from Eric Scott Kaplan, and "Title Foundry®" create

software. *Id.* All of these are uses of *foundry* that are in the general software / technology space but have nothing to do with Foundry Visionmongers.

Nor is Foundry Visionmongers' usage of *foundry* for "creative" applications (like video post-production) novel. The word *foundry* has been widely used by many other companies to describe products and services in that vein too. Examples from United States trademark registrations include PROFOUNDRY for post-production editing of advertising; FOUNDRY 360 for graphic design services; MOVE FOUNDRY for video production services; EXPERIENCE FOUNDRY for graphic design services; FUTURIST FOUNDRY for graphic design services; SONIC FOUNDRY for software for creating multimedia files; SPARK FOUNDRY for graphic arts design; THINK FOUNDRY WEST for post-production video editing of video, and THINK FOUNDRY for video film production. Ex. 25. In all, there are at least 420 live United States trademark registrations and applications that use "foundry" in the sense of a business establishment. Ex. 25. Among these registrations and applications, 155 are in Classes 9 or 42, the classes in which Foundry Visionmongers has trademark registrations, many of which have earlier priority dates than Foundry Visionmongers' registrations. *Id.* Among all trademark registrations and applications, 107 are in the software space, and 28 are in the AI space. *Id.*

Foundry Visionmongers' use of *foundry* falls well within the descriptive meaning of an establishment that offers products or services. Foundry Visionmongers also uses Foundry as an umbrella term for the source for numerous software products with different capabilities related to content creation—Nuke, NukeX, Nuke Studio, Hiero, HieroPlayer, Griptape, Nuke Stage, Katana, Mari, and Flix. Ex. 4.3. Accordingly, *foundry* is conceptually weak.

The alleged commercial strength of the Foundry Marks cannot overcome its conceptual weakness. Because the word foundry has descriptive meanings applicable to Foundry Visionmongers' products, consumers are far less likely to assume that two marks incorporating the term "foundry" emanate from the same source than they would be to make such an assumption between two marks sharing an arbitrary or fanciful component. *Bookings.com*, 591 U.S. at 562 (descriptive components of marks are less likely to lead to confusion). *Sleekcraft*, 599 F.2d at 350 ("Although appellant's mark is protectible and may have been strengthened by advertising . . . it is

a weak mark entitled to a restricted range of protection. Thus, only if the marks are quite similar, and the goods closely related, will infringement be found.") (citations omitted). Accordingly, this factor favors dismissal. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1153 (9th Cir. 2002) (holding "the weakness of [the plaintiff's] mark alone weighs heavily against finding infringement as a matter of law").

**b. The parties' marks are not presented similarly in the marketplace.**

The broader context of how the marks are presented in the marketplace further dispels any likelihood of confusion. "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft,* 599 F.2d at 351. When analyzing similarity, "[a] court should not myopically focus on only the alleged [infringing] marks to the exclusion of the entire product or even common sense." *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1080 (9th Cir. 2020). Rather, the marks must be "considered in their entirety and as they appear in the marketplace." *Id.* (internal quotation omitted). Here, the marks are not presented similarly in the marketplace in any respect.

Courts have frequently found that use of the exact same product name on competing products does not result in a likelihood of confusion when considered in context. In *Arcona*, for example, the plaintiff owned a trademark registration for EYE DEW for a skin care product. 976 F.3d at 1076. The defendant also sold a skin care product named EYE DEW. *Id.* The parties' products were sold in the same stores in the same geographic area. *Id.* The Ninth Circuit held, as a matter of law, that "no reasonable consumer would be confused by these two products . . . because the packaging, size, color, shape, and all other attributes" of the products were not similar. *Id.* at 1080–81. The plaintiff's product was labeled with its house mark ARCONA, while the defendant's product was labeled with its house mark FARMACY. *Id.*

The court in *Pocket Socks* relied on *Arcona* to grant a motion to dismiss in a case where the plaintiff owned a trademark registration for POCKET SOCKS for socks with a zippered pocket, and the defendant also sold a pocketed sock called "Pocket Socks." *Pocket Socks, Inc. v. Louis Vuitton N. Am., Inc.*, 2025 WL 1239348, at *1 (S.D. Cal. Apr. 29, 2025). The court explained that confusion was unlikely because the defendant, Louis Vuitton, displayed its socks with its "rather prominent

housemark," the pricing was different (under $50 for plaintiff vs. $500 for defendant), and the marketing channels differed (Amazon for plaintiff vs. Paris Fashion Week for defendant). *Id*. at *4.

Here, Adobe uses the word *foundry* with its famous house mark Adobe and/or its established brand Firefly, which makes it unlikely that a reasonable consumer would confuse it with a product offered by Foundry Visionmongers. Indeed, Exhibit D to the Complaint contains dozens of examples of how *foundry* is used in connection with Adobe's services, and every single example shows that *foundry* is used in combination with either Adobe or Firefly, or both. *See* Compl. Ex. D.

Exhibit D to the Complaint contains two charts of uses: one labeled "FOUNDRY" and the other labeled "ADOBE FOUNDRY." Foundry Visionmongers appears to suggest that the "FOUNDRY" chart establishes that Adobe uses *foundry* without linking *foundry* to either Adobe or Firefly. Any such suggestion is incorrect because every entry links *foundry* to Adobe, Firefly, or both. For example, the first entry in the "FOUNDRY" chart is an article with the headline "Adobe Hammers Together Media AI Partnerships with AI Firefly Foundry." *Id.* The next entry in the "FOUNDRY" chart is a podcast entitled "Adobe Launches Adobe's Foundry Service in the Next Big AI Move," and consists of an interview with an Adobe employee identified as Head of GenAI Ventures at Adobe. *Id.* All of the other examples in that chart similarly discuss the word *foundry* only in the context of Firefly Foundry and/or a service provided by Adobe. *Id.*

Because Adobe's Firefly Foundry offering uses the house mark Adobe and/or Firefly, consumers are unlikely to confuse the source of Firefly Foundry. This conclusion is bolstered by the fact that Foundry Visionmongers does not have a single product or service named "Foundry." To the contrary, it offers software named "Nuke" with a plug-in named "CopyCat." Those names are entirely distinct in sight, sound, and meaning from "Firefly" and "Firefly Foundry." *See Arcona*, 976 F.3d at 1080; *Pocket Socks, Inc.*, 2025 WL 1239348, at *4.

The way that customers obtain the parties' services in the marketplace reinforces the distinction. As shown in an Adobe webpage (that is incorporated by reference into the Complaint through a link), a customer can initiate the process of obtaining Adobe's Firefly Foundry by submitting a form asking Adobe to contact the customer on an Adobe.com webpage that features multiple Adobe design marks and multiple references to Firefly.[7]




¶ 38; Ex. 6. Clicking "Request more information" scrolls to the portion of the page that prominently states "Let us show you the full power of Adobe Firefly Foundry." Ex. 6. No reasonable customer contacting Adobe for the "Firefly Foundry" service is likely to be confused into believing that Foundry Visionmongers is the source of that service. *Pocket Socks,* 2025 WL 1239348, at *1. *Arcona*, 976 F.3d at 1081; *see also Fizz Soc. Corp. v. Maplebear, Inc.*, 791 F. Supp. 3d 990, 1009 (N.D. Cal. 2025) (while both parties had the identical mark FIZZ, the difference in how they were presented on the parties' websites "makes the marks not very similar").

Even apart from this marketplace context, confusion between Firefly Foundry and Foundry remains implausible. *Arcona*, 976 F.3d at 1080. Firefly Foundry has a different meaning from Foundry. Standing alone, "foundry" could refer to many types of commercial establishments offering services for others, particularly in the computer technology or visual design space. *See* Section III.A.1.a., *supra*. Firefly Foundry, on the other hand, contains an arbitrary term—Firefly—that distinguishes it from Foundry by referring to Adobe's specific and distinctive generative-AI

---

[7] The red boxes were added to the webpage screenshot by Plaintiff in its Complaint.

offering, Adobe Firefly. *See Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980) (holding ALPHA STEEL is distinct from ALPHA because the addition of "STEEL" indicated a "different origin"). Firefly Foundry can only refer to one thing.

The parties' marks also look different because Adobe's mark contains an additional word, and they sound different because Adobe's mark contains two words and two additional syllables. *See Knowles v. Spin Master, Inc.*, 2018 WL 6131207, at *4 (C.D. Cal. Nov. 2, 2018) (granting motion to dismiss because RUSTY RIVETS and RIVETS & RUBY had no similarity beyond sharing the word "rivets"). Further distinguishing the marks, *Firefly* dominates in Adobe's mark because it appears first. *See Citigroup Inc. v. Cap. City Bank Grp., Inc.*, 637 F.3d 1344, 1351 (Fed. Cir. 2011) (holding CAPITAL was the dominant portion of CAPITAL CITY BANK and distinguished it from the CITIBANK mark). Because Firefly Foundry is distinct in sight, sound, and meaning from Foundry, Foundry Visionmongers fails to plausibly allege a likelihood of confusion.

To try to manufacture a closer connection between the brands, the Complaint alleges, misleadingly, that Adobe uses the standalone term "Foundry" to promote Firefly Foundry, citing only a single example of material attributed to Adobe in support in the form of one of the initial press releases. ¶ 38. But the press release underscores how unlikely confusion is. To start, here is the headline:




It features a dominant fire-engine red Adobe logo, which is entirely distinct from any branding Foundry Visionmongers presents in its Complaint. *See* Ex. 5. The text begins with "Adobe launches," and the word "foundry" appears in the headline only in its descriptive sense of describing a "foundry service." *Id.* The body of the press release describes the "Adobe AI Foundry" service

built upon "Adobe's Firefly family of AI models," and names "Adobe" nine times across eleven paragraphs. *Id.* Moreover, it does not describe any software product that could be licensed by Foundry Visionmongers. To the contrary, it describes a "highly personalized" service that Adobe launched after Adobe's customers asked Adobe to "come in an and advise us, help us, partner with us, be our premier creative marketing AI partner on this." *Id.*

The Complaint ignores this context and points to an instance where "the Foundry" was used as a descriptive shorthand for a service that forges customer intellectual property with Adobe Firefly: "The Foundry's custom models, which can produce text, images, video, and other mediums like 3D scenes, are built off **Adobe's Firefly** family of AI models." ¶ 37 (emphasis added). Nothing about the press release is likely to cause consumers to believe that Foundry Visionmongers, rather than Adobe, is the source of Adobe's services, and the Court should disregard the Complaint's conclusory allegations to the contrary. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.") (internal quotation omitted).

The Complaint similarly identifies examples of third-party uses of "foundry." Just as with the press release described above, these examples in context all describe a service that allows customers to obtain a bespoke version of Adobe's Firefly generative AI offering. *See generally* Compl. Ex. D. No "reasonably prudent" buyer is likely to believe these materials describing a bespoke Adobe service are referring to software offered by Foundry Visionmongers. *Toyota Motor Sales*, 610 F.3d at 1178 (holding likelihood of confusion is assessed based on the perspective of a "reasonably prudent" buyer). Because the parties' marks as presented in the marketplace are entirely distinct from each other, this factor strongly favors dismissal.

**c. The parties offer distinct goods and services.**

The parties' offerings are also distinct and not closely related. Related goods or services are those "which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n.10 (citation omitted). However, "[t]he mere fact that two products or services fall within the same general field . . . does not mean [they] are sufficiently similar to create a likelihood of confusion." *Matrix Motor Co. v. Toyota Jidosha*

*Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1092 (C.D. Cal. 2003) (internal quotation marks omitted) (citing cases); *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003) (different music genres unrelated); *Nautilus Grp., Inc. v. Savvier, Inc.*, 427 F. Supp. 2d 990, 997 (W.D. Wash. 2006) (two pieces of exercise equipment unrelated). In *Matrix Motor*, for example, the court found no likelihood of confusion as a matter of law between a custom racing car called MATRIX made for a niche market of racing experts and the mass-produced TOYOTA MATRIX car. *Matrix Motor*, 290 F. Supp. 2d at 1092.

The parties' offerings here are even more distinct than those in *Matrix Motor*. Adobe's Firefly Foundry is "a deep, consultative partnership that feels more like hiring a boutique division of AI experts from Accenture or IBM than licensing a tool." ¶ 41. Materials incorporated in the Complaint describe the service as requiring months of work from a team of applied scientists, engineers, and creative workflow experts. ¶ 41; Ex. 8. The result of that effort is a bespoke AI model trained on the customer's intellectual property and branding that allows the customer to generate video, images, and audio from natural language prompts. ¶ 38. Given the months of work by highly trained professionals and the fact that a custom model is trained in each instance, a reasonable customer would expect this service to have a substantial cost and only be available to enterprise-grade customers.

Plaintiff offers nothing comparable. CopyCat is one of many plug-in features from Plaintiff's off-the-shelf Nuke software. ¶ 28. According to Foundry.com, CopyCat is bundled with certain versions of Nuke that cost approximately $5,000 per year. Ex. 4.4. This plug-in is not capable of creating a bespoke generative AI model. Instead, it automates repetitive tasks. *See* ¶ 30. It cannot ingest a company's brand guidelines, characters, and visual styles to produce original on-brand imagery, video, and 3D content.

Despite these obvious and profound differences, Foundry Visionmongers alleges that CopyCat has "the same capabilities and produce[] the same output as the Foundry's FOUNDRY products." ¶ 39. It supports that claim based on the tortured logic that both products are "responsibly trained on your brand franchise," and "give[] you the tools to train your models with your own data." ¶ 48. These weak comparisons underscore that the parties' services are not even "superficially within

the same category." *Matrix Motor,* 290 F. Supp. 2d at 1092; *see also Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1076–77 (N.D. Cal. 2012) (finding no proximity between internet-based customer management software and internet-based calendaring and sales performance service, despite "small potential overlap of services").

Moreover, the mere fact that VFX professionals might theoretically use both Adobe and Foundry Visionmongers products as "complementary" products or "in conjunction" with each other on a project does not support a likelihood of confusion. ¶ 47. Professionals using sophisticated tools like these in the same workflow would be highly capable of distinguishing between them and unlikely to become confused while using products they had already separately licensed. *See M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1084 (9th Cir. 2005) (holding that the possibility of confusion is "almost nil" where purchasers of record labels and music management databases were highly sophisticated, and regardless of any trademark, would be "well informed about the nature of a database program and its producer," despite finding the proximity of goods to "slightly" weigh in plaintiff's favor).

Unable to allege any plausible similarity between Adobe's Firefly Foundry and its own services, Foundry Visionmongers alleges that ***other*** Adobe software products, *i.e.*, Adobe After Effects and Adobe Substance 3D, compete directly with Foundry Visionmongers' Nuke and Mari, respectively. ¶ 47. These assertions are irrelevant because the Complaint does not allege Adobe After Effects or Adobe Substance 3D infringe Foundry Visionmongers' trademark rights. The parties' competing software products are branded with names that are entirely distinct in sight, sound, and meaning (*i.e.*, Adobe After Effects vs. Nuke; and Adobe Substance 3D vs. Mari). And the webpages to which the Complaint links confirm that After Effects and Substance 3D are branded as "Adobe" products, not "Foundry Visionmongers" products. Exs. 11-14.

Finally, Foundry Visionmongers' intent-to-use applications covering "artificial intelligence" products and services do not save its claims; to the contrary, they confirm their lack of merit. "[T]rademark rights are not conveyed through mere intent to use a mark commercially." *Brookfield*, 174 F.3d at 1052. Thus, an intent-to-use application confers no substantive rights until a statement of use has been filed and accepted. *Mkt. Corner Realty Assocs., LLC v. CGM-GH LLC*, 2004 WL

1077918, at *1 (S.D.N.Y. May 13, 2004) (holding a plaintiff could not invoke trademark priority based on a pending "intent to use application); 15 U.S.C. § 1051(b). Moreover, the Complaint concedes that Foundry Visionmongers filed its intent-to-use applications *after* Adobe broadly announced its Firefly Foundry service. *See* ¶¶ 22, 35. Thus, any rights Foundry Visionmongers might hypothetically acquire from those applications if they matured into registrations are inferior to Adobe's common law rights and subject to cancellation. *See Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, 850 (C.D. Cal. 2013) (holding intent-to-use application does "not confer common law priority"); *Nerdio, Inc. v. NerdIO Ltd.*, 2024 WL 2978518, at *17 (T.T.A.B. May 14, 2024) (cancelling intent-to-use based registration based on petitioner's senior common law rights).

In short, Adobe offers a service for developing a bespoke generative AI model delivered as an enterprise consultancy engagement; Foundry Visionmongers offers off-the-shelf professional visual effects software. ¶¶ 14-16, 28-30. These products and services are distinct, and no reasonable consumer could plausibly confuse them.

**d. Foundry Visionmongers has not alleged even a single instance of actual confusion.**

The Complaint is also devoid of any allegation concerning actual customer confusion. According to the Complaint, Adobe publicly announced Firefly Foundry on October 20, 2025. ¶ 35. The fact that Foundry Visionmongers has not identified a ***single example*** of someone mistaking Foundry Visionmongers' products as coming from Adobe (or vice versa) further confirms the dissimilarities between the parties' marks, companies, and offerings. *Sleekcraft*, 599 F.2d at 353 (the actual confusion "factor is weighed heavily . . . when the particular circumstances indicate such evidence should have been available."). As such, this factor weighs "heavily" against Foundry Visionmongers.

**e. The parties' marketing channels are distinct.**

There is also no allegation that the parties services are sold in the same marketing channel. The marketing channels factor "is concerned with where, how, and to whom the parties' products are sold." *Athleta, Inc. v. Pitbull Clothing Co.*, 2013 WL 142877, at *9 (C.D. Cal. Jan. 7, 2013) (internal quotation omitted). It also considers "the sales and marketing methods employed, and the

class of purchasers exposed to the marketing efforts." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876–77 (9th Cir. 2014).

Here, to obtain Foundry Visionmongers' Nuke with the CopyCat plug-in, an individual customer must visit Foundry.com and enter into a clickthrough license agreement with Foundry Visionmongers. Ex. 4.6. By contrast, to obtain Adobe's Firefly Foundry service, a company must negotiate a commercial contract and enter into a months-long collaboration with Adobe. *See* Section IV.A.1.c, *supra*. It is implausible that a company engaged in negotiating a contract with Adobe would fail to recognize that it is dealing with Adobe rather than Foundry Visionmongers. And while there is some overlap in customers because a portion of Foundry Visionmongers' customers (who might buy the higher-end Nuke products) are likely Fortune 2000 companies, that subset of customers is highly sophisticated and, therefore, the most unlikely to be confused. *See* Section IV.A.1.c., *infra*.

The Complaint characterizes Adobe's customers generally as including hobbyists like "recreational filmmakers" and "technology enthusiasts." ¶ 50. But the Complaint alleges that Adobe does not market Firefly Foundry to this class of consumer. The Complaint further alleges that the parties are "members of the same trade organizations" and "present products to consumers at trade shows." ¶ 52. But this shared presence does not give rise to an inference of confusion, particularly since nobody can purchase Adobe's Firefly Foundry service at a trade show booth and both parties' trade show presences would be prominently branded.

Because it is inconceivable that a person going through the process of learning about and contracting for Adobe's bespoke Firefly Foundry service could believe that anyone other than Adobe is the source of those services, this factor strongly favors dismissal.

**f. The parties' specialized services are expensive and sold to sophisticated consumers.**

The degree of sophistication of the buyers of Firefly Foundry and Foundry Visionmongers' products essentially rules out any possibility of confusion. "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. "Confusion is less likely where buyers exercise care and precision in

their purchases." *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937 (9th Cir. 2015) (quoting *Sleekcraft*, 599 F.2d at 353). For example, courts have found that consumers exercise a high degree of care when shopping on the internet, particularly where they are purchasing business software, expensive or specialized products or services, or where they must first register or sign up to obtain the product or service. *Network Automation*, 638 F.3d at 1152–53 ("[C]onsumers who use the internet for shopping are generally quite sophisticated about such matters.") (quoting *Toyota Motor Sales*, 610 F.3d at 1178).

Here, on both sides, the parties' services and consumers are of the kind that make confusion extremely unlikely. Foundry Visionmongers offers professional visual effects software, with customers that include "major feature film studios," "post-production houses," "independent studios, film makers, animators, content creators," and "VFX and animation professionals." ¶¶ 4, 14-15, 28-30. *See Oculu, LLC v. Oculus VR, Inc.*, 2015 WL 3619204, at *16 (C.D. Cal. June 8, 2015) (holding "tech-savvy" customers, as a matter of law, are unlikely to confuse the OCULU video streaming company with the OCULUS video headsets). Similarly, Firefly Foundry is unavailable to the general public; it is offered to specific Fortune 2000 clients who engage Adobe directly to build their custom AI models. *See* ¶¶ 35; 38. It is therefore implausible that the parties' consumers would be confused by their respective marks. *See Dfinity Found. V. Meta Platforms, Inc.*, 2022 WL 16857036, at *11 (N.D. Cal. Nov. 10, 2022) ("If web purchasers, particularly purchasers of sophisticated items, exercise a higher degree of precision in their dealings with and understanding of the internet, the developers to which Dfinity markets its software are perhaps multitudes more sophisticated and exercise a correspondingly higher degree of care."); *Robinson v. Hunger Free Am., Inc.*, 2018 WL 1305722, at *4 (E.D. Cal. Mar. 13, 2018).

**g. Foundry Visionmongers fails to plausibly allege Adobe intended to capitalize on its goodwill.**

There are no factual allegations supporting the Foundry Visionmongers' claim that Adobe adopted the name Firefly Foundry in bad faith. Under the intent factor, courts look to "whether defendant in adopting its mark intended to capitalize on plaintiff's good will." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1043 (9th Cir. 2010) (internal

citation omitted). "[P]rior knowledge of a [plaintiff's] trademark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, 668 F. Supp. 3d 1025, 1043 (C.D. Cal. 2023), *aff'd*, 2024 WL 4750497 (9th Cir. Nov. 12, 2024) (quoting *Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1195–96 (N.D. Cal. 2015)). Thus, on a motion to dismiss, a general allegation of "willful and w[a]nton" disregard of the plaintiff's alleged rights is insufficient. *Dfinity*, 2022 WL 16857036, at *11.

Here, Foundry Visionmongers' only allegations about intent are boilerplate assertions that "Adobe's conduct is intentionally malicious, willful and wanton" and "intentional, willful, and bad faith." ¶¶ 56, 71. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Perplexity Solved Sols., Inc. v. Perplexity AI, Inc.*, 2025 WL 1555749, at *1 (N.D. Cal. June 2, 2025) (dismissing Anti-Cybersquatting Consumer Protection Act claim based on conclusory allegation that defendant intended to profit from plaintiff's trademark) (citing *Iqbal*, 556 U.S. at 678). Accordingly, the intent factor favors dismissal.

**h. Foundry Visionmongers does not allege either party is likely to offer the same products or services under a Foundry mark.**

The final *Sleekcraft* factor asks whether there is a "strong possibility that either party may expand his business to compete with the other." *Sleekcraft*, 599 F.2d at 354 (internal quotation omitted). Here, the Complaint contains no allegations that either party is likely to expand into the other's line of business under a Foundry mark. In particular, the Complaint does not allege that Foundry Visionmongers offers, or intends to offer, bespoke generative AI model engineering services to Fortune 2000 companies. Nor does it allege that Adobe intends to offer off-the-shelf visual effects compositing software under the Firefly Foundry brand to compete with Nuke. Accordingly, this factor favors dismissal.

* * *

Because each *Sleekcraft* factor points decisively against a likelihood of confusion, the Complaint fails to state a claim for trademark infringement and false designation of origin.

**2. Foundry Visionmongers has not sufficiently pleaded a likelihood of reverse confusion.**

In sharp tension with its principal theory of forward confusion, Foundry Visionmongers also asserts a reverse confusion theory in two conclusory paragraphs of its Complaint. ¶¶ 53-54. The reverse confusion doctrine protects a relatively unknown plaintiff's "identity from being overwhelmed by a larger [defendant] who has saturated the market with publicity." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002). "[R]everse confusion occurs when consumers dealing with the senior mark holder [allegedly Foundry Visionmongers] believe that they are doing business with the junior [mark holder] [*i.e.*, Adobe]." *Surfvivor*, 406 F.3d at 630.[8] As discussed below, Foundry Visionmongers' allegations are fatally inconsistent with a reverse confusion theory.

First, the Complaint is replete with allegations that undermine the fundamental premise of a reverse confusion theory—that the Foundry mark is so commercially weak it could be "overtake[n]" by Adobe's use of Firefly Foundry. *Cohn*, 281 F.3d at 841. Foundry Visionmongers alleges that it is a "global leader" (¶ 14) and that is "known for its portfolio of award-winning content creation products" (¶ 2). It lists a litany of awards and public recognition that it has received (¶ 5) and extensively details its history of working with major Hollywood studios (¶ 14). In short, it extensively alleges commercial strength. Thus, the Complaint does not allege a case in which "the plaintiff's weaker mark is pitted against a defendant with a far stronger mark." *Cohn*, 281 F.3d at 841 (internal quotation omitted).

Even assuming that Foundry Visionmongers did not have sufficient commercial strength to avoid reverse confusion, it is implausible that Foundry Visionmongers' customers would be exposed to Adobe's use of Firefly Foundry and come to believe they are dealing with Adobe, rather than Foundry Visionmongers, based on the allegations of how Adobe has used Firefly Foundry. Indeed, all of the Adobe and third-party materials describing Firefly Foundry identified in the Complaint expressly link it to Adobe. Compl. Ex. D. And while "the use of house marks 'can aggravate reverse confusion' in some cases, this is not one of them." *World Champ Tech, LLC v. Peloton Interactive,*

---

[8] For the record, as discussed above, Adobe is actually the senior mark holder with respect to artificial intelligence services, but it recognizes that this is disputed and it does not rest this motion on that contention.

*Inc.*, 2025 WL 2673906, at *2 (9th Cir. Sept. 18, 2025) (quoting *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1165 (9th Cir. 2021)); *see also Cohn*, 281 F.3d at 837 (use of house marks distinguished parties with identical taglines selling the same goods and services); *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) (Mattel's use of "Barbie" in "Pearl Beach Barbie" prevented reverse confusion with "Pearl Beach" mark); (use of house marks, as a matter of law, reduced likelihood of reverse confusion, and stating "although the use of house marks can aggravate reverse confusion in some cases, this is not one of them") (internal quotation omitted); *Aliign Activation Wear, LLC v. Lululemon Athletica Canada, Inc.*, 2022 WL 3210698, at *1 (9th Cir. Aug. 9, 2022) (same).

Indeed, when Foundry Visionmongers uses *foundry*, it uses it as a house mark, not as the name of any product or service. By contrast, the top-level house mark that Adobe uses is *Adobe*. It is thus unlikely that Foundry Visionmongers' potential customers who see Adobe's marketing for an Adobe service will start believing the services are associated with Foundry Visionmongers when the service is prominently identified as a service in which a customer consults with a team of Adobe engineers and other professionals to create a bespoke AI model. *See* Compl. Ex. D. By the same token, Foundry Visionmongers' customers are accustomed to seeing the Foundry house name paired with a product name like Nuke or CopyCat. None of those elements are present in *Adobe Firefly Foundry*: the house mark is *Adobe*, not *Foundry*; the service name begins with *Firefly* (which is an established brand name associated with Adobe), not *Nuke*, *CopyCat* or any other product associated with Foundry Visionmongers; and *Foundry* is used in the descriptive sense of a service for building a custom AI model for the customer, rather than in the sense of a house name for a group of visual effects software products.

Taken together, the differences in house marks, branding, price, contracting parties, and product nature all point to the same conclusion: a reasonable Foundry Visionmongers customer could not plausibly believe that she is transacting with Adobe. *See* Section IV.A.1, *supra*. These factors foreclose any inference of reverse confusion as a matter of law. *See Cohn*, 281 F.3d at 842.

**3. Foundry Visionmongers has not pleaded and cannot plead Adobe used the Foundry Design Marks or Foundry.com domain name.**

A court may not impose liability for infringement of a mark unless the defendant uses a mark in a way that is likely to cause confusion. Because Foundry Visionmongers does not allege that Adobe used the **FOUNDRY.** and **FOUNDRY.** design marks or the Foundry.com domain name in any way, its claims involving those design marks and the domain name fail as a matter of law. *See Universal Prot. Serv., LP v. Coastal Fire & Integration Sys., Inc.*, 2023 WL 4042582, at *5 (S.D. Cal. June 15, 2023) (dismissing infringement claims as to marks that the defendant did not use).

**B. Foundry Visionmongers' State Law Claims Fail As A Matter of Law.**

Foundry Visionmongers' asserts two state law claim for trademark infringement and unfair competition under the common law and California Business and Professions Code § 17200. Both claims are based on the same factual allegations as its Lanham Act claims. Because "common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act," these claims fail for the same reason as Foundry Visionmongers' Lanham Act claim and should be dismissed. *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (internal quotation omitted).

## V. CONCLUSION

Foundry Visionmongers fails to plead, and cannot plead, facts establishing a likelihood of confusion between the parties' marks. The Complaint should be dismissed with prejudice without leave to amend.

Dated: May 12, 2026.

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/ Dori Ann Hanswirth*

DORI ANN HANSWIRTH
JOSEPH FARRIS
OSCAR RAMALLO
HAFEEZ KHAN

*Attorneys for Defendant Adobe Inc.*