ARNOLD & PORTER KAYE SCHOLER LLP
DORI ANN HANSWIRTH (pro hac vice)
Email: dori.hanswirth@arnoldporter.com
250 West 55th Street
New York, NY 10019
Telephone:(212) 836-8000
Facsimile:(212) 836-8689

ARNOLD & PORTER KAYE SCHOLER LLP
JOSEPH FARRIS (SBN 263405)
Email: joseph.farris@arnoldporter.com
HAFEEZ KHAN (SBN 339702)
Email: hafeez.khan@arnoldporter.com
Four Embarcadero Center, 14th Floor
San Francisco, CA 94111
Telephone: (415) 471-3100
Facsimile: (415) 471-3400

ARNOLD & PORTER KAYE SCHOLER LLP
OSCAR RAMALLO (SBN 241487)
Email: oscar.ramallo@arnoldporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199

*Attorneys for Defendant Adobe Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THE FOUNDRY VISIONMONGERS LTD.<br><br>Plaintiff,<br><br>vs.<br><br>ADOBE INC.,<br><br>Defendant. | Case No. 5:26-cv-02121-NW<br><br>Action Filed: March 11, 2026<br><br>**DEFENDANT ADOBE INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: July 22, 2026<br>Time: 9:00 a.m.<br>Place: Courtroom 3, 5th Floor<br><br>Judge: Honorable Noël Wise<br>Trial Date: None Set |

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES TO BE DECIDED .......... 1

MEMORANDUM OF POINTS AND AUTHORITIES .......... 1

I. INTRODUCTION .......... 1

II. STATEMENT OF FACTS .......... 2

A. Adobe launched its successful family of Firefly AI models in 2023. .......... 2

B. Adobe began promoting its Firefly Foundry service in November 2024 for developing bespoke AI models to select enterprise partners. .......... 3

C. Adobe extensively promoted Firefly Foundry to its intended market from October 2025 to today. .......... 4

D. Firefly Foundry does not compete with Foundry Visionmongers' products. .......... 4

E. After Adobe rejected its cease and desist letter on November 7, 2025, Foundry Visionmongers delayed in suing and seeking injunctive relief. .......... 5

F. The Firefly Foundry trademark has never confused an Adobe or Foundry Visionmongers customer. .......... 5

III. LEGAL STANDARD .......... 6

IV. ARGUMENT .......... 6

A. Foundry Visionmongers' delay in filing this Motion establishes that it has not, and will not, suffer irreparable harm. .......... 6

B. Foundry Visionmongers is unlikely to succeed on the merits of its claims because there is no likelihood of confusion between the Foundry Visionmongers' marks and Adobe's Firefly Foundry. .......... 8

1. Adobe's "Firefly Foundry" mark presents a distinct marketplace impression from "Foundry." .......... 8

2. The parties' offerings are not closely related. .......... 12

3. Firefly Foundry is sold through marketing channels that make confusion extremely unlikely. .......... 14

4. The Foundry Visionmongers' marks are weak, reflecting a descriptive concept in a crowded field. .......... 16

5. Foundry Visionmongers offers no evidence of actual confusion despite having ample time to collect such evidence, had it existed. .... 18

6. Consumers exercise extraordinary care when spending thousands or millions of dollars on goods or services. .... 19

7. Adobe adopted Firefly Foundry in good faith to align itself with other AI foundry services in the market, not to trade off Foundry Visionmongers' brand. .... 21

8. Neither party intends to use "foundry" on competing goods and services. .... 22

C. Foundry Visionmongers has not demonstrated any irreparable harm. .... 23

D. The public interest would not be served by an injunction. .... 24

E. The balance of equities favors denying Foundry Visionmongers' Motion. .... 25

**V.** CONCLUSION .... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Align Activation Wear, LLC v. Lululemon Athletica Canada, Inc.*, 2022 WL 3210698 (9th Cir. Aug. 9, 2022) ........ 10, 11

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ........ 6

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) ........ 8, 18, 19

*Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074 (9th Cir. 2020) ........ 9

*Arenas v. Shed Media U.S. Inc.*, 881 F. Supp. 2d 1181 (C.D. Cal. 2011), *aff'd*, 462 Fed. App'x 709 (9th Cir. 2021) ........ 24

*Athleta, Inc. v. Pitbull Clothing Co.*, 2013 WL 142877 (C.D. Cal. Jan. 7, 2013) ........ 14

*Dfinity Found. v. Meta Platforms, Inc.*, 2022 WL 16857036 (N.D. Cal. Nov. 10, 2022) ........ 20

*Dreamwerks Prod. Grp. Inc. v. SKG Studio*, 142, F.3d 1127, 1129 (9th Cir. 1998) ........ 8

*Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125 (C.D. Cal. 2001) ........ 21

*Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135 (9th Cir. 2002) ........ 12, 17, 23

*Fizz Soc. Corp. v. Maplebear, Inc.*, 791 F. Supp. 3d 990 (N.D. Cal. 2025) ........ 2, 8, 22

*Good Meat Project v. GOOD Meat, Inc.*, 716 F. Supp. 3d 783 (N.D. Cal. 2024) ........ 24

*Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156 (N.D. Cal. 2011) ........ 7

*Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, 668 F. Supp. 3d 1025 (C.D. Cal. 2023), *aff'd*, 2024 WL 4750497 (9th Cir. Nov. 12, 2024) ........ 22

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
2 F.4th 1150 (9th Cir. 2021)........................................................................................ 10

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
762 F.3d 867 (9th Cir. 2014)........................................................................................ 15

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
119 F. 4th 711 (9th Cir. 2024)...................................................................................... 20

*Lilith Games (Shanghai) Co. v. UCool, Inc.*,
2015 WL 5591612 (N.D. Cal. Sept. 23, 2015) ........................................................ 7, 25

*M2 Software, Inc. v. Madacy Ent.*,
421 F.3d 1073 (9th Cir. 2005)................................................................................ 2, 8, 14

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
290 F. Supp. 2d 1083 (C.D. Cal. 2003)........................................................................ 13

*Monster, Inc. v. Dolby Labs. Licensing Corp.*,
920 F. Supp. 2d 1066 (N.D. Cal. 2013) ....................................................................... 18

*Multi Time Mach., Inc. v. Amazon.com, Inc.*,
804 F.3d 930 (9th Cir. 2015)........................................................................................ 19

*Nat. Res. Def. Counsel, Inc. v. Winter*,
508 F.3d 885 (9th Cir. 2007)........................................................................................ 24

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024)........................................................................................ 6

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011)................................................................................... 8, 15

*Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*,
809 F.2d 601 (9th Cir. 1987)........................................................................................ 13

*Oakland Trib., Inc. v. Chron. Publ'g Co.*,
762 F.2d 1374 (9th Cir. 1985)......................................................................................... 7

*Oculu, LLC v. Oculus VR, Inc.*,
2015 WL 3619204 (C.D. Cal. June 8, 2015) ................................................................ 19

*Off. Airline Guides, Inc. v. Goss*,
6 F.3d 1385 (9th Cir. 1993)............................................................................................ 8

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
354 F.3d 1020 (9th Cir. 2004)........................................................................................ 20

*Prichett v. Bonta*,
818 F. Supp. 3d 1059 (N.D. Cal. 2025) ......................................................................... 6

*Spin Master, Ltd. v. Zobmondo Ent., LLC*,
944 F. Supp. 2d 830 (C.D. Cal. 2013) ........ 10

*Surfvivor Media, Inc. v. Survivor Prods.*,
406 F.3d 625 (9th Cir. 2005) ........ 8, 12

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
610 F.3d 1171 (9th Cir. 2010) ........ 8

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
423 F.3d 137 (2d Cir. 2005) ........ 7

*Winter v. Nat. Res. Def. Counsel, Inc.*,
555 U.S. 7 (2008) ........ 6

*World Champ Tech, LLC v. Peloton Interactive, Inc.*,
2025 WL 2673906 (9th Cir. Sept. 18, 2025) ........ 10

*Wreal, LLC v. Amazon.com, Inc.*,
840 F.3d 1244 (11th Cir. 2016) ........ 7

**Other Authorities**

1 *McCarthy on Trademarks and Unfair Competition* § 32:155 (5th ed 2024) ........ 17

## STATEMENT OF ISSUES TO BE DECIDED

Whether the Court should grant or deny Foundry Visionmongers' request for preliminary injunctive relief to bar Adobe from using its Firefly Foundry trademark.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Foundry Visionmongers' preliminary injunction motion (the "Motion") is untimely and lacks merit. Foundry Visionmongers filed its Motion almost seven months after it discovered Adobe's alleged infringement and was informed that Adobe would not rebrand Firefly Foundry, and almost two months after it filed its Complaint. Foundry Visionmongers knew Adobe was investing in developing its Firefly Foundry brand during that time and inexplicably sat on its hands for months until finally deciding to declare that urgency exists where there was none before. Whatever spurred this Motion, it was not the discovery of actual confusion or an urgent risk of irreparable harm, and the Motion should be denied on that basis alone.

Equally, the Motion should be denied because Foundry Visionmongers cannot show a likelihood of confusion. Foundry Visionmongers has never offered generative AI services and has no trademark rights at all for the use of the word "foundry" in the field of AI services: it ***admitted*** its own lack of trademark rights in the relevant market when it filed rushed "intent to use" trademark applications for AI services immediately after learning of Adobe's launch of Firefly Foundry. Indeed, given Foundry Visionmongers' complete lack of market presence, it would have made no sense for Adobe to have adopted the name "Firefly Foundry" to trade on Foundry Visionmongers' (nonexistent) goodwill for generative AI services. To the contrary, when Adobe decided to use the word "foundry" as part of the name of its customized Firefly services around November 2024, it did so ***to describe the services*** because there was already an established practice of companies describing high-end custom generative AI model training services as "foundry" services—including NVIDIA Foundry and Microsoft Azure Foundry—and numerous other comparable offerings like Salesforce AI Foundry, Palantir Foundry, and Intel Foundry Service. This is no different than any brand creating a subdivision with a common descriptive component like "studio" or "lab." – e.g., "Fox Studios" or "Disney Labs." In contrast, Adobe had no interest in naming its premium, bespoke

generative AI service after a company that did not offer generative AI services at all, and Adobe did not do so.

Adobe's use of "Firefly Foundry" has also created zero confusion with Plaintiff and has no likelihood of ever doing so. Tellingly, Plaintiff fails to offer survey evidence showing any actual confusion or likelihood of confusion (despite having had months in which it could have been diligently working to obtain that evidence). In fact, Plaintiff's Motion is bereft of even a single anecdotal account of consumer confusion. This is unsurprising because, among other things, the name "Firefly Foundry" is easily distinguishable from "Foundry," Firefly Foundry does not compete with any products from Foundry, and because any enterprise customers who might purchase both Firefly Foundry and Foundry Visionmongers products are sophisticated and discerning. It is simply not plausible that Firefly Foundry clients could be confused about whether they were dealing with Adobe at any point in the purchasing process, or that their initial interest in a premium, custom AI model training service would be sparked by their familiarity with Foundry Visionmongers. The reverse is also true—no customer familiar with Firefly Foundry (a bespoke consulting service typically costing more than $1 million) would confuse it with Plaintiff's products.

In short, Plaintiff's Motion is an improper attempt to stifle Adobe from using a common term to identify a non-competing service in a way that presents no possible risk of confusion—let alone a "probable risk" of confusion. *Fizz Soc. Corp. v. Maplebear, Inc.*, 791 F. Supp. 3d 990, 1017 (N.D. Cal. 2025) (denying preliminary injunction motion and holding that confusion must be "'probable' … not merely 'possible'") (quoting *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1085 (9th Cir. 2005)). It should be denied.

## II. Statement of Facts

### A. Adobe launched its successful family of Firefly AI models in 2023.

In 2023, Adobe launched Adobe Firefly, a family of generative AI models. Chotin Decl. ¶ 7. Firefly allows a user to generate or edit images and video with natural-language prompts, create sound effects from text prompts, generate an AI musical soundtrack automatically from a video or text prompts, and translate audio from one language to another. *Id.* ¶¶ 7-9. The general release version of Firefly is available to individuals and businesses to license. Businesses use Firefly to

quickly generate multi-modal content for advertising. *Id.* ¶ 10. The generally available version of Firefly is never branded with trademarks containing "foundry." *Id.*

Adobe heavily promotes Firefly, and the Firefly brand has become a rapid success. Adobe owns two ADOBE FIREFLY trademark registrations and one pending trademark application. Hanswirth Decl. ¶ 2. As a result, "Firefly" is strongly associated in the enterprise market with Adobe's AI-related offerings. *See* Chotin Decl. ¶¶ 6-10.

**B. Adobe began promoting its Firefly Foundry service in November 2024 for developing bespoke AI models to select enterprise partners.**

Firefly is trained on millions of pieces of content for the purpose of being able to generate creative content. Phillips Decl. ¶ 6. However, a general release Firefly model is not optimized to generate content that aligns with the customer's brand guidelines or intellectual property. Chotin Decl. ¶ 11. To address this limitation, Adobe began offering a highly customized service to its enterprise customers to develop bespoke AI models trained using millions of audiovisual data files from the client so that the bespoke models generated content with high fidelity to their brand language and other intellectual property. *Id*

In or around November 2024, Adobe conducted internet searches to brainstorm names for this new service. Phillips Decl. ¶¶ 8-9. These searches showed that "foundry" was commonly used by businesses for high-end, bespoke services, including in the AI space. *Id.* ¶ 9. For instance, "NVIDIA AI Foundry" makes custom AI models for film and television companies to train AI models on their own data. *Id.* ¶ 12; Hanswirth Decl. Ex. 10. "Microsoft Foundry" (formerly "Azure Foundry") has a service to customize AI Models, including for AI film creators. Hanswirth Decl. Ex. 13. Thus, Adobe's title for the new brand became Adobe Firefly Foundry and/or Firefly Foundry. Starting in December 2024, Adobe began marketing Firefly Foundry to select enterprise partners. Adobe rendered Firefly Foundry services to its first client no later than June 5, 2025. Chotin Decl. ¶ 28.

The service begins with Adobe meeting with a client to identify its challenges and needs. Adobe assigns the client a team of Adobe applied scientists, engineers, and creative workflow experts who work collaboratively with the client for approximately 5 to 9 months. Phillips Decl. ¶

18. Because the service is bespoke, there is no set or public pricing; contracts for the service cost over $1 million. *Id.* ¶ 19; Chotin Decl. ¶ 38. The resulting custom AI model is available exclusively to the client for whom it was developed. Chotin Decl. ¶¶ 12, 44. Adobe does not, and has no plans to, make Firefly Foundry models available for public download. *Id.* ¶ 12 .

**C. Adobe extensively promoted Firefly Foundry to its intended market from October 2025 to today.**

On October 20, 2025, Adobe issued a broadly publicized press release, published in TechCrunch and elsewhere, announcing the Firefly Foundry service for enterprise customers. Chotin Decl. ¶ 31. Two days later, Foundry Visionmongers sent Adobe a cease and desist letter and filed five new intent-to-use trademark applications, including a Foundry word mark and two Foundry design marks, for AI-related products and services. Dkt. 1, ¶¶ 22, 55. Since October 20, 2025, Adobe has consistently and vigorously promoted Firefly Foundry to the enterprise market, including highlighting it at its Adobe MAX conference on October 28 and running a continuous media relations campaign. Chotin Decl. ¶ 34. Adobe has directly marketed to prospective clients spanning a broad range of industries, including pharmaceuticals, insurance, financial services, retail, hardware, theme parks, and many more. *Id.* ¶ 30.

The sales process is built around extensive engagements and existing clientele who are well-aware that Adobe is the provider. *Id.* ¶ 15. When engaging in advertising generally, such as on the Firefly Foundry webpage, Adobe is prominently identified as the source of the service. For example, the webpage references "Adobe" and "Firefly" dozens of times and asks potential clients "to get in contact with Adobe." *Id.* ¶ 16, Ex. 1

While Adobe intends to continue promoting Firefly Foundry to the enterprise market, it has no intention to expand the brand into the mass market because Firefly Foundry is neither affordable to nor useful to ordinary consumers. *Id.* ¶ 41. Adobe has never made Firefly Foundry customer models available for public download. *Id.* ¶ 12.

**D. Firefly Foundry does not compete with Foundry Visionmongers' products.**

Foundry Visionmongers offers a plug-in called "CopyCat" to compositing software called "Nuke." As explained in Foundry Visionmongers' papers, Nuke is used in "high-end film and

television" to blend together live-action footage, computer-generated imagery, and matte paintings into a finished shot. Foulds Decl. ¶ 5. CopyCat can copy an artist's manual edits to video frames, reducing manual labor for repetitive tasks. CopyCat does not appear to have generative AI features, like text to video, image to video, or text to sound effects. Chotin Decl. ¶¶ 22, 24.

Foundry Visionmongers alleges that Griptape—which is a brand that Foundry Visionmongers purchased *after* this dispute arose and deliberately chose to rebrand as "Griptape by Foundry"—is an AI product that "can be trained on a particular customer's intellectual property to generate on-brand multi-modal content." Dkt. 28-1 at 6. Yet, according to Foundry Visionmongers' Creative Director, "funnily enough, under the hood, there is no AI" in Griptape. Chotin Decl. Ex. 2. Rather, Griptape is an orchestration system to coordinate AI tools; it is not a service for training bespoke generative AI models and does not have any of the generative AI functionalities of the custom models created using Firefly Foundry services. Chotin Decl. ¶¶ 26, 27.

### E. After Adobe rejected its cease and desist letter on November 7, 2025, Foundry Visionmongers delayed in suing and seeking injunctive relief.

Adobe responded to Foundry Visionmongers' cease and desist letter on November 7, 2025. Dkt. 28-33 at 7-10. In the letter, Adobe explained that Firefly Foundry was not similar to Foundry Visionmongers' software; that Foundry was a commonly used term; and that there was no risk of consumer confusion; therefore Adobe declined to accede to Foundry Visionmongers' demands to cease use of the Firefly Foundry trademark. While counsel for the parties spoke thereafter to try to resolve the issues, Adobe did not waver from its initial position and has continued to promote Firefly Foundry. Yet Foundry Visionmongers did not sue Adobe until March 11, 2025. Dkt. 1. It delayed another fifty-six days before moving for a preliminary injunction on May 6, 206. Dkt. 28-1.

### F. The Firefly Foundry trademark has never confused an Adobe or Foundry Visionmongers customer.

Despite Adobe's continuous promotion of Firefly Foundry to select enterprises beginning in November 2024 and more broadly starting in October 2025, neither Adobe nor Foundry Visionmongers is aware of any instances of actual confusion. Chotin Decl. ¶ 14; Dkt. 28-1 at 17-18.

## III. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Prichett v. Bonta*, 818 F. Supp. 3d 1059, 1070 (N.D. Cal. 2025) (quoting *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 24 (2008)). The movant must prove that "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent an injunction, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Id.* (citing *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115 (9th Cir. 2024)). While the Ninth Circuit allows for a "sliding scale approach," a court may not issue such an injunction unless "serious questions going to the merits were raised and the balance of hardships tips sharply in [the movant's] favor," and the movant has also shown a likelihood of irreparable injury and that the injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (9th Cir. 2011) (quotation omitted).

## IV. ARGUMENT

### A. Foundry Visionmongers' delay in filing this Motion establishes that it has not, and will not, suffer irreparable harm.

After sending a cease and desist letter to Adobe, Foundry Visionmongers inexplicably delayed for nearly ***seven months*** before moving for a preliminary injunction. This lack of urgency (while it knew that Adobe had fully launched and was investing in developing the Firefly Foundry brand) is sufficient reason by itself to deny its Motion. As described above, *see* Sec. II.C, *supra*, Foundry Visionmongers learned of Firefly Foundry by no later than October 22, 2025, when it sent a cease and desist letter to Adobe and rushed to file five new intent-to-use trademark applications. Dkt. 1, ¶¶ 22, 55. On November 7, 2025, Adobe's counsel responded substantively to the cease and desist letter, putting Foundry Visionmongers on notice that Adobe disagreed with Foundry Visionmongers' legal positions would not rebrand Firefly Foundry. Dkt. 28-33 at 7-10. Adobe continued to market Firefly Foundry. Yet Foundry Visionmongers took no action until filing the Complaint on March 11, 2026. Dkt. 1. It then waited *two more months* before finally filing this Motion. Dkt. 28.

The Ninth Circuit, this Court, and others courts have held that a court should deny a preliminary injunction when the plaintiff delays in seeking relief, because a lack of urgency

demonstrates there is no irreparable harm. *See, e.g.*, *Oakland Trib., Inc. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"); *Lilith Games (Shanghai) Co. v. UCool, Inc.*, 2015 WL 5591612, at *12–14 (N.D. Cal. Sept. 23, 2015) (denying motion for preliminary injunction, despite finding "a strong likelihood of success on the merits" because plaintiff delayed four months after talks broke down between the parties, and eight months after it discovered the alleged infringement, to file its motion); *Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156, 1167 (N.D. Cal. 2011) (denying motion for preliminary injunction where plaintiff's "delay in moving for an injunction [sic] implies a lack of urgency"); *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (collecting cases, stating that a "delay in seeking a preliminary injunction of even only a few months . . . militates against a finding of irreparable harm," and affirming denial based a five-month delay between the filing of the complaint and the filing the of motion); *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) (noting that "delays of as little as ten weeks" are sufficient "to defeat the presumption of irreparable harm").

Foundry Visionmongers cannot manufacture urgency from the recent National Association of Broadcasters ("NAB") trade show appearance, which was an entirely foreseeable continuation of marketing that had been ongoing for months. Adobe began promoting Firefly Foundry to select businesses as early as 2024 and accelerated its marketing efforts in October 2025, beginning with a press release in TechCrunch and the Adobe MAX conference a week later. Chotin Decl. ¶ 36. It has steadily marketed Firefly Foundry since then. *Id.* There was no reason for Foundry Visionmongers to assume that Adobe would not promote Firefly Foundry at NAB (or at another Adobe conference called Adobe Summit that overlapped with NAB in Las Vegas that same week); Foundry Visionmongers knew that Adobe had used its Adobe MAX conference six months earlier to similarly promote Firefly Foundry and had continuously promoted it since then.

Ultimately, Foundry Visionmongers' pronounced delay from the time that it was on notice of Adobe's alleged infringement to the filing of the Motion is unjustifiable, and it requires denial of the Motion because its own lack of urgency shows a lack of irreparable harm.

**B. Foundry Visionmongers is unlikely to succeed on the merits of its claims because there is no likelihood of confusion between the Foundry Visionmongers' marks and Adobe's Firefly Foundry.**

Foundry Visionmongers is not entitled to preliminary injunctive relief unless it can show a likelihood of success on two elements: (1) a protectable ownership interest in its marks; and (2) that Adobe's use is likely to cause consumer confusion. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011); *see also Fizz Soc.*, 791 F. Supp. 3d at 1017 (denying preliminary injunction motion and holding that confusion must be "'probable' . . . not merely 'possible'") (quoting *M2 Software*, 421 F.3d at 1085). Because Foundry Visionmongers is unlikely to succeed on the merits of its claims, this Court should deny the Motion.

When analyzing Foundry Visionmongers' "forward" confusion claim, the court should assess whether Adobe's Firefly Foundry customers are likely to mistakenly believe that they are dealing with Foundry Visionmongers using the eight-factor *Sleekcraft* test. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630–31 (9th Cir. 2005) (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)). In contrast, in analyzing "reverse" confusion the court should use the *Sleekcraft* factors to assess whether "consumers believe that goods bearing the [Adobe] mark came from, or were sponsored by, [Foundry Visionmongers]." *Id.* at 630. The court assesses these factors from the perspective of the "'reasonably prudent consumer' in the marketplace." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010) (quoting *Dreamwerks Prod. Grp. Inc. v. SKG Studio*, 142, F.3d 1127, 1129 (9th Cir. 1998)).

**1. Adobe's "Firefly Foundry" mark presents a distinct marketplace impression from "Foundry."**

Foundry Visionmongers argues that Firefly Foundry is "legally identical" to its Foundry Visionmongers' marks. *See* Dkt. 28-1 at 11-13. Not so. Under the "anti-dissection rule," the marks "must be considered ***in their entirety and as they appear in the marketplace***." *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) (emphasis added). The following examples from the parties' own websites are representative of how the marks typically appear in the marketplace:










Hanswirth Decl. ¶¶ 10-12. No reasonable purchaser would be confused into thinking these companies were affiliated simply because the word "foundry" appears in both websites.

There is no likelihood of forward confusion. Adobe's website prominently features brands strongly associated with Adobe, *i.e.*, its famous house name "Adobe" and "Firefly." Foundry Visionmongers' website also features the "Foundry" name in connection with prominent product names "Griptape" and "Nuke" (software that Foundry Visionmongers alleges has made its company a "household name"). Dkt. 28-1 at 16. In the marketplace context, "Firefly Foundry" and "Foundry" are neither "identical," nor even similar. *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1080 (9th Cir. 2020) (marketplace context rendered identical trademarks "not remotely similar").

Unable to show that these marks are similar in their marketplace context, as a fallback, Foundry Visionmongers invokes a theory of "reverse confusion" and suggests that the Court should penalize Adobe for using its distinctive house mark "Adobe" in connection with Firefly Foundry. First, this is not a "reverse confusion" case for the simple reason that Adobe, not Foundry Visionmongers, is the senior user of "foundry" in the generative artificial intelligence space. *See Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, 850 (C.D. Cal. 2013) (holding intent-to-use application does "not confer common law priority"). *Compare* Dkt. 28-43 *with* Dkt. 29-2, 29-3, 29-4.

But even if it were not, Foundry Visionmongers' theory that Adobe's house brand "aggravates" confusion is misplaced. Foundry Visionmongers cites *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021) to argue that Adobe's use of its house mark is "aggravating" in the context of a reverse confusion theory. But *Ironhawk* is readily distinguishable because it arose in a unique context where marks at issue were ***literally*** identical (Ironhawk's "Smart Sync" v. Dropbox's "Smart Sync") and the ***sole*** distinguishing aspect of the marks was their association with the parties' respective house marks. Further, the marks were used on closely overlapping "file-sharing" utilities, the plaintiff was a little-known company that had only one customer in its history whose entire reputation was at risk of being "swamped," and there was evidence of actual confusion, including testimony about customers expressing confusion about which company's product they owned and representatives of Ironhawk's sole customer expressing concerns at trade shows about "'double purchasing SmartSync." *Id.* at 1165.

More recently, the Ninth Circuit has repeatedly held that a junior user's use of its famous house mark in conjunction with an allegedly infringing mark negates reverse confusion. For example, in *World Champ Tech, LLC v. Peloton Interactive, Inc.*, 2025 WL 2673906, at *2 (9th Cir. Sept. 18, 2025), the Ninth Circuit affirmed summary judgment, holding that Peloton's commercially strong "Peloton Bike+" mark would not lead to reverse confusion with plaintiff's "Bike+" app in part because Peloton's app used its house mark, which "***reduc[ed]*** the potential for consumer confusion." *Id.* (emphasis added). The Court also found it significant that downloading the competing apps was a multistep process, rather than a "rash" decision. *Id.* In another case, *Align*

*Activation Wear, LLC v. Lululemon Athletica Canada, Inc.*, 2022 WL 3210698, at *1 (9th Cir. Aug. 9, 2022), the Ninth Circuit again affirmed summary judgment, holding that Lululemon's use of its house mark "***weigh[ed] heavily*** against a finding of reverse confusion" between the parties' competing "Align" and "Align Activation Wear" yoga pants. *Id.* (emphasis added).

So too here. Consumers encountering "Adobe Firefly Foundry" in the market are in no way likely to believe it is a reference to the company Foundry Visionmongers. Adobe's use of the dominant term "Firefly" in connection with "Foundry" sharply distinguishes its offering from "Foundry," and its use of its famous house mark only further clarifies that distinction.

This case is also a poor candidate for a reverse confusion theory for the additional reason that Foundry Visionmongers itself alleges that it is a "household name in the VFX industry, as evidenced by its award-winning products, tens of millions in sales, and recognition in earned media." Dkt. 28-1. There is no realistic probability that Adobe could "swamp" a household name with a niche Adobe offering, sold under a different mark, to sophisticated enterprise clients, for a very different service than Foundry Visionmongers' products.

Finally, Foundry Visionmongers asserts that Adobe makes only "occasional use" of "Adobe" or "Firefly" alongside Foundry. Dkt. 28-1 at 12. The record belies this. Foundry Visionmongers has not identified a single communication in which Adobe uses "Foundry" without any reference to "Adobe," "Firefly," or both. To be sure, when Adobe first broadly announced the service on October 20, 2025, it used shorthand phrases like "The Foundry" or "Adobe AI Foundry." But the press release was clearly identified as coming from Adobe and discussing "Adobe's Firefly family models." Ex. X (TechCrunch Press release with dominant fire engine red Adobe logo). Foundry Visionmongers also misleadingly highlights other exhibits to obscure uses of "Adobe Firefly Foundry" that provide overriding context for any shortened uses of "Foundry." *Compare* Dkt. 28-17, 28-35 (Plaintiff's versions) *with* Hanswirth Decl. Exs. 26, 25 (Adobe versions). After Foundry Visionmongers notified Adobe that it objected to the shorter versions, Adobe's counsel responded and clarified that Adobe intended to market the service as "Firefly Foundry" (Ex. X) and use "Adobe Firefly Foundry" and/or "Firefly Foundry" in future marketing, including at Adobe

MAX a week later.[1] Consistent with this, Adobe's trademark application for Firefly Foundry disclaims rights to "Foundry" apart from "Firefly." Dkt. 28-43. Tellingly, the vast majority of third party uses of "Foundry" or "Adobe Foundry" that Foundry Visionmongers compiled in Exhibit 28 of the Motion are from one or two days after that October 20 press release, and none are from after January 2026. Dkt. 28-32. And in any event, none of these third party communications following the press release mention Foundry Visionmongers or its products or otherwise suggest confusion.

Finally, Foundry Visionmongers' conclusory attempt to assert infringement of its design mark based solely on Adobe's Sphere advertisement (pictured at Dkt. 28-1 at 12) fares no better. Dkt. 28-1 at 12. Those marks use different colors, different fonts, different capitalization, different house marks, and the Adobe mark refers to "Firefly," which is strongly associated with Adobe and which appears right next to the word "Adobe." The Foundry Visionmongers design mark is a single word with a large yellow dot next to white letters. The Adobe ad uses a normal size period, in the same color as the letters, consistent with ordinary rules of grammar.

Because Firefly Foundry is presented entirely distinct from Foundry Visionmongers' marks in the marketplace, this factor strongly weighs against confusion.

**2. The parties' offerings are not closely related.**

For purposes of an infringement analysis, the parties' goods and services are not related unless they "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1147 (9th Cir. 2002) (internal quotation omitted). This test is not applied mechanically. *See Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 632 (9th Cir. 2005).

In *Surfvivor*, the plaintiff sold Hawaiian beach-themed "Surfvivor" shirts, and the defendant sold "Survivor" shirts referring to defendant's reality show of the same name. *Surfvivor*, 279 F.3d at 629. Despite both parties selling outdoor-themed t-shirts, the Ninth Circuit held this factor favored the defendant because there was "no material evidence in the record that customers are likely to associate the two products." *Id.* at 633; *see also Entrepreneur Media*, 279 F.3d at 1148 (holding a

---

[1] To the extent certain communications, like the job post in Exhibit 35 of the PI Motion (which is not client facing) may not be fully aligned with this practice, Adobe is willing to modify them to further clarify this distinction. It has already done this with that job posting.

"prototypical" magazine supported by sales of the magazine and ad placements was not related to a free magazine supported by promotional articles); *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987) (holding two weight loss services were unrelated because of differences in method of operation and customer groups).

Here, buyers would not reasonably expect Firefly Foundry to come from the same source as Foundry Visionmongers' products. Firefly Foundry is a bespoke service that can only be offered by a company that, like Adobe, has the capability to build generative AI models and teams of engineers and creative professionals available to work personally with the client to customize those models. *See* Chotin Decl. ¶ 38. Foundry Visionmongers provides no evidence it has these capabilities. Rather, Foundry Visionmongers alleges it is known for non-custom, off-the-shelf software. Dkt. 1 ¶ 14; Dkt. 28-1 at 3. The pricing is on vastly different scales— $1 million-plus vs. $5,000 per year. *Compare* Phillips Decl. ¶ 19 *with* Dkt. 29-9. Adobe's clients come from diverse industries, such as insurance, financial services, clothing, and pharmaceuticals—essentially any industry that advertises with multi-modal content. Chotin Decl. ¶ 30. Foundry Visionmongers' targeted customers are visual effects artists and film and video production industries. Dkt. 1 ¶ 14. These are exactly the type of "[m]eaningful differences between … products and services" that negate confusion, "even when the products are superficially within the same category." *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1092 (C.D. Cal. 2003) (internal quotation marks omitted).

Consistent with the fact that the parties' products and services are unrelated, Foundry Visionmongers has failed to connect any of the specific categories of goods or services listed in its trademark registrations as goods and services offered under Adobe's Firefly Foundry mark. Foundry Visionmongers recognized and acknowledged that its goods are unrelated to the Firefly Foundry service when it rushed to file new intent-to-use trademark applications seeking to monopolize the use of "foundry" in connection with AI services on the same day it sent Adobe its October 22, 2025, cease and desist letter. Dkt. 1, ¶¶ 22, 55. But these intent-to-use applications provide Foundry Visionmongers no enforceable rights—and only confirm that Foundry Visionmongers has never

operated in the market that Firefly Foundry operates in. *See* Dkt. 29 at 18-19 (discussing the lack of rights conferred by intent-to-use applications).

Unable to allege any plausible similarity between Adobe's Firefly Foundry and its own products, Foundry Visionmongers alleges that ***other*** Adobe software products, *i.e.*, Adobe After Effects and Adobe Substance 3D, compete directly with Foundry Visionmongers' Nuke and Mari, respectively. *See* Dkt. 28-1 at 13. These assertions are irrelevant because Foundry Visionmongers does not allege that Adobe After Effects or Adobe Substance 3D infringe Foundry Visionmongers' trademark rights. Nor can it; none of these products are branded with any "foundry" mark.

Attempting to invent a scenario where sophisticated customers might be confused, Foundry Visionmongers hypothesizes that, in the future, customers "will be able to select 'Foundry' in existing Adobe products like Premiere Pro and After Effects through a "dropdown" menu, believing it offers access to a Foundry Visionmongers tool. Dkt. 12 at 14. But this hypothetical ignores the fact that Adobe has not and would not make its custom trained "Firefly Foundry" models available to the general public. Rather, the only customers with a "dropdown" menu allowing access to a Firefly Foundry model are those have gone through the multi-month consultative process of building that model. It is implausible that such customers will not understand what Firefly Foundry is or who sponsors it. *See M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1084 (9th Cir. 2005) (holding that the possibility of confusion is "almost nil" among sophisticated purchasers of record labels and music management databases).

In short, Adobe offers a service for developing a bespoke generative AI model delivered as a high-touch enterprise consultancy engagement; Foundry Visionmongers offers off-the-shelf professional visual effects software products. These are distinct, and the parties' sophisticated clients and consumers are unlikely to confuse them.

**3. Firefly Foundry is sold through marketing channels that make confusion extremely unlikely.**

The marketing channels factor "is concerned with where, how, and to whom the parties' products are sold." *Athleta, Inc. v. Pitbull Clothing Co.*, 2013 WL 142877, at *9 (C.D. Cal. Jan. 7, 2013) (internal quotation omitted). It also considers "the sales and marketing methods employed,

and the class of purchasers exposed to the marketing efforts." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876–77 (9th Cir. 2014).

Here, obtaining the Firefly Foundry services requires meeting with Adobe sales representatives and negotiating a commercial contract and individualized pricing north $1 million with Adobe. Phillips Decl. ¶ 19. Foundry Visionmongers sells licenses to its products on its website or presumably through its own sales representatives for business customers. Dkt. 29-9. These are not products sold next to each other on the shelf that can be bought on a whim and in a moment of confusion.

To be sure, the companies sell to some of the same customers. But given the expensive and bespoke nature of the Firefly Foundry service, any overlap would limited to a subset of Foundry Visionmongers customers, such as those it says pay more than $100,000 per year for its licenses. *See* Dkt. 28-1 at 4-5. Indeed, Foundry Visionmongers cites Walt Disney Imagineering as an example of such a customer—which only demonstrates the extraordinary degree of sophistication of any overlapping customers. In this context, the partial overlap in customers raises no meaningful risk of confusion. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1143 (9th Cir. 2011) (reversing grant of preliminary injunction even though the parties sold "virtually interchangeable" software licenses in the same marketing channels for $995 to $10,995).

Foundry Visionmongers also points to shared presence at trade shows, in particular the NAB conference, to show that the parties have similar marketing channels, but the mere fact of shared presence at trade shows does not create a likelihood of confusion. *See* Dkt. 28-1 at 14-15. At trade shows, including NAB, Adobe's booths prominently display Adobe's branding and its employees wear clothing emblazoned with Adobe's logos, negating any likelihood of confusion. *See, e.g.*, Hanswirth Decl. ¶¶ 5-6. Foundry Visionmongers heavily relies on a single panel from NAB where an Adobe representative benignly volunteered that Firefly Foundry was not related to Foundry Visionmongers. But the full transcript and video of that panel (which Foundry Visionmongers did not provide) confirm that this comment did not arise in the context of any confusion and that no reasonable viewer of the panel discussion could believe that Foundry Visionmongers is the source of or is otherwise connected to Firefly Foundry. Hanswirth Decl. Exs. 7-8.

Foundry Visionmongers also asserts that Adobe hosted a two-hour invite-only breakfast at NAB that was limited to 100 attendees and subject to an NDA where Firefly Foundry was discussed. *See* Dkt. 28-18, ¶¶ 8-9; Dkt. 28-22. But, again, it is inconceivable that an enterprise customer invited to an Adobe-branded breakfast to discuss Adobe offerings under an NDA with Adobe would somehow believe they were learning about Foundry Visionmongers' products.

Because it is implausible that a person going through the process of learning about and contracting for Adobe's bespoke Firefly Foundry service could believe that anyone other than Adobe is the source of those services, this factor strongly favors denial of the Motion.

**4. The Foundry Visionmongers' marks are weak, reflecting a descriptive concept in a crowded field.**

The strength of the mark factor favors denying the Motion because Foundry Visionmongers' marks are both conceptually and commercially weak.

"Foundry" is a commonplace descriptive term, used to describe many types of businesses that makes things for others, including a wide range of uses in creative and audiovisual spaces, as evidenced by trademark registrations like PROFOUNDRY for post-production editing of advertising; FOUNDRY 360 for graphic design services; MOVE FOUNDRY for video production services; EXPERIENCE FOUNDRY for graphic design services; FUTURIST FOUNDRY for graphic design services; SONIC FOUNDRY for software for creating multimedia files; SPARK FOUNDRY for graphic arts design; THINK FOUNDRY WEST for post-production video editing of video, and THINK FOUNDRY for video film production. Dkt. 29-32.

Indeed, before Adobe adopted the name "Firefly Foundry," the AI industry was commonly describing custom AI model training services like Firefly Foundry as "foundry services," including models for creative/audiovisual applications. For example, "NVIDIA AI Foundry" makes custom AI models for "today's most successful films and television shows." Hanswirth Decl. Ex. 12. A client of "Microsoft Foundry" (formerly "Azure AI Foundry") used Microsoft's AI customization service to release and show an AI film at the 2026 NAB Show. *Id.* Exs. 13-15. Beyond custom model training, technology companies commonly use "foundry" to describe other AI-related offerings. As examples, "Intel Foundry" is Intel's semiconductor manufacturing service—"the first

systems foundry designed for the AI era" (*id.* Ex. 19); "Salesforce AI Foundry" is an enterprise AI research initiative focused on developing AI agent and automation capabilities (*id.* Ex. 16); and "Palantir Foundry" is a data integration and AI-powered operations platform for enterprise customers (*id.* Ex. 17).

Foundry Visionmongers' reliance on its "incontestable registrations" to prove conceptual strength is unavailing. "[T]he incontestable status of [a plaintiff's] mark does *not* require a finding that the mark is strong." *Entrepreneur Media*, 279 F.3d at 1142. Incontestability is irrelevant to this Motion because incontestability precludes certain types of challenges "solely to the *validity*" of the mark, not its strength. 1 *McCarthy on Trademarks and Unfair Competition* § 32:155 (5th ed 2024). Moreover, Foundry Visionmongers has no incontestable registrations in the AI space. It asserts no registrations (as opposed to mere applications) in that space at all.

Foundry Visionmongers also does not establish that its marks have commercial strength. A mark is commercially weak if it exists in a "crowded field." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002). "In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Id.* Here, in addition to the descriptive uses highlighted above, there are over 420 live trademark applications and registrations, plus many more common law uses, of marks that contain the word "foundry". Dkt. 29-32. Because "foundry" marks are so common and prominent in the marketplace, when potential clients see "foundry" in the context of Firefly Foundry or Foundry Visionmongers, their "customers will not likely be confused by any two in the crowd and are likely to pick out" offerings from the crowded field "foundry" users. *Entrepreneur Media*, 279 F.3d at 1144.

Moreover, Foundry Visionmongers implicitly admits that its marks are commercially weak in the AI space. Foundry Visionmongers does not assert any registrations covering AI-related goods and services. Rather, Foundry Visionmongers only has intent-to-use applications, which grant it no enforceable rights, and which it rushed to file. *See* Dkt. 1, ¶ 22.

Additionally, Foundry Visionmongers provides no evidence that its marks are so strong that reasonable consumers would associate any reference to "foundry" as a reference to Foundry Visionmongers, and overlook any other context, such Adobe or Firefly branding. At most, Foundry

Visionmongers establishes that Foundry Visionmongers is recognized by visual effects artists and their employers as one of many "foundry" companies in the audiovisual space. Furthermore, Foundry Visionmongers failed to submit any consumer survey evidence testing whether people in the parties' respective markets associate "foundry" exclusively with Foundry Visionmongers—despite bearing the burden on this Motion and having ***seven months*** to prepare one.

Because Foundry Visionmongers' marks are descriptive and has not established its "Foundry' mark is so strong that consumers understand it as the only "foundry" user in the relevant fields, this factor strongly favors denial of Foundry Visionmongers' Motion.

**5. Foundry Visionmongers offers no evidence of actual confusion despite having ample time to collect such evidence, had it existed.**

Foundry Visionmongers fails to provide *any* evidence of actual confusion. The fact that Foundry Visionmongers has not identified a ***single instance of anyone mistaking its products for Adobe's*** (or vice versa) strongly confirms the dissimilarities between the parties' marks, companies, and offerings. *Sleekcraft*, 599 F.2d at 353 (holding the actual confusion "factor is weighed heavily . . . when the particular circumstances indicate such evidence should have been available").

To start, Foundry Visionmongers has failed to present any survey evidence of actual confusion. "[S]urvey evidence is often the most persuasive evidence concerning likelihood of confusion" and "a trier of fact may be entitled to presume that one party's failure to conduct a survey concedes that the survey evidence would be unfavorable to it." *Monster, Inc. v. Dolby Labs. Licensing Corp.*, 920 F. Supp. 2d 1066, 1072 (N.D. Cal. 2013). Foundry Visionmongers delayed seven months between its cease and desist letter and the filing of its preliminary injunction motion, giving it ample time to conduct multiple surveys. There are two possible explanations for this: either it failed to conduct a survey during that time, or it did conduct survey(s) and did not like the results. Whichever the reason, the absence of a survey is telling. (By contrast, Adobe could not have conducted a survey in the time it had to oppose this Motion.)

Foundry Visionmongers hypothesizes that the lack of actual confusion between Firefly Foundry "is not surprising" because Firefly Foundry "appears to remain in very limited release, without any public pricing or download availability" In support of that, it points to the fact that

Adobe's website directs customers to "get in contact with Adobe so we can understand your specific needs and goals." Dkt. 28-1 at 18.

But the record is clear that the Firefly Foundry service has been launched to some clients for almost a year and broadly announced for ***months***, and none of the facts Foundry Visionmongers' points to suggest otherwise. The bespoke nature of the Firefly Foundry service means it is inherently a customized offering that is not amenable to standardized public pricing. Chotin Decl. ¶ 38. Adobe asks clients to discuss their needs and goals as the first step of the service. *Id.* ¶ 37. And Adobe delivers each Firefly Foundry model exclusively to the client who partnered with Adobe to develop it, rather than for public download. Phillips Decl. ¶¶ 18, 20.

The reason Foundry Visionmongers lacks evidence of actual confusion is not that Firefly Foundry has barely launched. It is that Adobe's use of Firefly Foundry is not confusing. Accordingly, Foundry Visionmongers' failure to present any form of actual confusion weighs "heavily" in favor of denying the Motion.

**6. Consumers exercise extraordinary care when spending thousands or millions of dollars on goods or services.**

The degree of sophistication of the buyers of Firefly Foundry and Foundry Visionmongers' products essentially rules out any possibility of confusion. "Confusion is less likely where buyers exercise care and precision in their purchases." *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937 (9th Cir. 2015) (quoting *Sleekcraft*, 599 F.2d at 353).

Here, on both sides, the parties' offerings and consumers are of the kind that make confusion extremely unlikely. Foundry Visionmongers offers professional visual effects software, with customers that include "major feature film studios," "post-production houses," "independent studios, film makers, animators, content creators," and "animation studios" and VFX professionals. Dkt. 28-2 ¶¶ 6-7. Meanwhile, Firefly Foundry is unavailable to the general public; it is offered to enterprise clients who engage Adobe directly to build their custom AI models at a cost of over $1 million. Chotin Decl. ¶¶ 12, 38; Phillips Decl. ¶ 4. It is therefore implausible that the parties' highly sophisticated consumers would be confused by their respective marks. *See Oculu, LLC v. Oculus VR, Inc.*, 2015 WL 3619204, at *16 (C.D. Cal. June 8, 2015) ("tech-savvy" customers not confused

by OCULU and OCULUS); *Dfinity Found. v. Meta Platforms, Inc.*, 2022 WL 16857036, at *9 (N.D. Cal. Nov. 10, 2022) (business software purchasers exercise "high[] degree of care").

Foundry Visionmongers suggests that even sophisticated purchasers "may still be initially confused" about whether the parties are "somehow affiliated or connected." Dkt. 18. But this is not a plausible "initial interest" confusion case, *i.e.*, there is no suggestion that Adobe is trying to divert people interested in Foundry Visionmongers' products by leading them to believe they are contacting Foundry when they are really contacting Adobe. Adobe's webpage clearly asks customer to "get in contact with Adobe" to see the "full power of Adobe Firefly Foundry." Chotin Decl. Ex. 1; *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F. 4th 711, 722 (9th Cir. 2024) (holding "clear labeling" eliminated initial interest confusion as a matter of law).

Foundry Visionmongers suggests that customers could be initially confused about whether there was a "license" because these products may be encountered in the same workflows (e.g., because Adobe After Effects licenses Foundry Visionmongers' "Keylight" plugin). But the parties' history of cross-licensing undermines rather than supports this theory. Foundry Visionmongers admits elsewhere that professional users of VFX software are used to seeing third-party integrations, including between Adobe and Foundry Visionmongers products. Foulds Decl. ¶ 32 ("Because video production ***often involves numerous third-party products***, a number of the ***FOUNDRY-branded products are designed to work with Adobe and vice-versa***.") (emphasis added). Indeed, the screenshot in Foundry Visionmongers' own evidence shows that within After Effects, Keylight is explicitly identified as third-party technology licensed *from* Foundry Visionmongers, teaching users that when Adobe incorporates Foundry Visionmongers' technology, it labels it as such. *Id.* ¶ 33. Foundry Visionmongers has apparently always trusted its customers to be able to distinguish between the companies even when encountering their names in the same products without suffering "initial interest" confusion, or else it would not voluntarily license its products to Adobe and vice versa.

Furthermore, these buttons do not "divert" consumers looking for information about a Foundry Visionmongers as a way to increase Adobe's sales, as required to support an initial interest confusion claim. *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020,

1023 (9th Cir. 2004) (defendant displayed banner ads to computer users who searched for plaintiff's trademarks, diverting them to websites of plaintiff's direct competitors). The buttons are only available to users within enterprises that have worked directly with *Adobe* for months to develop a bespoke Firefly Foundry AI model. And the people clicking the buttons are not looking to buy anything. They are accessing an AI model that their employer already bought. These buttons, accordingly, are not likely to divert sales from Foundry Visionmongers.

Finally, Foundry Visionmongers tries to counter this by arguing that because "the parties have the same name, … virtually no amount of consumer care can prevent confusion." Dkt. 28-1 at 18 (quoting *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1134 (C.D. Cal. 2001)). *Electropix* undermines Foundry Visionmongers' position. Although it found a likelihood of confusion between "Livewire" and "LiveWire," it held sophisticated customers would were ***unlikely*** to confuse "Live Wire" and "Liberty Livewire" for "custom-tailored" services:

> Plaintiff and Defendants sell very specialized, custom-tailored technical and creative services to sophisticated customers. These sophisticated consumers purchase the services over an extended period of time and after significant interaction with the respective sellers. Confusion between Plaintiff's company "Live Wire" and Defendants' company "Liberty Livewire" is therefore unlikely.

*Electropix*, 178 F. Supp. 2d at 1131. Likewise, the parties' sophisticated customers are unlikely to confuse "Adobe Firefly Foundry" or "Firefly Foundry" with "Foundry."

**7. Adobe adopted Firefly Foundry in good faith to align itself with other AI foundry services in the market, not to trade off Foundry Visionmongers' brand.**

The "intent" factor also favors Adobe because it adopted the mark "Firefly Foundry" in good faith. Adobe adopted "foundry" as a term descriptive of its service because there were multiple preexisting AI "foundry services" and other comparable "foundry" services in the technology industry at the time it adopted its mark (none of which had anything to do with Foundry Visionmongers). *See* Phillips Decl. ¶¶ 14-15.

Foundry Visionmongers offers no evidence to the contrary. Rather, it argues only that Adobe must have known of Foundry Visionmongers at the time it named Firefly Foundry because the companies "appear[ed] at the same trade shows, offer[ed] related products, and use[d] one another's technology." *Id*. But prior knowledge of a mark is not sufficient to give rise to an inference of bad

faith. *See Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, 668 F. Supp. 3d 1025, 1043 (C.D. Cal. 2023) (internal quotation omitted), *aff'd*, 2024 WL 4750497 (9th Cir. Nov. 12, 2024). That would be true *even if* Foundry Visionmongers had a registered trademark for generative AI services at the time Adobe selected its mark, which it did not. Given that Adobe had no intent to sell any product that Foundry sold, there is no reason at all to infer bad faith and disregard the affirmative evidence of the real reason it chose the name.

**8. Neither party intends to use "foundry" on competing goods and services.**

In arguing the likelihood of expansion factor, Foundry Visionmongers again conflates its general set of product offerings with Adobe's to conclude that "competition is already occurring, and is only likely to increase as Plaintiff expands its products under the FOUNDRY® Marks, such as by acquiring new companies." Dkt. 28-1 at 20. But Foundry Visionmongers *does not* state that it offers, or intends to offer, bespoke generative AI model engineering services. Just because certain of Foundry Visionmongers' products may incorporate some artificial intelligence technology (such as via plug-ins) or integrate with artificial intelligence technology does not mean that that offering is the same as Adobe's service for creating bespoke AI models. *See* Chotin Decl. ¶¶ 19-27; *Fizz Soc.*, 791 F. Supp. 3d at 1017 (weighing likelihood of expansion factor against plaintiff because there must be a "strong possibility" of expansion and there was "no specific concrete evidence that either party intend[ed] to enter into the other's field") (quotations omitted). It is likely a rare company anywhere in the world today that does not have some plan to incorporate AI technology in the future-—this does not make all companies into AI model developers. Likewise, there is no evidence that Adobe plans to expand its Firefly Foundry service in a way likely to create confusion or to rebrand any Adobe visual effects software as "Firefly Foundry." Because there is no evidence of expansion by either party, this factor weighs against a likelihood of confusion.

* * *

In assessing the likelihood of confusion, the Court must consider "what the analysis as a whole [] reveals about the ultimate question" of likelihood of confusion, without "mechanically" counting the number of factors in favor of each party or "giving the same weight to a particular

factor from case to case." *Entrepreneur Media*, 279 F.3d at 1141. Here, because the balance of factors decisively points away from confusion, the Court should deny the Motion.

**C. Foundry Visionmongers has not demonstrated any irreparable harm.**

For the reasons described in Sec. IV.A, *supra*, Foundry Visionmongers' delay alone shows that it has not, and will not, suffer irreparable harm without the requested injunctive relief. And, even putting that aside, its arguments that it will be irreparably harmed have no merit.

Foundry Visionmongers further argues that it will lose market share absent injunctive relief because consumers will buy Adobe After Effects instead of Foundry Visionmongers' Nuke, and Adobe Substance 3D instead of Foundry Visionmongers' Mari. *See* Dkt. 28-1 at 22. That assertion is bereft of any evidentiary support. Firefly Foundry is *not* compositing software like Nuke or texturing software like Mari—and it certainly is not a reasonable replacement for them. *See* Chotin Decl. ¶¶ 11-12. Someone who wants $5,000 compositing software will not instead spend over $1 million on the Firefly Foundry service. Thus, there is no risk of Foundry Visionmongers' loss of market share due to Adobe's use of Firefly Foundry. Moreover, Adobe After Effects and Adobe Substance 3D are not branded with the word "foundry." It is therefore implausible that Foundry Visionmongers would lose market share as a result of consumers believing Foundry Visionmongers made the software.

Foundry Visionmongers' fallback arguments about a risk of reverse confusion fare no better. There is no risk of reverse confusion for all the reasons discussed above. This is particularly so where Foundry Visionmongers itself contends its products are highly commercially successful within a niche market, touting Emmy Awards, Academy Awards, and various conference awards for its product offerings. *Id*. If "Foundry" is a "household name in the VFX industry" (Dkt. 28-1 at 16), then its commercial strength makes any potential reverse confusion exceedingly unlikely.

Foundry Visionmongers also asserts that "unique circumstances" exist such that irreparable harm is likely due to Adobe's purported "$1 billion" marketing budget. Dkt. 28-1 at 22. This is highly misleading. Foundry Visionmongers appears to be relying on public reporting of Adobe's *company-wide global marketing budget*. *See id*. Adobe does not have a $1 billion budget for Firefly Foundry, nor would it make sense to engage in extensive mass marketing of Firefly Foundry, a

service geared toward a much smaller audience of enterprise customers seeking a bespoke product. Chotin Decl. ¶ 41. Nor does Adobe intend to make Firefly Foundry available across its suite of products for all customers. *Id.* ¶¶ 43-46. As a result, there is no risk that Adobe would "drown out the distinctiveness of" Foundry Visionmongers' marks absent the extraordinary remedy of a preliminary injunction. Accordingly, Foundry Visionmongers fails to establish that it will suffer irreparable harm without an injunction.

**D. The public interest would not be served by an injunction.**

The public interest would not be served by the Court's grant of broad injunctive relief in this case. First, because Foundry Visionmongers' public interest argument rests on the likelihood of consumer confusion, if there is no such likelihood, then there is also not "any significant threat to the public interest in the absence of injunctive relief." *Good Meat Project v. GOOD Meat, Inc.*, 716 F. Supp. 3d 783, 806 (N.D. Cal. 2024).

But even assuming there was a possible likelihood of confusion, the public, Foundry Visionmongers has requested overbroad relief—seeking to prohibit any use by Adobe of the word "foundry" in commerce, including descriptively in advertising, marketing, promoting, or selling any good or service with the word "foundry." Dkt. 28-44. A preliminary injunction "must be tailored to remedy the specific harm alleged." *Nat. Res. Def. Counsel, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007). Granting broad preliminary injunction relief as to a common descriptive term like "foundry" would have a chilling effect on competition and the ability of companies beyond Adobe to describe their services accurately to consumers, which is not in the public interest. *See Arenas v. Shed Media U.S. Inc.*, 881 F. Supp. 2d 1181, 1195 (C.D. Cal. 2011), *aff'd*, 462 Fed. App'x 709 (9th Cir. 2021) (denying preliminary injunction against trademark infringement based on "the significant public interest in upholding First Amendment Principles" where claims are intellectual property infringement are "highly attenuated") (internal citation omitted). Foundry Visionmongers is not seeking to prevent trademark infringement, but is instead attempting to exert dominion over the descriptive word "foundry." As a result, the public interest would not be served with the Court issuing an injunction here.

### E. The balance of equities favors denying Foundry Visionmongers' Motion.

Finally, the balance of equities also tilts sharply in Adobe's favor. Foundry Visionmongers waited nearly seven months to bring this Motion, while it knew that Adobe continuing to invest in and build the Firefly Foundry brand. *Lilith Games*, 2015 WL 5591612, at *12–14 (holding that delay "affect[ed] the equities" because the defendant "made huge investments during those four months that would likely be lost if the Court were to grant a preliminary injunction"). Adobe now unfairly faces significant disruption to its business and customer relationships due to Foundry Visionmongers' long delay.

In particular, Adobe has spent months of time and substantial resources developing, marketing, and delivering its Firefly Foundry services since Plaintiff was on notice of Firefly Foundry. Chotin Decl. ¶ 47. Adobe would be forced to rebrand ongoing client engagements, revise or renegotiate existing client contracts, and update all marketing and public-facing websites and social media channels. *Id.* ¶ 48. It is also likely to lose business opportunities and suffer harm to its credibility. *Id.* ¶ 49. And it would likely incur these harms a second time should it ultimately prevail in the case subsequent to the Court's preliminary injunction ruling. *Id.* ¶ 50. If Foundry Visionmongers was going to seek the extraordinary remedy of a preliminary injunction, it was incumbent on it to do so expeditiously to avoid subjecting Adobe to these harms. As a result, the balance of equities weigh heavily in favor of denying Foundry Visionmongers' Motion.

## V. CONCLUSION

For the foregoing reasons, the Court should deny the Motion.

Dated: May 20, 2026

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/ Dori Ann Hanswirth*

DORI ANN HANSWIRTH
JOSEPH FARRIS
OSCAR RAMALLO
HAFEEZ KHAN

*Attorneys for Defendant Adobe Inc.*