ARNOLD & PORTER KAYE SCHOLER LLP
DORI ANN HANSWIRTH (pro hac vice)
Email: dori.hanswirth@arnoldporter.com
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

ARNOLD & PORTER KAYE SCHOLER LLP
JOSEPH FARRIS (SBN 263405)
Email: joseph.farris@arnoldporter.com
HAFEEZ KHAN (SBN 339702)
Email: hafeez.khan@arnoldporter.com
Four Embarcadero Center, 14th Floor
San Francisco, CA 94111
Telephone: (415) 471-3100
Facsimile: (415) 471-3400

ARNOLD & PORTER KAYE SCHOLER LLP
OSCAR RAMALLO (SBN 241487)
Email: oscar.ramallo@arnoldporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199

*Attorneys for Defendant Adobe Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE FOUNDRY VISIONMONGERS LTD.<br><br>             Plaintiff,<br><br>     vs.<br><br>ADOBE INC.,<br><br>             Defendant. | Case No. 3:26-cv-02121-NW<br><br>Action Filed: March 11, 2026<br><br>**DEFENDANT ADOBE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:    July 22, 2026<br>Time:    9:00 a.m.<br>Place:    Courtroom 3, 5th Floor<br><br>Judge:    Honorable Noël Wise<br>Trial Date: None Set |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................. 1

STATEMENT OF RELIEF SOUGHT / ISSUES TO BE DECIDED ........................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................................. 1

I.  Introduction ................................................................................................................... 1

II.  Factual Background ....................................................................................................... 3

    A.  Adobe's Firefly and Firefly Foundry generative artificial intelligence services. ............................................................................................................ 3

    B.  Foundry Visionmongers' history of offering visual effects software. .................... 4

    C.  Foundry Visionmongers' trademark registrations for visual effects software. ........ 5

    D.  Foundry Visionmongers' hurried trademark applications for artificial intelligence services after learning of Firefly Foundry. .......................................... 5

    E.  Foundry Visionmongers' allegations of "forward" and "reverse" confusion. ......... 5

III.  Legal Standard ............................................................................................................... 6

IV.  Argument ....................................................................................................................... 6

    A.  Foundry Visionmongers' claims fail because it cannot plead a likelihood of forward confusion. .............................................................................................. 7

        1.  "Foundry" is a common descriptive mark in the markets in which Foundry Visionmongers seeks to monopolize its use. ......... 7

        2.  The Firefly Foundry mark and the Foundry house mark are not presented similarly in the marketplace. ......................................... 10

        3.  Adobe offers a service to develop custom generative AI models, while Foundry Visionmongers offers a machine learning tool that automates rote tasks. ......................................... 15

            a.  Foundry Visionmongers has never offered a service to develop bespoke generative AI models or anything similar to such a service. ........................................................................ 15

            b.  Foundry Visionmongers' intent-to-use applications grant it no enforceable rights. ........................................................... 18

        4.  Foundry Visionmongers has yet to allege even a single example of actual confusion. ........................................................ 18

5. The parties' specialized services are expensive and sold to sophisticated consumers.................................................. 19

6. The parties' personalized marketing to sophisticated buyers eliminates a likelihood of confusion. ............................................ 20

7. Foundry Visionmongers offers only boilerplate allegations that Adobe intended to capitalize on its goodwill......................... 21

8. Foundry Visionmongers does not allege either party is likely to offer the same products or services under a "foundry" mark. .. 22

B. Reverse confusion is implausible because both Adobe and Foundry Visionmongers are widely-known among the relevant purchasers........................ 22

V. Conclusion ............................................................................................ 24

**TABLE OF AUTHORITIES**

**Cases**

*Aliign Activation Wear, LLC v. Lululemon Athletica Canada, Inc.*,
   2022 WL 3210698 (9th Cir. Aug. 9, 2022)................................................................23

*Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*,
   616 F.2d 440 (9th Cir. 1980).................................................................................12

*AMF, Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979)............................................................ 7, 10, 15, 19, 22

*Arcona, Inc. v. Farmacy Beauty, LLC*,
   976 F.3d 1074 (9th Cir. 2020)........................................................................ 10, 12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................... 6, 18

*Athleta, Inc. v. Pitbull Clothing Co.*,
   2013 WL 142877 (C.D. Cal. Jan. 7, 2013) ...............................................................20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................................6

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
   174 F.3d 1036 (9th Cir. 1999).................................................................................18

*Bruker Nano, Inc. v. Beijing Transcend Vivoscope Bio-Tech., Co.*,
    2025 WL 3089552 (S.D. Cal. Nov. 5, 2025) .......................................................20

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
   269 F.3d 270 (3d Cir. 2001)...................................................................................15

*Citigroup Inc. v. Cap. City Bank Grp., Inc.*,
   637 F.3d 1344 (Fed. Cir. 2011)...............................................................................12

*Cleary v. News Corp.*,
   30 F.3d 1255 (9th Cir. 1994).....................................................................................7

*Cohn v. Petsmart, Inc.*,
   281 F.3d 837 (9th Cir. 2002)..............................................................................22, 23

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010).....................................................................................6

*Design & Sales, Inc. v. Elec. Data Sys. Corp.*,
   954 F.2d 713 (Fed. Cir. 1992)...................................................................................20

*Dfinity Found. v. Meta Platforms, Inc.*,
   2022 WL 16857036 (N.D. Cal. Nov. 10, 2022)...............................................................19

*Dinan v. SanDisk LLC*,
   2020 WL 364277 (N.D. Cal. Jan. 22, 2020) ................................................................8

*Echo Drain v. Newsted*,
    307 F. Supp. 2d 1116 (C.D. Cal. 2003).............................................................................. 15

*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 (9th Cir. 2002)............................................................................................ 10

*Fitbug Ltd. v. Fitbit, Inc.*,
    78 F. Supp. 3d 1180 (N.D. Cal. 2015) ............................................................................. 21

*Fizz Soc. Corp. v. Maplebear, Inc.*,
    791 F. Supp. 3d 990 (N.D. Cal. 2025) ............................................................................. 12

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
    618 F.3d 1025 (9th Cir. 2010)............................................................................................ 21

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
    2026 WL 1593307 (U.S. Jun. 4, 2026) ............................................................................. 22

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
    599 U.S. 140 (2023) ........................................................................................................... 6

*Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*,
    797 F.3d 1363 (Fed. Cir. 2015).......................................................................................... 9

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
    762 F.3d 867 (9th Cir. 2014).............................................................................................. 20

*Lodestar Anstalt v. Bacardi & Co.*,
    31 F.4th 1228 (9th Cir. 2022)............................................................................................. 6

*M2 Software, Inc. v. Madacy Ent.*,
    421 F.3d 1073 (9th Cir. 2005)..................................................................................... 16, 20

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
    290 F. Supp. 2d 1083 (C.D. Cal. 2003)............................................................................ 15

*Mintz v. Subaru of Am., Inc.*,
    716 F. App'x 618 (9th Cir. 2017) ...................................................................................... 6

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
    856 F.2d 1445 (9th Cir. 1988)............................................................................................ 7

*Mkt. Corner Realty Assocs., LLC v. CGM-GH LLC*,
    2004 WL 1077918 (S.D.N.Y. May 13, 2004)................................................................... 18

*Multi Time Mach., Inc. v. Amazon.com, Inc.*,
    804 F.3d 930 (9th Cir. 2015).............................................................................................. 19

*Murray v. Cable Nat'l Broad. Co.*,
    86 F.3d 858 (9th Cir. 1996)................................................................................................ 6

*Naimi v. Starbucks Corp.*,
    2018 WL 11255596 (C.D. Cal. Feb. 28, 2018).................................................................. 8

*Nautilus Grp., Inc. v. Savvier, Inc.*,
    427 F. Supp. 2d 990 (W.D. Wash. 2006) .......................................................................... 15

*Nerdio, Inc. v. NerdIO Ltd.*,
    2024 WL 2978518 (T.T.A.B. May 14, 2024) ..................................................................... 18

*Network Automation*,
    638 F.3d 1137 (9th Cir. 2011) ............................................................................. 7, 17, 19

*Oculu, LLC v. Oculus VR, Inc.*,
    2015 WL 3619204 (C.D. Cal. June 8, 2015) ..................................................................... 19

*Performance Designed Prods. LLC v. Plantronics, Inc.*,
    2019 WL 3082160 (S.D. Cal. July 15, 2019) ...................................................................... 6

*Pocket Socks, Inc. v. Louis Vuitton N. Am., Inc.*,
    2025 WL 1239348 (S.D. Cal. Apr. 29, 2025) ..................................................................... 10

*Rearden LLC v. Rearden Com., Inc.*,
    683 F.3d 1190 (9th Cir. 2012) ........................................................................................... 21

*Spin Master, Ltd. v. Zobmondo Ent., LLC*,
    944 F. Supp. 2d 830 (C.D. Cal. 2013) ............................................................................... 18

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ............................................................................................. 13

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005) ......................................................................................... 7, 23

*Threshold Enters. Ltd. v. Pressed Juicery, Inc.*,
    445 F. Supp. 3d 139 (N.D. Cal. 2020) ................................................................................. 9

*Toho Co. v. Sears, Roebuck & Co.*,
    645 F.2d 788 (9th Cir. 1981) ............................................................................................... 6

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
    610 F.3d 1171 (9th Cir. 2010) ....................................................................................... 7, 19

*United States Pat. & Trademark Off. v. Booking.com B. V.*, 591 U.S. 549 (2020) ....................... 8

*Walter v. Mattel, Inc.*,
    210 F.3d 1108 (9th Cir. 2000) ........................................................................................... 23

**Statutes**

15 U.S.C. § 1051(b)(1) ............................................................................................................. 5, 18

15 U.S.C. § 1114 ............................................................................................................................. 6

15 U.S.C. § 1114(1) ........................................................................................................................ 3

15 U.S.C. § 1125(a) .................................................................................................................... 3, 6

Cal. Bus. & Prof. Code § 17200 .................................................................................................... 3

**Other Authorities**

Hannah Fernandes, Vera Glonina, William J. Morris & Andreas
        Seling, *AI Washing: An Emerging Topic*, Int'l Trademark Ass'n (Mar. 11, 2026) ............. 1

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................................. 1, 6

## NOTICE OF MOTION AND MOTION TO DISMISS

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that on July 22, 2026 at 9:00 a.m., or as soon thereafter as this motion may be heard in Courtroom 3, 5th Floor, of the above-entitled court, located at 280 South First Street, San Jose, California, defendant Adobe Inc. ("Adobe" or "Defendant") will and hereby does move, under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rules"), to dismiss the First Amended Complaint ("FAC") filed by plaintiff The Foundry Visionmongers Ltd. ("Foundry Visionmongers" or "Plaintiff") on May 26, 2026 (Dkt. 38). This motion is based on this Notice of Motion; the accompanying Memorandum of Points and Authorities, Request for Consideration, and Declaration of Oscar Ramallo ("Ramallo Decl."); the pleadings and papers on file in this matter; and such other matters as may be presented to the Court at the hearing.

### STATEMENT OF RELIEF SOUGHT / ISSUES TO BE DECIDED

Adobe seeks dismissal of the entire FAC with prejudice under Rule 12(b)(6) on the grounds that Foundry Visionmongers has not pleaded and, as a matter of law, cannot plead infringement of its alleged trademarks.

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Foundry Visionmongers' FAC fails to state any claim for which relief can be granted. In an attempt to bolster the deficient allegations set forth in its original Complaint, Foundry Visionmongers attempts to "AI wash" its products—the CopyCat machine learning plug-in, the Cattery library of CopyCat machine learning models, and the Griptape orchestration tool—by conflating their machine learning algorithms and orchestration capabilities with generative AI.[1] But Foundry Visionmongers pleads no facts establishing that the parties' sophisticated clientele are unable to distinguish between machine learning in general and generative AI that turns text prompts

---

[1] "AI washing" refers to a phenomenon "in which companies overstate or misrepresent the use of artificial intelligence (AI) in their products and services." Hannah Fernandes, Vera Glonina, William J. Morris & Andreas Seling, *AI Washing: An Emerging Topic*, Int'l Trademark Ass'n (Mar. 11, 2026), https://www.inta.org/news-and-press/inta-news/ai-washing-an-emerging-topic/.

into images, audio, and video, like Firefly Foundry models. The FAC repeatedly attempts to gloss over these critical differences by using the vacuous phrase "AI capable" to describe Foundry Visionmongers' products (*see, e.g.*, ¶¶ 23, 43, 48, 51),[2] but it fails to allege that Foundry Visionmongers offers any service comparable to Adobe's bespoke Firefly Foundry service.

Tellingly, Foundry Visionmongers had no pending trademark applications or registrations for the mark FOUNDRY in connection with artificial intelligence *at all* until October 2025, when it learned that Adobe had launched Firefly Foundry. Within days, Foundry Visionmongers rushed to file "Intent to Use" trademark applications for visual effects software that uses AI "for entertainment, films, games, and video." Exs. 1-3. In other words, Foundry Visionmongers could not aver under penalty of perjury—as required when submitting a trademark application based on actual use—that it was using its FOUNDRY mark for artificial intelligence services prior to Adobe's use of Firefly Foundry.

After Foundry Visionmongers sued Adobe in March 2026, Adobe moved to dismiss the original Complaint because it failed to state a plausible claim of likelihood of confusion between its Foundry-branded visual effects software and Adobe's Firefly Foundry bespoke generative artificial intelligence services. In response, Foundry Visionmongers amended its Complaint and has attempted to rewrite history—now alleging for the first time that "prior to" filing those "Intent to Use" applications, it had "developed common law rights in the use of its FOUNDRY Marks in connection with . . . machine learning and generative AI products and services." ¶ 34. These new allegations do not cure the deficiencies in the original Complaint.

To the contrary, every *Sleekcraft* factor points decisively against a likelihood of confusion: "foundry" is a weak, widely used term in a crowded field; Adobe's mark is presented as "Firefly Foundry" or "Adobe Firefly Foundry," creating a wholly distinct commercial impression; the parties' sophisticated enterprise customers negotiate custom contracts through dedicated sales channels, making cross-brand confusion wildly implausible; and Foundry Visionmongers pleads no actual confusion despite seven months of awareness and ample opportunity to find it.

---

[2] Unless otherwise stated, citations to "¶ __" are to the paragraphs of the FAC; citations to numbered exhibits ("Ex. __") are to the exhibits to the Ramallo Declaration filed herewith.

Because the legal analysis points decisively against a likelihood of confusion, the FAC should be dismissed with prejudice.

**II.   FACTUAL BACKGROUND**

The following facts are taken from the FAC, documents incorporated by reference in the FAC, and judicially noticeable records.

Foundry Visionmongers first sued Adobe on March 11, 2026. Dkt. 1. Adobe moved to dismiss Foundry Visionmongers' original Complaint on May 12, 2026. Dkt. 29. In lieu of opposing Adobe's motion to dismiss, Foundry Visionmongers filed its FAC on May 26, 2026. Dkt. 38. Like its original Complaint, the FAC asserts that Adobe's use of Firefly Foundry constitutes: (1) trademark infringement under 15 U.S.C. § 1114(1); (2) false designation of origin under 15 U.S.C. § 1125(a); (3) California common law trademark infringement; and (4) violation of Cal. Bus. & Prof. Code § 17200 et seq. *Id.*

**A.   Adobe's Firefly and Firefly Foundry generative artificial intelligence services.**

Since 2023, Adobe has offered a family of generative AI models under the brand name "Firefly." ¶ 58, Ex. 5. Firefly allows users to generate new images, video, text, audio, vectors, and 3D using text prompts. ¶ 59. Firefly is offered to a broad range of customers from individual creators to businesses. *Id.*

Building on its Firefly platform, in 2025, Adobe introduced select "Fortune 2000" enterprise customers to a "premium bespoke" managed service called "Firefly Foundry." ¶¶ 53, 59. Through the Firefly Foundry service, a team of Adobe scientists, engineers, and creative workflow experts work directly with each client over several months "to build a unique generative AI model from the ground up, trained exclusively on that company's private data and assets." ¶ 64; Ex. 7. Firefly Foundry is thus "a deep, consultative partnership that feels more like hiring a boutique division of AI experts from Accenture or IBM than licensing a tool." ¶ 64.[3]

---

[3] Apart from Firefly Foundry, the FAC references two other Adobe software products but does not allege they have been marked under the "Firefly Foundry" brand: a visual effects software product branded as Adobe After Effects, and Adobe's suite of software for texture effects, branded as Adobe Substance 3D. ¶ 78. Foundry Visionmongers alleges that these Adobe products compete with its products called Nuke and Mari. *Id.*

**B.      Foundry Visionmongers' history of offering visual effects software.**

Foundry Visionmongers is a London-based company that offers visual effects software products. Most relevant to this dispute, Foundry Visionmongers points to the following:

- **"Nuke."** Foundry Visionmongers' flagship "compositing" software for professional video editing. ¶¶ 8, 14-17.

- **"CopyCat."** A plug-in to Nuke. ¶ 44. Using the CopyCat plug-in, a visual effects artist can manually edit "a small number of frames" of video, and CopyCat uses "machine learning" to automate the repetitive task of editing thousands of additional frames in a similar manner to the manually-edited frames. ¶ 47. For example, an artist can manually paint blue eyes on a character on a small number of frames, and the plug-in will automatically give the character blue eyes in other similar frames. *See* ¶ 48.

- **"The Cattery."** An open-source library on Foundry Visionmongers' website of CopyCat machine learning models are created by third parties. ¶ 49. Foundry Visionmongers warns its clients that models in the Cattery library have not been vetted to ensure the data used to train the models was used lawfully. Ex. 4.1.  Foundry Visionmongers' terms of use expressly prohibit users from submitting anything that uses generative AI to the Cattery. Ex. 4.3.

- **"Griptape."** An "enterprise-grade AI orchestration" tool that coordinates other tools to create efficient workflows. ¶ 51.

The FAC does not allege that any of these tools are generative AI models. It does not allege that these tools can generate video, audio, and other multimodal content from text prompts. Nor does the FAC allege that these tools are a service for training bespoke generative AI models.

Regarding its customer base, Foundry Visionmongers alleges that approximately 60% of its revenue comes from "enterprise customers spending more than $100,000 per year, while the other 40% comes from thousands of small and medium-sized businesses and individuals." ¶ 26. Foundry Visionmongers employs business-to-business sales representatives for "large global studios and large companies." ¶ 27.

**C.    Foundry Visionmongers' trademark registrations for visual effects software.**

Foundry Visionmongers alleges that it owns three trademark registrations: one word mark—FOUNDRY—and two design marks—**FOUNDRY.** and **FOUNDRY.**—all registered on December 4, 2018. ¶ 31. The registrations cover computer software for visual effects, 3D animation, digital image editing, and related services. None of the three registrations covers goods or services involving "artificial intelligence." *Id.*

The FAC further alleges that Adobe infringes the "FOUNDRY Marks" collectively, defining the term to include all three trademark registrations described in Section II.B, *supra*, all three trademark applications described in Section II.D, *supra*, and Foundry.com. ¶¶ 33, 111, 115, 121.

**D.    Foundry Visionmongers' hurried trademark applications for artificial intelligence services after learning of Firefly Foundry.**

On October 20, 2025, Adobe announced its Firefly Foundry service in a press release. *See* ¶¶ 53, 64. On October 22, 2025—just *two days* later—Foundry Visionmongers rushed to file five new intent-to-use trademark applications, three of which are raised in the FAC: a FOUNDRY word mark, and two design marks: **FOUNDRY.** and **FOUNDRY.** . ¶ 33.[4] These applications represent the first time that Foundry Visionmongers has sought U.S. trademark registrations in connection with "artificial intelligence" products and services under the "Foundry" brand name. *Id.*

According to judicially noticeable USPTO records, Foundry Visionmongers filed these trademark applications on an intent-to-use basis, confirming that it was ***not presently offering*** the applied-for services as of the date of its applications. Exs. 1-3. *See* 15 U.S.C. § 1051(b)(1). All five applications remain pending and are currently subject to non-final refusals by the Trademark Office, to which Foundry Visionmongers has not responded. *See* Exs. 1-3.

**E.    Foundry Visionmongers' allegations of "forward" and "reverse" confusion.**

The FAC inconsistently alleges both "forward" and "reverse" confusion theories. Most of the FAC is dedicated to alleging forward confusion, *i.e.*, that "Foundry" is strong and that Adobe's customers are likely to be confused into believing that Foundry Visionmongers is the source or

---

[4] The other two applications are for "F." in a gray circle, and "F." in a yellow circle.

sponsor of Adobe's Firefly Foundry. *See, e.g.*, ¶ 72. Yet, two conclusory paragraphs of the FAC also allege "reverse confusion," *i.e.*, that there is a risk of Firefly Foundry "overtaking and swamping" Foundry Visionmongers' marks. ¶¶ 93-94.

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court need not "accept as true allegations that contradict exhibits attached to the FAC or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

In the trademark infringement context, the Supreme Court has instructed that "if, in a given case, a plaintiff fails to plausibly allege a likelihood of confusion, the district court should dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6)." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 157 n.2 (2023). Thus, "courts have not hesitated to dismiss [trademark] claims at the pleading stage." *Performance Designed Prods. LLC v. Plantronics, Inc.*, 2019 WL 3082160, at *4 (S.D. Cal. July 15, 2019) (citing cases); *see also Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 859–61 (9th Cir. 1996) (affirming Rule 12(b)(6) dismissal with prejudice of infringement claims where no likelihood of confusion existed as a matter of law between marks "America's Talking" and "America Speaks"); *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 793–94 (9th Cir. 1981) (affirming dismissal with prejudice of claim that use of BAGZILLA for garbage bags infringed GODZILLA mark); *Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618, 620, 622 (9th Cir. 2017) (affirming dismissal with prejudice).

## IV.    ARGUMENT

Foundry Visionmongers asserts two claims under the Lanham Act: trademark infringement under 15 U.S.C. § 1114 and false designation of origin under § 1125(a). "[T]he legal analysis under the two sections is essentially identical:" a plaintiff must allege facts to plausibly show "(1) a protectable ownership interest in the mark; and (2) a likelihood of consumer confusion in the defendant's use of its allegedly infringing mark." *Lodestar Anstalt v. Bacardi & Co.*, 31 F.4th 1228,

1245 (9th Cir. 2022) (internal quotation marks omitted). The analysis of Foundry Visionmongers' state law claims is "substantially congruent to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (internal quotation omitted).

Whether under its theory of forward or reverse confusion, the FAC fails to plausibly allege that the parties' sophisticated clients would likely be confused by Adobe's use of Firefly Foundry.

**A.    Foundry Visionmongers' claims fail because it cannot plead a likelihood of forward confusion.**

In the Ninth Circuit, courts assess likelihood of confusion using the eight-factor test set forth in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). When analyzing Foundry Visionmongers' "forward" confusion claim, the court should assess whether Adobe's Firefly Foundry clients are likely to mistakenly believe that Foundry Visionmongers is the source or sponsor of Adobe's service. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630–31 (9th Cir. 2005).

The court assesses these factors from the perspective of the "'reasonably prudent consumer' in the marketplace," *i.e.*, in this case, from the perspective of Adobe's Fortune 2000-level clients who are contemplating entering into a months-long collaboration with Adobe for the development of a bespoke generative artificial intelligence platform. *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010). How an "[u]nreasonable, imprudent, and inexperienced" person might react to the parties' marks is "not relevant." *Id.*

**1.    "Foundry" is a common descriptive mark in the markets in which Foundry Visionmongers seeks to monopolize its use.**

"Foundry" is a common term that content creators, digital artists, and hundreds of businesses in the software and technology industries use to describe what they do. It follows that Foundry Visionmongers' rights in the term "foundry," if any, are weak. This factor favors Adobe.

In analyzing the strength of a mark, courts assess both the mark's "conceptual" and "commercial" strength. *Network Automation*, 638 F.3d 1137, 1149 (9th Cir. 2011). Conceptually, descriptive and suggestive marks are "presumptively weak." *Id.* This presumption of conceptual weakness applies even to "incontestable registrations." *Miss World (UK) Ltd. v. Mrs. Am. Pageants,*

*Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988). The reason that conceptual weakness impacts the likelihood of confusion analysis is that "[w]hen a mark incorporates generic or highly descriptive components, consumers are less likely to think that other uses of the common element emanate from the mark's owner." *United States Pat. & Trademark Off. v. Booking.com B. V.*, 591 U.S. 549, 562 (2020) (internal quotation omitted).

Here, "foundry" is used as a term for a business that creates something for others—similar to the terms "studio" or "lab"—particularly in the technology and design fields. For example, in the technology field, several dictionaries, including one cited by Foundry Visionmongers in its preliminary injunction papers, recognize Intel's business model of manufacturing computer chips for others as a "foundry" model. Ex. 14; *see also* Exs. 13, 15; *Dinan v. SanDisk LLC*, 2020 WL 364277, at *5 (N.D. Cal. Jan. 22, 2020) (taking judicial notice of definition at dictionary.com), *aff'd*, 844 F. App'x 978 (9th Cir. 2021).

Consistent with that meaning, "foundry" has been widely used in the generative AI space, and particularly as a descriptive term for services related to the development of bespoke AI models. For example, in May 2023, Databricks released its "Mosaic LLM Foundry," a toolkit for LLM development. Ex. 24. In November 2023, NVIDIA announced its "NVIDIA AI Foundry" service "for building custom generative AI models." Ex. 17; *see also* Ex. 16. Among other things, NVIDIA's services are marketed to Foundry Visionmongers' core customers: "NVIDIA helps artists, studios, and streaming platforms" that make "today's most successful films and television shows" who rely on NVIDIA for "AI Audio and Video" and its "full-stack platform for AI-enabled media workflows." Ex. 18. Similarly, since 2024, Microsoft has offered "Microsoft Foundry," a "unified Azure platform-as-a-service for enterprise AI operations, model builders, and application development," which has also been specifically marketed to clients in the entertainment industry. Ex. 19; *see also* Exs. 20-21. Use of the term "foundry" to refer to a custom-AI service is also widespread beyond development of custom models for the entertainment industry, including "Salesforce AI Foundry," "Palantir Foundry," and "MosaicML LLM Foundry" for various enterprise AI applications. Exs. 22-24; *see also Naimi v. Starbucks Corp.*, 2018 WL 11255596, at *2 (C.D. Cal. Feb. 28, 2018) (taking judicial notice of word usages on a motion to dismiss).

In fact, the USPTO's Principal Register of trademarks reflects that there are at least 429 live trademark registrations or applications using the term "foundry." *See Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1374 (Fed. Cir. 2015) (holding trademark registrations "show the sense in which a mark is used in ordinary parlance"). Ignoring this indisputably crowded field, Foundry Visionmongers alleges that "[t]here are no other registrations for FOUNDRY or FOUNDRY-formative marks in the visual effects space" (¶ 32). But that is false. The register is replete with examples of "foundry" marks in fields in which Foundry Visionmongers operates or in complementary fields. These include:

- FOUNDRY 360 for "creating … articles, video, and other multimedia";
- MOVE FOUNDRY for "video production" and "animation production" services;
- EXPERIENCE FOUNDRY for "[g]raphic design services";
- FUTURIST FOUNDRY for "[g]raphic design" services;
- SONIC FOUNDRY for "software for … digital multimedia files";
- SPARK FOUNDRY for "graphic arts designing";
- THINK FOUNDRY WEST for "[p]ost-production video editing";
- THINK FOUNDRY for "[p]ost production editing services for video"; and
- PROFOUNDRY for "post-production editing of advertising".

Ex. 25; *see also* Exs. 26-27.

The Court can and should take judicial notice of these marks on the Principal Register to determine that Foundry Visiomogners' claim to own the exclusive use of "foundry" in fields related to "visual effects" is incorrect. *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) (taking judicial notice of USPTO files to determine meaning of word).

In an attempt to overcome the conceptual weakness of "foundry," the FAC adds a new wholly conclusory "allegation" that "foundry" is "conceptually strong, suggestive . . . (if not arbitrary) because it requires significant imagination to associate it with Plaintiff's products and services (rich media AI-enabled digital content creation and VFX solutions)." ¶ 42. But no such imagination is required when there are already hundreds of marks using "foundry" in the sense of a studio or lab, including market leaders in AI-enabled digital content creation like NVIDIA and

Microsoft. If Foundry Visionmongers' customers need imagination to associate the word "foundry" with its digital content creation tools, it may well be because none of those tools are in fact named "foundry."

Foundry Visionmongers fares no better with commercial strength, because a mark is commercially weaker when it exists in a "crowded field." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002). When there are many similar marks in the marketplace, "customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Id.* Here, despite NVIDIA and Microsoft—two of the largest corporations in the world—competing for the same entertainment industry customers as Foundry Visionmongers and the existence of hundreds of other "foundry" brands, there are no allegations of any confusion whatsoever in the FAC between those brands and Foundry Visionmongers' offerings.

### 2.    The Firefly Foundry mark and the Foundry house mark are not presented similarly in the marketplace.

No reasonably prudent customer is likely to perceive "Foundry" and "Firefly Foundry" as "identical" or "virtually identical" when encountering them in the marketplace, further dispelling any likelihood of confusion. "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351. When analyzing similarity, "[a] court should not myopically focus on only the alleged [infringing] marks to the exclusion of the entire product or even common sense." *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1080 (9th Cir. 2020). Rather, the marks must be "considered in their entirety and as they appear in the marketplace." *Id.*

In *Arcona*, for example, the plaintiff owned a trademark registration for EYE DEW for a skin care product. 976 F.3d at 1076. The defendant also sold a skin care product named EYE DEW. *Id.* The parties' products were sold in the same stores in the same geographic area. *Id.* The Ninth Circuit held, as a matter of law, that "no reasonable consumer would be confused by these two products . . . because the packaging, size, color, shape, and all other attributes" of the products were not similar. *Id.* at 1080–81. Despite identical marks, no confusion was likely as a matter of law because the plaintiff's product was labeled with its house mark ARCONA, while the defendant's product was labeled with its house  fmark FARMACY; *see also Pocket Socks, Inc. v. Louis Vuitton*

*N. Am., Inc.*, 2025 WL 1239348, at *1, 4 (S.D. Cal. Apr. 29, 2025) (granting motion to dismiss where the plaintiff owned a trademark registration for POCKET SOCKS for socks with a zippered pocket, and the defendant also sold a pocketed sock called "Pocket Socks" based on inclusion of different house marks, pricing, and marketing channels).

Here, the parties' marks are presented in an entirely distinct fashion, *e.g.*:





¶¶ 18, 59.[5] On its webpage, Adobe emphasizes that Firefly Foundry is an Adobe service featured on the "Adobe for Business" webpage and called "Adobe Firefly Foundry," incorporating both its famous Adobe house mark and its well-known Firefly brand. By contrast, Foundry Visionmongers emphasizes the "Nuke" brand, its allegedly well-known and multi-award-winning compositing

[5] The red boxes on the screenshot of the Adobe webpage are additions by Foundry Visionmongers in its FAC.

software. The webpage uses the **FOUNDRY.** house mark, which is distinct from the **Adobe for Business** house mark that appears in the corresponding location of Adobe's page. Moreover, Foundry Visionmongers does not allege that it has any product or service named "foundry." It is thus wholly implausible that Adobe's customers would view Firefly Foundry as a Foundry Visionmongers product. *See Fizz Soc. Corp. v. Maplebear, Inc.*, 791 F. Supp. 3d 990, 1009 (N.D. Cal. 2025) (while both parties had the identical mark FIZZ, the difference in how they were presented on the parties' websites "makes the marks not very similar").

Even apart from this marketplace context, confusion between Firefly Foundry and Foundry remains implausible. *Arcona*, 976 F.3d at 1080. Firefly Foundry has a different meaning from Foundry. Standing alone, "foundry" could refer to many types of commercial establishments offering services for others, particularly in the AI, computer technology, or visual design space. *See* Section IV.A.1, *supra*. Firefly Foundry, on the other hand, contains an arbitrary term—Firefly— that distinguishes it from Foundry by referring to Adobe's specific and distinctive generative AI offering, Adobe Firefly. *See Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980) (holding ALPHA STEEL is distinct from ALPHA because the addition of "STEEL" indicated a "different origin"). And the arbitrary term, Firefly, at the start of the mark dominates over the descriptive term, Foundry, at the end of the mark. *See Citigroup Inc. v. Cap. City Bank Grp., Inc.*, 637 F.3d 1344, 1351 (Fed. Cir. 2011) (holding CAPITAL was the dominant portion of CAPITAL CITY BANK and distinguished it from the CITIBANK mark). Unlike "Foundry," which hundreds of companies use to describe their products or services, Firefly Foundry can only refer to Adobe, not any other source of goods and services.

To try to manufacture a closer connection between the brands, the FAC alleges, misleadingly, that Adobe uses the standalone term "Foundry" to promote Firefly Foundry, citing a press release announcing the Firefly Foundry service as an example. ¶ 58. But the press release underscores how unlikely confusion is. To start, here is the headline:



It features a dominant fire-engine red Adobe logo, which is entirely distinct from any branding Foundry Visionmongers presents in its FAC. *See* Ex. 5. The text begins with "Adobe launches," and the word "foundry" appears in the headline only in its descriptive sense of describing a "foundry service." *Id.* The body of the press release describes the "Adobe AI Foundry" service built upon "Adobe's Firefly family of AI models," and names "Adobe" nine times across eleven paragraphs. *Id.* Moreover, it does not describe any software product that could be licensed by Foundry Visionmongers. To the contrary, it describes a "highly personalized" service that Adobe launched after Adobe's customers asked Adobe to "come in and advise us, help us, partner with us, be our premier creative marketing AI partner on this." *Id.* Nothing about the press release is likely to cause consumers to believe that Foundry Visionmongers, rather than Adobe, is the source of Adobe's services, and the Court should disregard the FAC's conclusory allegations to the contrary. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.") (internal quotation omitted).

Foundry Visionmongers also cites a screenshot of an Adobe interface in which it contends that Adobe presents "Foundry" as a "standalone tool" from Adobe's Firefly models. ¶ 63. *Id.*

But the screenshot itself undermines Foundry Visionmongers' assertion. The dropdown menu prominently displays Adobe's Firefly fire engine red "Fi" logo directly next to the word "Foundry," clearly identifying it as a model within Adobe's Firefly ecosystem as opposed to any sort of product offered by Foundry Visionmongers. Moreover, Firefly Foundry models are only available to clients who have undergone a months-long process of partnering with Adobe to create them. *See* ¶ 64. It is implausible that a client who spent months working personally with Adobe to develop the model would believe that Foundry Visionmongers, rather than Adobe and the client, had developed it.

In the same vein, the FAC alleges that "Adobe and third parties have consistently truncated Firefly Foundry to Foundry." ¶ 62. But in every example offered in the FAC, "foundry" was used in context with "Adobe," "Firefly," or both, in such a manner that no reasonably sophisticated consumers could be confused into believing that Foundry Visionmongers was the source of Adobe Firefly Foundry. *See* FAC, Ex. D.

Foundry Visionmongers also alleges that Adobe marketed its Firefly Foundry service in a confusingly similar manner to Foundry Visionmongers' design marks on the Sphere in Las Vegas during the 2026 National Association of Broadcasters (NAB) conference. ¶ 71. But again, the cited examples themselves disprove this: "Foundry" did not appear on the Sphere; "Powered by Adobe Firefly Foundry" did. And Adobe used a different color (Adobe red), font, capitalization, and used an ordinary period at the end of a sentence (as opposed to a stylized large yellow dot after one word). *Id.* Foundry Visionmongers does not have a monopoly on the right to use periods in sentences that end in the word "foundry."

Finally, Foundry Visionmongers points to a comment made by Hannah Elsaker during a panel at the NAB show, where she stated that Firefly Foundry was "not to be confused with the gentleman to my left, Foundry, Foundry." ¶ 101. This statement confirms that Adobe is careful to avoid confusion, and a statement that expressly distinguishes Adobe's offerings from those of Foundry Visionmongers is unlikely to confuse anyone. Because the parties' marks as presented in the marketplace are entirely distinct from each other, this factor strongly favors dismissal.

**3.     Adobe offers a service to develop custom generative AI models, while Foundry Visionmongers offers a machine learning tool that automates rote tasks.**

The parties sell fundamentally different things—an end-to-end consultative service for building bespoke generative AI models versus an off-the-shelf plug-in that automates repetitive editing. This lack of relatedness of goods and services further favors dismissal.

**a.     Foundry Visionmongers has never offered a service to develop bespoke generative AI models or anything similar to such a service.**

Related goods or services are those "which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n.10 (citation omitted). However, "[t]he mere fact that two products or services fall within the same general field . . . does not mean [they] are sufficiently similar to create a likelihood of confusion." *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1092 (C.D. Cal. 2003) (internal quotation marks omitted) (citing cases); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 288 (3d Cir. 2001) (physical merchandise theft deterrent products sufficiently different from firewall software); *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003) (different music genres unrelated); *Nautilus Grp., Inc. v. Savvier, Inc.*, 427 F. Supp. 2d 990, 997 (W.D. Wash. 2006) (two pieces of exercise equipment unrelated).

Here, the parties' offerings here are distinct. Adobe's Firefly Foundry is "a deep, consultative partnership that feels more like hiring a boutique division of AI experts from Accenture or IBM than licensing a tool." ¶ 64. Materials incorporated in the FAC describe the service as requiring months of work from a team of applied scientists, engineers, and creative workflow experts. ¶ 64; Ex. 7. The result of that effort is a bespoke AI model trained on the customer's intellectual property and branding that allows the customer to generate video, images, and audio from natural language prompts. ¶ 59. *See Matrix Motor Co.*, 290 F. Supp. 2d at 1092 (holding custom MATRIX car unrelated to mass-produced Toyota Matrix). Plaintiff offers nothing comparable.

***CopyCat.*** Attempting to retroactively AI wash its products, Foundry Visionmongers alleges that its "AI strategy began with its introduction of CopyCat." ¶ 44. But CopyCat is neither a service

for creating a generative AI model, nor a generative AI model itself. Rather, CopyCat uses machine learning to automate repetitive tasks. *See* ¶ 47. While the FAC seeks to conflate a tool that automates rote image-editing tasks with AI models that generate new multimodal audiovisual content from scratch, there are no facts pleaded in the FAC suggesting that the parties' sophisticated clients would conflate the two. *See M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1084 (9th Cir. 2005) (holding sophisticated purchasers would not be confused between music management databases and a record label).

*Cattery.* As Cattery is a library of Copycat machine learning models posted by third parties, it follows that the machine learning models are inherently limited in the same way that any implementation of CopyCat is: they are merely automating rote tasks. ¶ 49. Unlike Firefly Foundry's generative AI models, the machine learning models on Cattery are not trained on a client's brand guidelines or intellectual property portfolio. Nor are they even trained by Foundry Visionmongers. To the contrary, the Cattery page contains a prominent disclaimer that the user should beware of the data's provenance and that Foundry Visionmongers "does not certify or approve, nor are we responsible for, the licensing or legal framework" of the data used in the machine learning model. Ex. 4.1. And Foundry Visionmongers' terms of use expressly prohibit third-party contributors to submit any materials involving generative artificial intelligence. Ex. 4.3. No sophisticated purchaser would confuse an open-source library such as this with a service to work with Adobe to lawfully train on the client's intellectual property to develop generative AI models.

*Griptape.* Griptape is even further afield. It is neither a generative AI model, nor even a machine learning tool. Rather, it is a software tool that orchestrates the workflow of other tools, some of which may incorporate AI. ¶ 51; Ex. 4.2. There are no facts alleged in the FAC that support Foundry Visionmongers' implicit argument that sophisticated consumers conflate a workflow orchestration tool with a generative AI model or a partnership to develop a bespoke model.

*Nuke and Mari.* Unable to allege any plausible similarity between Adobe's Firefly Foundry and its own products, Foundry Visionmongers also alleges that *other* Adobe software products, *i.e.*, Adobe After Effects and Adobe Substance 3D, compete directly with Foundry Visionmongers' Nuke and Mari, respectively. ¶¶ 76, 78. These assertions are irrelevant because the FAC does not

allege Adobe After Effects or Adobe Substance 3D infringe Foundry Visionmongers' trademark rights. The parties' competing software products are branded with names that are entirely distinct in sight, sound, and meaning (*i.e.*, Adobe After Effects vs. Nuke; and Adobe Substance 3D vs. Mari). And the webpages to which the FAC links confirm that After Effects and Substance 3D are branded as "Adobe" products. Exs. 10-12.

Foundry Visionmongers attempts to muddy the waters by asserting that VFX professionals might use both Adobe and Foundry Visionmongers products as "complementary" products or "in conjunction" with each other on a project (¶¶ 76, 78) but that mere fact does not support a likelihood of confusion. Professionals using sophisticated tools like these in the same workflow would be highly capable of distinguishing between them and unlikely to become confused while using products they had already separately licensed. *Network Automation*, 638 F.3d at 1152–53 (holding sophisticated parties could distinguish "virtually interchangeable" software products).

Similarly, Foundry Visionmongers asserts that Adobe "seamlessly integrate[s]" Firefly Foundry "across the Adobe ecosystem" (¶ 80), seeming to suggest that Firefly Foundry models are available to anyone in the general public who buys Adobe's products. That suggestion is false. As the FAC concedes, Firefly Foundry is a "bespoke" service offered to "Fortune 2000" companies in which "the AI model is trained only using the particular customer's IP." ¶ 59. Firefly Foundry models are not seamlessly available **to the general public** across Adobe's ecosystem. For those select clients for whom a Firefly Foundry integration is available, it is implausible that these clients, who have worked closely with Adobe for months to integrate Firefly Foundry models into Adobe products, would believe that Foundry Visionmongers made them.

In short, Adobe offers a service for developing a bespoke generative AI model delivered as an enterprise consultancy engagement; Foundry Visionmongers offers off-the-shelf professional visual effects software with a machine learning plug-in that automates certain rote tasks. ¶¶ 14-17, 47, 48, 51. These products and services are distinct, and the parties' sophisticated clients could not plausibly confuse them.

### b. Foundry Visionmongers' intent-to-use applications grant it no enforceable rights.

Foundry Visionmongers' intent-to-use applications covering "artificial intelligence" products and services do not save its claims; to the contrary, they confirm their lack of merit. "[T]rademark rights are not conveyed through mere intent to use a mark commercially." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999). Thus, an intent-to-use application confers no substantive rights until a statement of use has been filed and accepted. *Mkt. Corner Realty Assocs., LLC v. CGM-GH LLC*, 2004 WL 1077918, at *1 (S.D.N.Y. May 13, 2004) (holding a plaintiff could not invoke trademark priority based on a pending "intent to use" application); 15 U.S.C. § 1051(b).

Moreover, the FAC concedes that Foundry Visionmongers filed its intent-to-use applications *after* Adobe broadly announced its Firefly Foundry service—and long after other major technology companies, such as Databricks, NVIDIA, and Microsoft, had been widely using the term "Foundry" to market generative AI services. *See* ¶¶ 33, 53. Thus, any rights Foundry Visionmongers might hypothetically acquire from those applications if they matured into registrations are inferior to the rights of multiple other companies, and are subject to cancellation. *See Spin Master, Ltd. v. Zobmondo Ent., LLC*, 944 F. Supp. 2d 830, 850 (C.D. Cal. 2013) (holding intent-to-use application does "not confer common law priority"); *Nerdio, Inc. v. NerdIO Ltd.*, 2024 WL 2978518, at *17 (T.T.A.B. May 14, 2024) (canceling intent-to-use based registration where the registrant's actual use post-dated the petitioner's actual use). And the new, conclusory allegation in the FAC that Foundry Visionmongers has common law rights for these goods and services (¶ 35) is nothing more than a "formulaic recitation" of one of the elements of its claims, which "will not do" to prevent dismissal. *Iqbal*, 556 U.S. at 678.

### 4. Foundry Visionmongers has yet to allege even a single example of actual confusion.

The FAC was filed more than seven months after Foundry Visionmongers learned of Adobe's use of Firefly Foundry. *See* ¶¶ 53, 55. The FAC is filled with suppositions about how the parties' sophisticated clientele could be confused by Adobe's mark, but it is devoid of any allegation

---

that Foundry Visionmongers has conducted a consumer survey to test those suppositions, despite ample time and resources to do so. The FAC is also devoid of even a single example of actual confusion, despite alleging that such confusion is "inevitable." ¶ 72. Accordingly, this factor weighs heavily in favor of dismissal. *Sleekcraft*, 599 F.2d at 353 (the actual confusion "factor is weighed heavily . . . when the particular circumstances indicate such evidence should have been available.").

**5. The parties' specialized services are expensive and sold to sophisticated consumers.**

The degree of sophistication of the buyers of Firefly Foundry and Foundry Visionmongers' products essentially rules out any possibility of confusion. "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. "Confusion is less likely where buyers exercise care and precision in their purchases." *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937 (9th Cir. 2015) (quoting *Sleekcraft*, 599 F.2d at 353); *see also Network Automation*, 638 F.3d at 1152–53 ("[C]onsumers who use the internet for shopping are generally quite sophisticated about such matters.") (quoting *Toyota Motor Sales*, 610 F.3d at 1178).

Here, on both sides, the parties' services and consumers are of the kind that make confusion extremely unlikely. Foundry Visionmongers offers professional visual effects software to customers including "major feature film studios," "post-production houses," "independent studios, film makers, animators, content creators," and "VFX and animation professionals." ¶¶ 4, 14-15, 44-47. *See Oculu, LLC v. Oculus VR, Inc.*, 2015 WL 3619204, at *16 (C.D. Cal. June 8, 2015) (holding "tech-savvy" customers, as a matter of law, are unlikely to confuse the OCULU video streaming company with the OCULUS video headsets).

Similarly, Firefly Foundry is unavailable and unaffordable to the general public; it is offered to specific Fortune 2000 clients who engage Adobe directly to build their custom AI models. *See* ¶¶ 53, 59. It is therefore implausible that the parties' consumers would be confused by their respective marks. *See Dfinity Found. v. Meta Platforms, Inc.*, 2022 WL 16857036, at *11 (N.D. Cal. Nov. 10, 2022) ("If web purchasers, particularly purchasers of sophisticated items, exercise a higher degree of precision in their dealings with and understanding of the internet, the developers to which Dfinity

markets its software are perhaps multitudes more sophisticated and exercise a correspondingly higher degree of care.").

### 6.    The parties' personalized marketing to sophisticated buyers eliminates a likelihood of confusion.

The marketing channels factor favors dismissal because the parties reach customers through direct, individually negotiated enterprise relationships, leaving no shared channel in which a buyer could mistake one for the other. This factor "is concerned with where, how, and to whom the parties' products are sold." *Athleta, Inc. v. Pitbull Clothing Co.*, 2013 WL 142877, at *9 (C.D. Cal. Jan. 7, 2013) (internal quotation omitted). It also considers "the sales and marketing methods employed, and the class of purchasers exposed to the marketing efforts." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876–77 (9th Cir. 2014).

Here, Foundry Visionmongers alleges that 60% of its revenue comes from enterprise customers spending more than $100,000 per year. ¶ 26. For these customers, Foundry Visionmongers "employs Enterprise Sales Managers to handle B2B sales, solution selling, and account management for large global studios and large companies." ¶ 26. Similarly, the Firefly Foundry service is a "bespoke" service that requires Adobe's clients to negotiate a commercial contract. *See* ¶ 64.

It is implausible that an experienced corporate purchaser dealing personally with her contacts at Adobe would believe she is purchasing a service from Foundry Visionmongers. *Bruker Nano, Inc. v. Beijing Transcend Vivoscope Bio-Tech., Co.*, 2025 WL 3089552, at *2 (S.D. Cal. Nov. 5, 2025) (holding that likelihood of confusion is "almost nil" where "Ph.D.-level scientists and research professionals, who are familiar with the product specifications, negotiate directly with vendors (*e.g.*, at the upcoming neuroscience conference), and make deliberate procurement decisions after extensive evaluation") (quoting *M2 Software*, 421 F.3d at 1084); *see also Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 718 (Fed. Cir. 1992) (holding confusion is unlikely where goods or services "are expensive and purchased *only* by experienced corporate officials after significant study and contractual negotiation").

For example, Foundry Visionmongers alleges that confusion is likely because the parties are "members of the same trade organizations" and "present products to consumers—and frequently attend as sponsors in the same tier—at trade shows." ¶ 92. But Foundry Visionmongers fails to explain how sophisticated clients who attend trade conferences and understand the marked differences between a service to develop custom generative AI models and a software plug-in that uses machine learning to automate rote tasks could be confused at a trade conference.

Unable to plausibly allege that the enterprise purchasers of Firefly Foundry are likely to be confused, Foundry Visionmongers speculates that purchasers of the parties' consumer-grade products, such as "recreational filmmakers and content creators, and AI and digital technology enthusiasts," could be confused. ¶ 87. Such speculations fail to support a plausible claim for relief because Firefly Foundry is not available to ordinary consumers, and none of the consumer-grade products offered by Adobe are branded with "foundry." Indeed, in a likelihood of confusion analysis, "[t]he relevant group for showing confusion is the consuming public for the particular good or service—that is, consumers who are actually in the market for the good or service at issue." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012) (internal quotation marks omitted). Foundry Visionmongers cannot save its defective claims by adopting "an overly expansive understanding of the relevant market" that includes hypothetical consumers who cannot buy Firefly Foundry services and who have no "foundry"-branded products or services available to them from Adobe. *Id.*

**7.  Foundry Visionmongers offers only boilerplate allegations that Adobe intended to capitalize on its goodwill.**

Under the intent factor, courts look to "whether defendant in adopting its mark intended to capitalize on plaintiff's good will." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1043 (9th Cir. 2010) (internal citation omitted). "[P]rior knowledge of a [plaintiff's] trademark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, 668 F. Supp. 3d 1025, 1043 (C.D. Cal. 2023), *aff'd*, 2024 WL 4750497 (9th Cir. Nov. 12, 2024) (quoting *Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1195–96 (N.D. Cal. 2015)).

Here, Foundry Visionmongers' only allegations about intent are conclusory boilerplate assertions that "Adobe's conduct is intentionally malicious, willful and wanton" and "intentional, willful, and bad faith." ¶ 107. Foundry Visionmongers entirely fails to reckon with the far more obvious explanation that Adobe's selection of "Firefly Foundry" was related to the multiple pre-existing generative AI "foundry" services (a class of service providers that does not include Foundry Visionmongers). *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 2026 WL 1593307, at *6 (U.S. Jun. 4, 2026) (holding a pleading that does not "rule out obvious alternative explanation[s] for the defendant's conduct" is implausible) (internal quotations and citations omitted). Accordingly, the intent factor favors dismissal.

**8.    Foundry Visionmongers does not allege either party is likely to offer the same products or services under a "foundry" mark.**

The final *Sleekcraft* factor asks whether there is a "strong possibility that either party may expand his business to compete with the other." *Sleekcraft*, 599 F.2d at 354 (internal quotation omitted). Here, the FAC does not suggest that the parties intend to offer the same goods or services under a "foundry" mark, nor does it contain any allegations that either party is likely to expand into the other's line of business under a "foundry" mark. Indeed, Foundry Visionmongers does not allege that it has plans or even the capability to help customers develop bespoke generative AI models. Likewise, there are no factual allegations that Adobe will brand any of its other products with "foundry" marks.

* * *

Because the balance of *Sleekcraft* factors points against a likelihood of confusion, the FAC fails to state a claim for trademark infringement and false designation of origin.

**B.    Reverse confusion is implausible because both Adobe and Foundry Visionmongers are widely-known among the relevant purchasers.**

In sharp tension with its principal theory of forward confusion, Foundry Visionmongers also asserts a reverse confusion theory in two conclusory paragraphs of its FAC. ¶¶ 93-94. The reverse confusion doctrine protects a relatively unknown plaintiff's "identity from being overwhelmed by a

larger [defendant] who has saturated the market with publicity." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002). "[R]everse confusion occurs when consumers dealing with the senior mark holder [allegedly Foundry Visionmongers] believe that they are doing business with the junior [mark holder] [*i.e.*, allegedly Adobe[6]]." *Surfvivor*, 406 F.3d at 630.

Foundry Visionmongers' allegations are fatally inconsistent with a reverse confusion theory. First, the FAC is replete with allegations that undermine the fundamental premise of a reverse confusion theory—that the Foundry mark is so commercially weak it could be "overtake[n]" by Adobe's use of Firefly Foundry. *Cohn*, 281 F.3d at 841. And the FAC's new allegations further undermine Foundry Visionmongers' reverse confusion argument. Foundry Visionmongers alleges that it is a "global leader" (¶ 14) and that it is "known for its portfolio of award-winning content creation products" (¶ 2). It lists a litany of awards and public recognition that it has received, including a 2021 Engineering Excellence Award from the Hollywood Professional Association and a 2026 Product of the Year Award at the 2026 NAB show for Nuke, which it added in the FAC (¶ 5), and extensively details its history of working with major Hollywood studios (¶ 14). In short, it extensively alleges commercial strength, not a scenario where its "weaker mark is pitted against [Adobe's] . . . far stronger mark." *Cohn*, 281 F.3d at 841 (internal quotation omitted).

Even assuming that Foundry Visionmongers did not have sufficient commercial strength to avoid reverse confusion, it is implausible that Foundry Visionmongers' customers would be exposed to Adobe's use of Firefly Foundry and come to believe they are dealing with Adobe, rather than Foundry Visionmongers, based on the allegations of how Adobe has used Firefly Foundry. And while "the use of house marks 'can aggravate reverse confusion' in some cases, this is not one of them." *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) (Mattel's use of "Barbie" in "Pearl Beach Barbie" prevented reverse confusion with "Pearl Beach" mark and stating that "although the use of house marks can aggravate reverse confusion in some cases, this is not one of

---

[6] As discussed in Section IV.A3.b., *supra*, Adobe in fact is the *senior* user for a service to develop bespoke AI models. Regardless, for the reasons set forth herein, Foundry Visionmongers' reverse confusion allegations fail even if Adobe were the junior user.

them") (internal quotation omitted); *Aliign Activation Wear, LLC v. Lululemon Athletica Canada, Inc.*, 2022 WL 3210698, at *1 (9th Cir. Aug. 9, 2022) (same).

Indeed, when Foundry Visionmongers uses "foundry," it uses it as a house mark, not as the name of any product or service. By contrast, the top-level house mark that Adobe uses is *Adobe*. It is thus unlikely that Foundry Visionmongers' potential customers who see Adobe's marketing for an Adobe service will start believing the services are associated with Foundry Visionmongers when the service is prominently identified as a service in which a customer consults with a team of Adobe engineers and other professionals to create a bespoke AI model. *See* FAC Ex. D. Taken together, the differences in house marks, branding, price, contracting parties, and product nature all point to the same conclusion: a reasonable Foundry Visionmongers customer could not plausibly believe that she is transacting with Adobe. *See* Section IV.A.1, *supra*. These factors foreclose any inference of reverse confusion as a matter of law.

## V.   CONCLUSION

Foundry Visionmongers fails to plead, and cannot plead, facts establishing a likelihood of confusion between the parties' marks. The FAC should be dismissed with prejudice without leave to amend.

Dated: June 9, 2026.

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By:  */s/ Dori Ann Hanswirth*

DORI ANN HANSWIRTH
JOSEPH FARRIS
OSCAR RAMALLO
HAFEEZ KHAN

*Attorneys for Defendant Adobe Inc.*